**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | |
|---|---|
| LAURIE-JO STRATY, TEXAS ALLIANCE FOR RETIRED AMERICANS and BIGTENT CREATIVE, <br><br> Plaintiffs, <br><br> vs. <br><br> GREGORY ABBOTT, in his official capacity as Governor of the State of Texas; and RUTH HUGHS, in her official capacity as Texas Secretary of State, <br><br> Defendants. | Civil Action No. 1:20-cv-1015 <br><br> Related to: <br> *Texas League of United Latin American Citizens v. Abbott*, No. 1:20-cv-1006 |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs Laurie-Jo Straty, Texas Alliance for Retired Americans, and BigTent Creative (together, "Plaintiffs") file this Complaint for Declaratory and Injunctive Relief against Defendant Gregory Abbott, in his official capacity as Governor of the State of Texas, and Ruth Hughs, in her official capacity Texas Secretary of State (together, "Defendants"). This Complaint challenges the constitutionality of Governor Abbott's October 1, 2020 proclamation that prohibits Texas counties from providing voters with more than one location to return their marked mail-in ballots. In support of their claims and request for relief, Plaintiffs allege as follows:

### NATURE OF THE CASE

1.      In their latest ploy to suppress the vote, which they have thinly veiled as an attempt to "enhance[e] ballot security," Defendants have ordered that there can only be one location in each county where voters can return their marked mail-in ballots directly to the county election administration. This means that thousands of Texans who *must* vote by mail to avoid the risk of

COVID-19 infection will be prevented from dropping off their mail-in ballots at secure county drop-off locations.  For many voters who will vote by mail, the nearest drop-off location will now be dozens or even hundreds of miles away, forcing those voters to travel long distances to deliver their ballots to their county's election administration or to put their ballots in the care of the overburdened, unreliable United States Postal Service ("USPS")—which has explicitly informed Defendants that election mail will be delayed in Texas. This latest effort to take away Texas voters' access to voting during the pandemic imposes a significant, unjustifiable burden and must be immediately enjoined.

2.     The first case of COVID-19 in Texas was confirmed on March 4, and Governor Abbott declared a state of disaster nine days later. By the beginning of April, every Texan was under a stay-at-home order and Governor Abbott postponed the scheduled May local elections until November to avoid community spread of infection. However, the governor quickly succumbed to mounting political and economic pressure to open the state back up, which resulted in the dramatic rise in rates of infection over the summer months. As of October 1, less than seven months after the state's first case of COVID-19, Texas has seen 752,501 confirmed cases and 15,823 people have died.  Texans age 65 and older constitute approximately 70% of those fatalities, despite that age group making up less than 13% of the state's overall population. While tragic, this figure is not surprising: before the novel coronavirus even touched U.S. soil, epidemiologists warned that individuals above the age of 65 and individuals with certain underlying heath conditions are particularly vulnerable to COVID-19's most severe complications.

3.     The Texans whose age puts them at the highest risk of severe complications from the virus are, fortunately, eligible to cast their ballots by mail. Still, the right to vote extends beyond just the right to *cast a ballot*. Rather, the right to vote includes "the right to mark a piece of paper

and drop it in a box or the right to pull a lever in a voting booth. The right to vote includes the right to have the ballot *counted*." *Reynolds v. Sims*, 377 U.S. 533, 555 n.29 (1964) (citation and quotation omitted) (emphasis added). Particularly in light of the pandemic and its myriad challenges, the law Plaintiffs challenge here—which derives from Governor Abbott's October 1 "proclamation enhancing ballot security" ("October Proclamation")—will unduly burden and, in some cases, entirely prevent the most vulnerable Texans from having their votes counted in November.

4.      On July 27, 2020—after skyrocketing rates of COVID-19 infection in Texas and calls for expanded voting by mail to protect Texas voters from the risk of infection inherent with in-person voting—Governor Abbott issued a proclamation extending early voting in Texas to October 13 and suspending the Texas Election Code provision that permitted voters to return their mail-in ballots in person only on election day ("July Proclamation"). The July Proclamation permits eligible voters to return their marked ballots to a county drop-off location on election day *or* during the early voting. With the July Proclamation, Texas joined many other states in offering voters the opportunity to return their mail-in ballots at secure, tamper-proof ballot drop-off sites that are available before, during, and after business hours in the weeks leading up to the election so that voters may quickly and efficiently submit their completed ballots as their schedules allow.

5.      The July Proclamation made clear that expanded early voting in person and a bigger window for voters to hand-deliver mail-in ballots was the state's answer (however unsatisfactory) to its citizens' concerns about participating in the November election.  Counties therefore began preparing for a longer in-person early voting period and, at the same time, considered establishing additional mail-in ballot drop-off locations to ensure that voters casting their ballots by mail have ready access to drop-off locations.

6.     The availability of drop-off locations has become absolutely critical in the pandemic. While other means of voting may allow voters to cast their ballots outside of regular business hours, or in a manner that minimizes in-person interactions, or at a location that guarantees their ballot is submitted in time to be counted, drop-off locations provide the only means of voting that guarantee voters *all* of these things, ensuring that even those voters who are vulnerable to the worst complications of COVID-19 and rightfully concerned about the mounting delays in mail service by the USPS have safe and available means of returning their ballots to elections officials in time to be counted. In this vein, the nonpartisan U.S. Election Assistance Commission ("EAC") currently recommends at least one drop-off location for every 15,000 to 20,000 registered voters.

7.     Governor Abbott has ignored this EAC guidance, as well as his constituents' grave concerns and what is plainly required to protect vulnerable Texans' ability to vote in this election. Yesterday—a mere *twelve days* before voting in Texas begins—he issued the October Proclamation, mandating that voters may only return their mail-in ballots to a single designated location in their county of residence ("Ballot Return Restriction"). In issuing this restriction, Governor Abbott threw a wrench in the counties' plans to decrease the burden on voters casting their ballots by mail by providing those voters with a convenient, reliable way to timely return their marked mail-in ballots.

8.     Not only is the Ballot Return Restriction suppressive, it is also perplexing. It represents a drastic about-face to the position taken by the Texas government only *one day earlier*: On September 30, 2020, Texas Attorney General Ken Paxton represented to the Texas Supreme Court that the July Proclamation permitted multiple ballot drop-off locations in each county. As such, "the Secretary of State has advised local officials that the Legislature has permitted ballots

to be returned to any early-voting clerk office." *In re Hotze, et al.*, No. 20-0751, Brief in Supp. of Mandamus Petition at 5 (Tex. Sept. 30, 2020).

9.     The Ballot Return Restriction is sudden, surprising, and surreptitious. It was mandated just days before the start of early voting in a general election that is expected to see the largest voter turnout in years, with an unprecedented number of voters casting their ballots by mail to avoid the risk of COVID-19 infection and serious complications or even death.  Meanwhile, the USPS is overburdened and subject to increasing delays. Thus, many vulnerable voters whose only safe option is voting by mail will have to either (a) hope that USPS delivers their mail-in ballot to the county election office by the deadline or (b) travel great distances and wait in long lines to return their mail-in ballot at the single approved location in their county of residence. The former option poses a significant risk of disenfranchisement based on the unreliability of the postal service, and the latter is simply infeasible for elderly and disabled Texans with no or limited access to reliable transportation or those who have mobility issues. The latter option also exposes voters to the same risks that they were attempting to avoid in voting by mail.

10.     In the following ways, the Ballot Return Restriction directly threatens the right to vote for countless lawful Texas voters. Plaintiffs therefore seek emergency relief from this Court to enjoin the unlawful Ballot Return Restriction.

## JURISDICTION AND VENUE

11.     Plaintiffs bring this action under 42 U.S.C. §§ 1983 and 1988 to redress the deprivation, under color of state law, of rights secured by the United States Constitution.

12.     This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343 because the matters in controversy arise under the Constitution and laws of the United States.

13.     This Court has personal jurisdiction over the Defendants, who are sued in their official capacities only.

14.     Venue is proper in the U.S. District Court in the Western District of Texas pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events that gave rise to Plaintiffs' claims occurred there.

15.     This Court has the authority to enter a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

## PARTIES

16.     LAURIE-JO STRATY is a 65-year-old citizen and resident of and registered voter in Dallas County. Ms. Straty is unable to vote in person because she is particularly vulnerable to the coronavirus due to her multiple sclerosis, which leaves her immunocompromised. She is also unable to stand in line to wait to vote in person because she has an inflamed Achilles tendon. Ms. Straty helps care for her 90-year-old parents, who live in a senior living home. She fears that if she were to vote in person, she would risk exposing them, and other residents of the care facility, to the coronavirus. Because Ms. Straty is aware of reports of widespread issues with USPS, she does not trust that her ballot will arrive on time and be properly counted if she mails it in. Prior to the Ballot Return Restriction, Ms. Straty planned to drop off her ballot in person at a location near her home, a trip that would have taken approximately 5 minutes each way. Because of the Ballot Return Restriction, however, that location is no longer available. Instead, Ms. Straty must drop off her ballot at a location that will require her to travel 20 minutes each way. Ms. Straty is concerned about long lines to drop off her ballot due to congestion at the single drop off location in the county.

17.     The TEXAS ALLIANCE FOR RETIRED AMERICANS ("TARA") is incorporated in Texas as a 501(c)(4) nonprofit, social welfare organization under the Internal Revenue Code. The Alliance has over 145,000 members, composed of retirees from public and

private sector unions, community organizations, and individual activists. It is a chartered state affiliate of the Alliance for Retired Americans. TARA's mission is to ensure social and economic justice and the full civil rights that retirees have earned after a lifetime of work. The Ballot Return Restriction frustrates TARA's mission because it deprives individual members of the right to vote and to have their votes counted, threatens the electoral prospects of progressive candidates whose supporters will face greater obstacles casting a vote and having their votes counted, and makes it more difficult for TARA and its members to associate to effectively further their shared political purposes. TARA and its individual members intend to engage in voter assistance programs. And, for the past several months, TARA has participated in Dallas Votes, a coalition seeking, in part, to guarantee more drop-off locations so its Dallas members are able to guarantee the county's receipt of their marked mail-in ballots without shouldering the burden of traveling long distances and waiting in long lines. TARA would like to educate voters and conduct awareness campaigns about returning mail-in ballots to convenient locations as a superior alternative to returning ballots via USPS because, in increasing the likelihood that these voters' ballots will count, TARA fulfills its organizational mission. TARA is unable to present voters with a feasible alternative to returning mail-in ballots via USPS because the Ballot Return Restriction prevents county election administrators from offering voters convenient locations for personally delivering their mail-in ballots.

18.     BIGTENT CREATIVE ("BigTent") is incorporated in California as an LLC. Plaintiff BigTent is a non-profit, non-partisan voting registration and get-out-the-vote (GOTV) technology organization. BigTent's mission is to use technology to simplify political engagement, increase voter turnout, and strengthen American democracy. It carries out this mission by channeling funds from donors to young people of color to organize within their own communities

using social media platforms. BigTent has registered more than 8,000 new voters throughout the United States for the upcoming November election. In Texas, BigTent has helped over 3,000 voters register to vote. Since the onslaught of COVID-19, BigTent has added additional information to its website; for example, during the primary elections, BigTent offered up-to-date, state-by-state information for voters whose primaries have been postponed, including Texas. The Ballot Return Restriction frustrates BigTent's mission because it presents Texans with significant obstacles in registering to vote, casting their votes, and having those votes counted, thus thwarting political engagement. Because of the burdens on returning absentee ballots created by Defendants, BigTent will be required to divert time and resources to educating its employees and influencers, updating the Texas-specific pages on its website to account for the Ballot Return Restriction, and funding influencer social media posts to inform Texas voters about these obstacles and how they can successfully overcome them. These efforts will reduce the time and resources BigTent is able to spend funding influencers to engage in voter registration efforts within Texas and organizing efforts in swing states. Any resources spent ensuring voters in Texas can successfully return their ballots necessarily takes away from the get-out-the-vote efforts which are crucially needed in other states.

19.     Defendant Gregory Abbott is the Governor of Texas and is named as a Defendant in his official capacity. Governor Abbott issued the proclamation imposing the Ballot Return Restriction, and in doing so acted under color of state law at all times relevant to this action.

20.     Defendant Ruth Hughs is the Secretary of State of Texas and is named as a Defendant in her official capacity. Secretary Hughs is the state's chief elections officer and, as such, is responsible for the administration and implementation of election laws in Texas, including

the Ballot Return Restriction at issue in this complaint. *See* Tex. Elec. Code § 31.001(a). The

Secretary acted under color of state law at all times relevant to this action.

## FACTUAL ALLEGATIONS

### I.    COVID-19's Impact on Early Voting

21.    Virtually all aspects of life in our country today are affected by the unprecedented

COVID-19 pandemic. In Texas alone, more than 752,501 people have been infected with

confirmed cases of the virus; more than 1.8 million people have lost their jobs; and more than

15,823 people have lost their lives. Almost 70% of fatalities in the state have been of Texans age

65 or older, who, along with people that have certain underlying health conditions such as asthma,

diabetes, and cancer, are at increased risk of suffering severe complications from COVID-19.

22.    Though epidemiologists initially expected the rate of infection to decline during the

summer months, Governor Abbott declined to extend early stay-at-home orders and, from mid-

May to July, the State's positively rate tripled, from 6.99% to 20.8%.  Thousands of new COVID-

19 cases continue to be reported daily, and the rate of infection is expected to resurge this fall and

winter.

23.    Even without a statewide stay-at-home order in November, the continuing threat

posed by the pandemic requires that self-isolation and social distancing remain the norm in order

to protect the millions of Texans most vulnerable to the virus's worst complications.

24.    The threat of infection, and the need to socially distance to prevent community

spread of infection, has greatly affected this year's elections in Texas. This is particularly true for

vulnerable voters—individuals age 65 and older and individuals with certain underlying health

conditions. Casting a ballot at a polling location is not a viable option for these vulnerable voters;

their only way to safely vote is by mail, returning their marked ballots either through USPS or at

a ballot drop-off location.

**II.      The Need for Ballot Drop-Off Locations**

25.      Under the Texas Election Code, a voter's returned mail-in ballot must be postmarked by 7:00 p.m. on election day and received by the voter's county election administration by 5:00 p.m. the day after the election.

26.      USPS advises that First-Class mail typically takes between two to five days to arrive at its destination even under normal circumstances. USPS has also recommended (in a pre-COVID-19 world) that jurisdictions ask their citizens to mail their ballots at least a week before ballots are due because of increased mail demands around the time of an election.

27.      Now, in light of COVID-19, there has been a substantial increase in postal delays, and USPS has recently advised elections officials around the country that election mail will take seven to ten days to arrive at its intended destination.

28.      The general counsel of USPS sent Defendant Hughs a letter "strongly recommend[ing]" a timeframe to ensure that ballots arrive to voters and are returned to the counties on time, but the timeframe is unworkable in Texas.

29.      For example, USPS recommends that the Secretary have all voters submit their applications to vote by mail *at least fifteen days before* the election, though the deadline for submitting an application to vote by mail is eleven days before the election under the Texas Election Code.

30.      USPS also recommends that the Secretary allow one week for the ballot to arrive to voters and one week for the voter's marked ballot to arrive back to the county.

31.      But, as discussed above, the deadline to apply to vote by mail is October 23. Assuming the county immediately processes the many applications it will receive from voters on October 23—which is already after the deadline by which USPS "strongly recommends" that vote-by-mail applications should be received by the county—those voters may very well not receive

their ballots from the county until October 30. Assuming next that the voters receiving their ballots on October 30, mark those ballots, and put them back in the mail the same day, based on USPS's instructions and warning county elections administrators likely will not receive those marked ballots back until November 6, two days after the Texas Election Code's receipt deadline. This exact scenario has been illustrated again and again in past elections: the majority of late ballots in every election arrive within a few days of the ballot receipt deadline.

32.     Increased delays at USPS are also attributable to the ongoing budgetary crisis, due to COVID-19, and operational changes that have limited overtime hours for employees and decommissioned mail processing equipment.

33.     Currently, USPS is operating with significantly reduced staff as more and more employees fall victim to the virus: as of mid-August, nearly 10% of all postal workers—or approximately 63,000 of the agency's employees across the country—have tested positive for COVID-19.

34.     Underfunded and understaffed, the USPS will be tasked with processing a much higher volume of mail than it is accustomed to processing for the November election.

35.     The upshot of all this is that as USPS attempts to deliver an unprecedented number of vote-by-mail ballots across the country—both from county elections officials to voters, and then back again—the system will be under heightened pressure, causing increased delays and, ultimately, an increase in the number of ballots that are not received by the county election administrators before the ballot receipt deadline. Those ballots will be left uncounted, and the voters who cast them will be disenfranchised.

36.     The enormous problems with USPS service since COVID-19 is no secret. Texans have already experienced delayed mail delivery across the state. As such, voters are increasingly

concerned that their mail-in ballots will not be received by the county election office in time to be counted. Texas mail-in voters understand that, due to delays, they may receive their ballots with insufficient time to mark and mail those ballots back by the deadline. Thus, to ensure that their ballots will be counted, many voters intend to personally return their mail-in ballots.

37.     County ballot drop-off locations permit eligible vote-by-mail voters to drop off their ballots at a designated site rather than mail in their ballots via USPS. Drop-off locations are increasingly a staple of effective election administration. This year, drop-off locations are available in at least 34 states and Washington, D.C. These drop-off locations, when available, are heavily utilized. For example, in Colorado's 2016 general election, which was conducted by mail, nearly three-quarters of all ballots were returned to a drop-off location.

38.     In Texas, county elections officials have been relying on and planning on continuing to rely upon expanded drop-off locations to decrease traffic and to guarantee that drop-off locations are closer, and thus more accessible, to mail-in voters.

39.     For example, Harris County has already been operating 11 ballot drop-off locations to be open during early voting and on election day; Travis County has already been operating four such locations; and Dallas County was considering operating additional ballot drop-off locations before the issuance of the Ballot Return Restriction.

## III.     The Ballot Return Restriction

40.     On July 27, 2020, Governor Abbott issued a proclamation permitting early voting to begin on Tuesday, October 13, and permitting voters to deliver their marked mail in ballots in person to an early voting clerk's office any time between October 13 up to and including election day, November 3, 2020. Counties therefore began preparing for a longer in-person early voting period and, at the same time, considered establishing additional mail-in ballot drop-off locations to ensure that voters casting their ballots by mail have ready access to drop-off locations.

41.     Election administrators planned for multiple return locations because the size of some counties would make it difficult, if not impossible, for some voters to return their ballots to election administration headquarters in each county.

42.     Despite county elections administrators' efforts, just yesterday Governor Abbott suddenly changed course and announced the Ballot Return Restriction, which is purportedly intended to "enhance[e] ballot security."

43.     Neither Governor Abbott nor the Secretary have explained *how* the restriction enhances ballot security, and indeed the Restriction does not.

44.     Whether voters can return their mail-in ballots at one county drop-off location or choose from one hundred locations, an election official is legally required to verify the voter's picture ID and the information on the ballot carrier envelope. Accordingly, there is already in place a procedure to protect against improper voting, which is, any event, exceedingly rare.

## IV.     The Ballot Return Restriction's Impact

45.     By land mass, Texas is the largest state in the contiguous United States. By population, Texas is the second largest state in the Union, and is home to approximately 29 million residents.

46.     Harris County alone covers over 1,703 square miles, making it larger geographically than the state of Rhode Island. The distance to drive across Harris County is equivalent to driving all the way through Massachusetts; clear across all of Puerto Rico; or nearly all the way across Taiwan. A boat ride the distance of Houston is equivalent to a boat ride from Cleveland, Ohio, to the Canadian side of Lake Erie.

47.     According to the U.S. Census Bureau's population estimates, as of July 2019, Harris County alone is home to over 4.7 million people. If it were a state, it would be the 25th most populous state–larger than Kentucky, Oregon, Iowa, or Nevada (among 20 others). In fact, Harris

County has more people living in it than the states of Rhode Island, both Dakotas, Alaska, Vermont, and Wyoming combined.

48.     Harris County's size is a fraction of Texas's largest county, Brewster, which covers over 6,000 square miles. Spread out amongst those 6,000 square miles is a population in which those aged 65 and older make up 25%, almost double the percentage of people aged 65 and older across the state's population.

49.     And even at a quarter the size of Harris County, Travis County's population of 1.3 million residents is larger than the populations of Montana, Rhode Island, Delaware, South Dakota, North Dakota, Alaska, Washington, D.C., Vermont, and Wyoming. It is approximately 1,023 square miles.

50.     The nonpartisan EAC, which issued a series of documents providing guidance for state elections officials on how to administer and secure election infrastructure in light of the COVID-19 pandemic, recommends at least one drop-off location per 15,000 to 20,000 voters.

51.     Assuming that only 10% of Texas voters cast their ballots by mail in November—which vastly underestimates the expected rate in light of the pandemic, as evidenced by the increased rates of voting by mail in the July primary runoff—Harris County, with over 2 million registered voters, should have at least 10 ballot drop-off locations, and Travis County, with over 800,000 registered voters, should have at least 4 drop-off locations.

52.     The EAC further suggests that election administrators "[c]onsider adding more drop-off locations to areas where there may be communities with historically low vote by mail usage," and stresses that drop-off locations should be allocated using demographic data and analysis, recognizing the differences in rural and urban populations, and recommends using U.S. Census Bureau tools "to help visualize where residents of your jurisdiction work or live to help

you see where drop-off locations might be particularly useful." That guidance applies to all of Texas, in which only about 6% of voters have cast their ballots by mail in any given election.

53.     The Ballot Return Restriction does not take any of these recommendations into account. To the contrary, it blatantly disregards differences in population, geography, and demography that exist in Texas' 254 diverse counties, as well as the sheer number of voters in each county who will be voting by mail in November at unprecedented rates.

54.     The Ballot Return Restriction's arbitrary burden on timely returning mail-in ballots places a significant burden on Texans' ability to safely vote in November. Voters will be forced to decide between mailing their ballots and risking loss or delay, voting in person and risking COVID-19 infection, or finding transportation to travel tens, hundreds, or even thousands of miles from their homes to wait in line with other voters to drop of their mail-in ballots. Despite their best efforts to navigate the perilous waters of the Texas vote-by-mail process, many voters will be disenfranchised.

55.     This does not have to be the case. Permitting counties to operate more than one ballot drop-off location will reduce Texas voters' burden in returning their ballots and will make it safer for those voters to personally deliver their ballots while ensuring that those ballots are returned before the receipt deadline. On the other hand, Defendants have *no* interest in limiting the number of drop-off locations in every county.

**FIRST CLAIM FOR RELIEF**
**U.S. Const. amends. 1, XIV**
**Undue Burden on the Right to Vote**

56.     Plaintiffs reallege and incorporate by reference all prior paragraphs of this Complaint and the paragraphs below as though fully set forth herein.

57.     Under the *Anderson-Burdick* balancing test, a court considering a challenge to a state election law must carefully balance the character and magnitude of injury to the First and

Fourteenth Amendment rights that the plaintiff seeks to vindicate against "'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)).

58.     The Ballot Return Restriction severely burdens the right to vote. At best, the Restriction requires Texans—millions of whom are vulnerable to severe complications from COVID-19—to travel long distances to avoid the health and safety hazards posed by voting in person and the risk that USPS will not deliver their ballots on time. At worst, they disenfranchise voters who cannot risk exposure to COVID-19 by voting in person but who also cannot travel the long distance to the single ballot drop-off location in their county. This is a particular concern for those Texans who receive their mail-in ballots shortly before election day because such voters may be rightfully concerned that their ballots will not be received in time to be counted.

59.     Defendants can offer no justification that outweighs the significance of the burden here: the disenfranchisement of millions of Texans.

60.     Defendants' stated reason for the Ballot Return Restriction—ballot security—is patently pretextual. In the October Proclamation, Governor Abbott pointed to no reason why having multiple drop-off locations, rather than one, will pose any threat whatsoever to the security of the ballots submitted at each location. In fact, the protocols in place at each drop-off locations are the same: an election official is legally required to verify the voter's picture ID and the information on the ballot carrier envelope.

61.     Moreover, other state interests, including maintaining the health and safety of the electorate, which was Defendants' stated interest in issuing the July Proclamation, militate in favor

of *more* ballot drop-off locations in geographically large and highly populated counties. This interest cannot be advanced by Defendants' decision to open only *one* ballot drop-off location per county, no matter the county's size or population. Larger counties require additional ballot drop-off sites to enable voters to vote efficiently while maintaining recommended social distancing.

62.     In short, the Ballot Return Restriction is not supported by *any* state interest, let alone one that is sufficiently compelling to justify the significant burdens on the right to vote. The Ballot Return Restriction therefore violates the First and Fourteenth Amendments.

## SECOND CLAIM FOR RELIEF
### U.S. Const. amend. XIV
### Violation of Equal Protection

63.     Plaintiffs reallege and incorporate by reference all prior paragraphs of this Complaint and the paragraphs below as though fully set forth herein.

64.     The Equal Protection Clause protects "the equal weight accorded to each vote and the equal dignity owed to each voter." *Bush v. Gore*, 531 U.S. 98, 104 (2000). Yet the Ballot Return Restriction, as applied, treats Texans differently depending on where they live: those that live in counties with bigger populations and counties with bigger land masses will be burdened more than those that live in counties with smaller populations and counties covering smaller geographic areas. As discussed above, there is no compelling, let alone rational, interest in treating these similarly situated voters differently.

65.     The Ballot Return Restriction severely burdens voters by limiting ballot drop-off locations to one per county. The Ballot Return Restriction will require millions of voters to travel long distances to reach their ballot drop-off locations. While some voters will have the option to drop off their ballots close to home, others will have to travel substantially farther.

66.     As discussed above, Defendants can advance no legitimate, let alone compelling, state interest to justify these severe burdens.

## FOURTH CLAIM FOR RELIEF
### Ku Klux Klan Act, 42 U.S.C. § 1985(3)

67.     Plaintiffs reallege and incorporate by reference all prior paragraphs of this Complaint and the paragraphs below as though fully set forth herein.

68.     42 U.S.C. § 1985(3) prohibits conspiracies that have the purpose of "depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws" (the "Equal Protection Provision") or conspiracies "to prevent by force, intimidation, or threat," any lawful voter from supporting or advocating for any candidate in a presidential or congressional election (the "Support and Advocacy Provision").

69.     The Ballot Return Restriction was designed to disenfranchise voters that Defendants, Republican politicians, believe are not likely to support Republican candidates. The Ballot Return Restriction has a disproportionate impact on older and more diverse voters, many of which typically vote for Democratic candidates. The barriers to voting placed by the Ballot Return Restriction will prevent many of these individuals from lawfully casting their ballots.

70.     Defendants conspired with individuals in the Republican Party, including members of the Texas Republican Party and the Republican National Committee, to issue the Ballot Return Restriction in order to prevent lawful voting. They did so in order to deprive the impacted voters of the equal protection of the laws and deprive them of their rights.

71.     The Ballot Return Restriction thus falls within the scope of Section 1985(3)'s Equal Protection provision, which provides a cause of action against anyone who "conspire[s] … for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws." 42 U.S.C. § 1985(3).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that this Court:

A.     Declare that the October Proclamation's Ballot Return Restriction is unconstitutional, and that county election administrators may establish, at their discretion, multiple locations where voters may return their marked mail-in ballots to secured ballot drop-off locations;

B.     Preliminarily and permanently enjoin Defendants, and their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, from taking any action to inhibit election administrators from offering drop-off locations as described;

C.  Award statutory damages pursuant to 42 U.S.C. § 1985(3); and

D.  Grant such other or further relief as the Court deems just and proper.


Dated:  October 2, 2020                              Respectfully submitted,

*/s/ Skyler Howton*
Skyler M. Howton, TX# 24077907
PERKINS COIE LLP
500 North Akard St., Suite 3300
Dallas, TX 75201-3347
Telephone: (214) 965-7700
Facsimile: (214) 965-7799
showton@perkinscoie.com

Marc E. Elias*
John M. Geise*
Stephanie Command*
PERKINS COIE LLP
700 Thirteenth Street, N.W., Suite 800
Washington, D.C. 20005-3960
Telephone: (202) 654-6200
Facsimile: (202) 654-6211
melias@perkinscoie.com
jgeise@perkinscoie.com
scommand@perkinscoie.com

Danielle Sivalingam (Serbin)*
Gillian Kuhlmann*
PERKINS COIE LLP
1888 Century Park East, Suite 1700
Century City, California 90067
Telephone: (310) 788-9900
Facsimile: (310) 788-3399
dsivalingam@perkinscoie.com
gkuhlmann@perkinscoie.com

Jessica Frenkel*
PERKINS COIE LLP
1900 Sixteenth Street
Suite 1400
Denver, Colorado 80202-5255
Telephone: (303) 291-2300
Facsimile: (303) 291-2400
jfrenkel@perkinscoie.com

*Attorneys for Plaintiffs*

*\*Pro hac vice applications forthcoming*