**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | |
|---|---|
| LAURIE-JO STRATY; TEXAS ALLIANCE FOR RETIRED AMERICANS; and BIGTENT CREATIVE, <br><br> Plaintiffs, <br><br> vs. <br><br> GREGORY ABBOTT, in his official capacity as Governor of the State of Texas; and RUTH HUGHS, in her official capacity as Texas Secretary of State, <br><br> Defendants. | Civil Action No. 1:20-cv-1015-RP <br><br> Related to: <br> *Texas League of United Latin American Citizens v. Abbott*, No. 1:20-cv-1006 <br><br><br> **HEARING REQUESTED** |

<u>**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RETRAINING ORDER AND PRELIMINARY INJUNCTION**</u>

# TABLE OF CONTENTS

I.   INTRODUCTION ........................................................................................................ 1

II.  BACKGROUND ......................................................................................................... 1

     A.   The COVID-19 pandemic has caused a public health crisis in Texas rendering
access to mail-ballot drop-off locations vital. ........................................................ 1

     B.   In the months and days leading up to the Governor's October 1st announcement
of the Ballot Return Restriction, the message to elections officials, voters, and
even the Texas Supreme Court was clear that counties could offer multiple ballot
drop off locations. .................................................................................................. 5

     C.   The Ballot Return Restriction drastically and suddenly limited the availability of
ballot drop-off locations for millions of Texas voters less than two weeks before
voting begins. .......................................................................................................... 7

III. ARGUMENT ............................................................................................................... 9

     A.   Plaintiffs are likely to succeed on the merits of their claims. .............................. 10

          1.   The Ballot Return Restriction unduly burdens Plaintiffs' First and
Fourteenth Amendment rights. .............................................................. 10

          2.   The Ballot Return Restriction violates Plaintiffs' right to equal protection.
................................................................................................................ 14

          3.   Defendants have violated the Ku Klux Klan Act, 42 U.S.C. § 1985(3)... 14

     B.   Plaintiffs will suffer irreparable injury absent an injunction. .............................. 16

     C.   The balance of the equities and the public interest favor an injunction................ 17

IV.  CONCLUSION ......................................................................................................... 17

i

**TABLE OF AUTHORITIES**

CASES                                                                    PAGE(S)

*Burdick v. Takushi*,
    504 U.S. 428 (1992)..................................................................................10

*Bush v. Gore*,
    531 U.S. 98 (2000)....................................................................................14

*Byrum v. Landreth*,
    566 F.3d 442 (5th Cir. 2009) ....................................................................10

*Democratic Exec. Comm. of Fla. v. Lee*,
    915 F.3d 1312, 1346 (11th Cir. 2020) ......................................................14

*Duke v. Cleland*,
    5 F.3d 1399 (11th Cir. 1993) ....................................................................13

*Elrod v. Burns*,
    427 U.S. 347 (1976)..................................................................................16

*Ga. Coal. for People's Agenda, Inc. v. Deal*,
    214 F. Supp. 3d 1344 (S.D. Ga. 2016)......................................................11

*Ga. Coal. for People's Agenda, Inc. v. Kemp*,
    347 F. Supp. 3d 1251, 1268 (N.D. Ga. 2020) ..........................................16

*Gonannies, Inc. v. Goupair.Com, Inc.*,
    464 F. Supp. 2d 603 (N.D. Tex. 2006) .......................................................9

*Hunter v. Hamilton Cnty. Bd. of Elections*,
    635 F.3d 219 (6th Cir. 2011) ....................................................................14

*In re State*,
    No. 20-0394, 2020 WL 2759629 (Tex. May 27, 2020)...............................3

*League of Women Voters of Fla., Inc. v. Detzner*,
    314 F. Supp. 3d 1205 (N.D. Fla. 2018)...............................................16, 17

*League of Women Voters of N.C. v. North Carolina*,
    769 F.3d 224 (4th Cir. 2014), cert. denied, 135 S. Ct. 1735 (2015) ........16

*League of Women Voters of Ohio v. Brunner*,
    548 F.3d 463 (6th Cir. 2008) ....................................................................14

*Ne. Ohio Coal. for the Homeless v. Husted*,
    696 F.3d 580 (6th Cir. 2012) ....................................................................11

*Norman v. Reed*,
    502 U.S. 279 (1992)..................................................................................10

**TABLE OF AUTHORITIES**

CASES                                                                    PAGE(S)

*Obama for Am.v. Husted*,
   697 F. 3d 423 (6th Cir. 2012) .....................................................................12, 16

*Ohio NAACP v. Husted*,
   768 F.3d 524 (6th Cir. 2014) .....................................................................12

*One Wis. Inst., Inc. v. Thomsen*,
   198 F. Supp. 3d 896 (W.D. Wis. 2016) ....................................................3, 11

*Reynolds v. Sims*,
   377 U.S. 533 (1964)....................................................................................10

*Sherbert v. Verner*,
   374 U.S. 398 (1963)....................................................................................13

*Soltysik v. Padilla*,
   910 F.3d 438 (9th Cir. 2018) .....................................................................13

*Tex. Democratic Party v. Abbott*,
   No. 20-50407, 2020 WL 2982937 (5th Cir. June 4, 2020).......................3

*Tex. Democratic Party v. Abbott*,
   No. CV SA-20-CA-438-FB, 2020 WL 2541971 (W.D. Tex. May 19, 2020) ..................16, 17

*Tex. Indep. Party v. Kirk*,
   84 F.3d 178 (5th Cir. 1996) .......................................................................10

*United Bhd. of Carpenters & Joiners of Am., Local 610, AFL-CIO v. Scott*,
   463 U.S. 825 (1983)....................................................................................14, 15

*Wood v. Meadows*,
   117 F.3d 770 (4th Cir. 1997) .....................................................................13

STATUTES & OTHER AUTHORITIES

Ku Klux Klan Act, 42 U.S.C. § 1985(3).........................................................14

Tex. Elec. Code § 276.013...............................................................................12

Tex. Elec. Code § 64.012.................................................................................12

Tex. Elec. Code § 82.003.................................................................................3

Tex. Elec. Code § 86.00[6](a-1) ......................................................................6

Tex. Elec. Code § 86.006.................................................................................4, 12

Tex. Elec. Code § 86.006(a).............................................................................12

## TABLE OF AUTHORITIES

**CASES**                                                                                      **PAGE(S)**

Tex. Elec. Code § 86.006(a-1) ..................................................................................5

Tex. Elec. Code § 86.007 .........................................................................................3

Tex. Elec. Code §§ 82.001-82.004 ..........................................................................2

U.S. Const. amend. XIV, § 1 ...................................................................................14

## I.      INTRODUCTION

Since the first American diagnosis with the novel coronavirus was made in the Spring, COVID-19 has claimed over 200,000 lives in the United States, roughly one out of every thirteen of which have been in Texas. Residents 65 and older account for nearly 70% of the COVID-19 deaths reported in the state. Every single day, thousands of Texans are newly diagnosed, and the CDC has warned that Americans should brace for even more infections this fall.

In the face of this unprecedented crisis, most states have taken affirmative steps to ensure that voters are able to safely and easily exercise their right to vote during the pandemic. Not Texas. At virtually every turn, Governor Greg Abbott and Secretary of State Ruth Hughs ("Defendants") have blocked attempts to safeguard the right to vote (and the health of voters or elections officials). On Thursday, a mere 12 days before voting was scheduled to begin, Governor Abbott issued a surprise proclamation suddenly forbidding county election administrators from offering more than one ballot drop box in each county (the "Ballot Return Restriction" or "Restriction"), regardless of the county's size, its population, or any other of its unique features.

The Restriction was directly contrary to a proclamation the Governor issued two months earlier, which expressly permitted Texas voters to personally return their ballots to their county election administrators' satellite offices. Thus, with his abrupt announcement, the Governor effectively reversed what little relief he had provided to facilitate safe and effective voting during the pandemic. That about-face violates federal law. An injunction is urgently needed.

## II.      BACKGROUND

### A.      The COVID-19 pandemic has caused a public health crisis in Texas rendering access to mail-ballot drop-off locations vital.

Texas reported its first case of COVID-19 on March 4, 2020. *See* Texas Covid Map & Case Count, https://www.nytimes.com/interactive/2020/us/texas-coronavirus-cases.html (last visited

Oct. 4, 2020). A mere seven months later, Texas has recorded over 800,000 confirmed cases of the virus, with no end in sight. *Id*. In the past week alone, Texas has averaged between 4,000-5,000 new cases *per day*. *Id*. Nearly 16,500 of the state's residents have died from the virus, with thousands more suffering profound health consequences that may be with them permanently. *Id*. Older and Latinx residents have been hit particularly hard: 69.8% of the reported COVID-19 fatalities have been among Texans 65 or older, and 56.1% have been among Hispanic residents. *See* COVID-19 Demographics, Texas Dep't of Health & Human Servs., https://dshs.texas.gov/coronavirus/TexasCOVID19Demographics.xlsx.asp (last visited Oct. 4, 2020); *see also* Ex. 1 ¶¶ 3, 5; Ex. 2 ¶ 3; Ex. 3 ¶ 3; Ex. 4 ¶ 3; Ex. 5 ¶ 3.[1]

Shortly after the crisis began, the CDC began recommending that states take several affirmative steps to ensure that voters and elections officials are not unnecessarily exposed to the virus while participating in elections. *See* Considerations for Election Polling Locations & Voters, CDC, https://www.cdc.gov/coronavirus/2019-ncov/community/election-polling-locations.html. This included providing broad access to voting by mail. In response, virtually every other state has made voting by mail accessible to any voter who would seek to use it during the pandemic. Texas stands out as one of the very few exceptions, where voters may only vote by mail if they: (1) are 65 or over, (2) will be absent from their home county during early in-person voting and on election day, (3) have a "disability," which Texas law defines as a sickness or physical condition that prevents them from appearing at the polling place, or (4) are confined in jail but otherwise eligible to vote. *See* Tex. Elec. Code §§ 82.001-82.004. Far from relaxing these requirements (as other states have broadly done), Defendants have fought hard to strictly maintain them, including by arguing that persons with pre-existing conditions that make them particularly susceptible to bad

---

[1] Citations to exhibit numbers are to the exhibits appended to the Declaration of Skyler Howton.

outcomes should they contract COVID-19 do not have a "disability" within the meaning of Texas law. *See In re State*, No. 20-0394, 2020 WL 2759629, at *1 (Tex. May 27, 2020); *see also Tex. Democratic Party v. Abbott*, No. 20-50407, 2020 WL 2982937, at *1 (5th Cir. June 4, 2020).

Nevertheless, Texas is still anticipated to see an unprecedented surge in mail voting this election. Approximately 17% of voting age Texans—roughly 3.6 million people—are 65 or older, and as such eligible to vote by mail. Ex. 9. Approximately 64% of those 3.6 million people are expected to turn out in each general election. Ex. 10. Accordingly, there are more than 2 million people in just *one* of the four eligible categories who are likely to vote and they represent a group that is particularly vulnerable to COVID-19. *See* Tex. Elec. Code § 82.003. Increased mail voting was evident even in Texas elections held earlier this year. In Fort Bend County, for instance, there was a 59% increase in mail ballot applications from the March primary to the July runoff. *Id.*, Ex. 11. Harris County experienced a 109% increase. *Id.* Counties expect the demand for mail ballots will only continue to climb as November approaches. But because of ripple effects the pandemic has had on USPS, and because of the limitations of Texas's vote-by-mail scheme, mail voting *alone* does not offer those voters a safe and efficient means of casting their ballots.

Texas requires domestic mail-in ballots to be postmarked by 7:00 p.m. on election day and received by 5:00 p.m. the day after the election. Tex. Elec. Code § 86.007. Some voters may not receive their mail ballots in time to timely return them by mail. In November, mail-in ballots will likely be requested in record numbers. Ex. 1 ¶ 5. There are two primary and interlocking reasons for this: *first*, elections administrators will be delayed in sending mail-in ballots in response to the influx of applications; and, *second*, the overburdened and understaffed postal service will fail to timely deliver ballots to voters and fail to return voted ballots to the counties before the Deadline.

To obtain a mail-in ballot, a voter must apply and state her eligibility. If approved, the county elections administrator sends a ballot to the voter. In light of the increased demand for mail ballots, and the other burdens on elections administrators as a result of the pandemic, their ability to process mail ballot applications will be strained. Ex. 11 ("For election machinery statewide, the expected increase in VBM will be a challenge."). That, in turn, limits voters' ability to mark and return their ballots by mail in time to be counted. Even under normal circumstances, USPS recommends that ballots be placed in the mail by voters at least seven days before a receipt deadline. Ex. 12 at 2. However, voters may not receive their ballots in time to do so. *Id.*

The problem is exacerbated by recent postal service delays. A briefing prepared for the Postmaster General on August 12 shows a sharp decrease in the delivery performance for Presort First-Class Mail, beginning in July. Ex. 13. The rate at which USPS is meeting its overall delivery standards fell from the low 90s in June to well below 85% in mid-July. *Id.* Despite promises by USPS that it was going to do better, its service performance scores have not markedly recovered. As records recently produced by USPS and filed in a lawsuit pending against it show, as of September 19, service performance for First-Class mail has continued to regularly dip below 85%, almost 10% below where it was before the pandemic reached the United States. Ex. 14 at 1. In the Houston area, delivery performance plateaued in the low 80s in July. *Id*. at 41. In August, it reached 78%. *Id.* Through September 19, delivery performance had still not reached 90%. *Id.*

The deleterious impacts that the unreliability of mail delivery has on the right to vote in the pandemic are compounded by Texas's ban on third-party ballot delivery. In Texas, third parties who assist others in delivering their ballots, except in narrow circumstances, risk felony charges. Tex. Elec. Code § 86.006. Accordingly, voters who are unable to obtain postage or unwilling to risk arbitrary disenfranchisement by surrendering the delivery of their ballot to the vagaries of

postal service delivery must personally deliver their marked ballots to a permissible drop off location.

This year drop-off locations are available in at least 34 states and Washington, D.C. When available, ballot drop off is heavily utilized. Ex. 16. For example, in Colorado's 2016 general election, which was conducted by mail, nearly three-quarters of all ballots were returned to a drop-off location. *Id.* In recommendations issued about best state practices for elections administration during the pandemic, the nonpartisan U.S. Election Assistance Commission ("EAC") recommends at least one drop-off location for every 15,000 to 20,000 registered voters. Ex. 15.

**B.**     **In the months and days leading up to the Governor's October 1st announcement of the Ballot Return Restriction, the message to elections officials, voters, and even the Texas Supreme Court was clear that counties could offer multiple ballot drop off locations.**

On July 27, Governor Abbott issued a Proclamation permitting early voting to begin on October 13, and permitting voters to deliver their marked mail-in ballots in person to an early voting clerk's office from October 13 through November 3 ("July Proclamation"). Ex. 17. This was a revision from ordinary practice in non-pandemic times, during which Texas generally permits in-person return of mail ballots only on Election Day. Tex. Elec. Code § 86.006(a-1). Because of the unprecedented challenges of voting during the pandemic, however, the Governor's July Proclamation "suspend[ed] Section 86.006(a-1) of the Texas Election Code" for the November election. Ex. 17.

The July Proclamation did not set any limit on the number of drop-off locations counties were permitted to use and shortly after it was issued, other government officials, including the Secretary of State, confirmed that counties were now allowed to have multiple drop-off locations for voters to drop off their mail-in ballots before election day. In late August, for example, the Secretary told the Chair of the Harris County Republican Party that mail ballots could be returned

to *any* early-voting clerk office. Ex. 19. Similarly, when asked specifically "if it is acceptable for voters to drop off their ballots up to election day at [county clerk] annexes," a staff attorney from the Secretary's office emphasized that "[b]ecause this hand-delivery process can occur at the early voting clerk's office, this may include satellite offices of the early voting clerk." *Id.*

These assurances by Texas officials continued literally up until the day before the Governor issued the Ballot Return Restriction. Thus, on September 30, when the Texas Supreme Court asked Texas Attorney General Ken Paxton whether, "in light of the Governor's July 27, 2020 proclamation, . . . allowing a voter to deliver a marked mail ballot in person to any of [the] eleven annexes in Harris County violates Texas Election Code section 86.00[6](a-1)," Ex. 20 at 1, the Attorney General responded that, "[t]he Government Code generally provides that the singular includes the plural," *id.* at 5 (citing Tex. Gov't Code § 311.012(b)). On that basis, he reported to the Court that "the Secretary . . . has advised local officials that the Legislature has permitted ballots to be returned to *any* early-voting clerk office." *Id.*

In reliance on the July Proclamation and the assurances from public officials, Texas counties began increasing the number of drop-off locations available to voters. They did so with the objective of reducing lines at early voting locations, providing more alternatives to voting in person during the pandemic, and making access to drop-off locations easier and safer for many mail-in voters who otherwise would have had to travel long distances to drop off their ballots. Many of those voters, because they are voting by mail to avoid exposure to COVID-19, would be dissuaded from voting if they encounter long lines at ballot drop off locations.

The counties announced these plans to voters, who made plans to vote based on them. In Harris County, for example, the clerk's office conducted a campaign to educate voters about the availability of the 12 drop off locations that it was planning, including through social media,

interviews in the media, and information on its "Harris Votes" website that lists all 12 sites. *See* Ex. 21 ¶ 21. Travis County also announced that it would offer four drop-off locations for early voting, *id.*, Ex. 18, and Fort Bend County very recently finalized plans to accept mail ballots at multiple locations.  Ex. 11.  Indeed, on October 1, mere hours before the Governor announced the Ballot Return Restriction, Fort Bend publicly announced its plan to accept ballots at multiple locations. *See id.*, Ex. 23.

**C.     The Ballot Return Restriction drastically and suddenly limited the availability of ballot drop-off locations for millions of Texas voters less than two weeks before voting begins.**

The day after the Attorney General represented to the Texas Supreme Court that voters could, in fact, return ballots to satellite locations, the Governor surprised the public and local elections administrators alike by suddenly announcing the Ballot Return Restriction, prohibiting counties from having more than one drop-off location. Ex. 22. In issuing this restriction, the Governor stripped millions of voters of a safe way to timely return their marked mail-in ballots, while also injecting widespread confusion into the voting process right before voting was scheduled to begin. Ex. 2 ¶¶ 5-6; Ex. 3 ¶¶ 10-11; Ex. 4 ¶¶ 8-13; Ex. 5 ¶¶ 5-8; Ex. 6 ¶¶ 5-10; Ex. 8 ¶ 7.

The counties that had publicly announced their plans to offer multiple drop off locations to voters must now do a complete turn-about, developing new plans *and* communicating the reversal to voters in less than two weeks, when early voting begins. Voters, too, will have to revise and rethink their plans as to how they will successfully vote. The pandemic is forcing voters to plan far in advance of election day on how to cast their ballots with minimal risk to exposure to COVID-19 and also ensure their votes are counted. Many of Texas's voters have relied upon these public communications advising them that there will be multiple locations where they can drop off their ballots. For example, Richard and Ellen Shaw, who are both particularly vulnerable to COVID-19

due to their ages and medical conditions, planned to return their mail ballots to a drop-off location in Harris County just minutes away from their home. Ex. 4 ¶ 12. Now, they must travel up to 45 minutes away to drop off their ballots. *Id.* ¶ 10. If the Shaws reach their county's drop-off location and find there is a line, they plan to go home and try again another time out of concerns that having to wait in a long line with many other voters could risk the exact exposure to the virus that they are trying to avoid by voting by mail ballot to begin with. *Id.* ¶ 11; *see also* Ex. 2 ¶ 5; Ex. 5 ¶ 7; Ex. 6 ¶ 6, 8; Ex. 7 ¶ 5; Ex. 8 ¶ 5. Moreover, voters like the Shaws represent the subset of voters who have actually learned of the Governor's about-face. There is a significant risk that many voters who planned to use the locations that the Governor's October 1 order now effectively shutters will not learn that they can no longer drop off their ballots at those locations until they arrive there and attempt to do so. Ex. 1 ¶ 8; Ex. 3 ¶¶ 10-11; Ex. 4 ¶ 13. The widespread confusion that the Governor's order will engender cannot be over-emphasized.

It also imposes severe risks that voters' ballots will not arrive in time to be counted, and that lawful voters will be disenfranchised as a result. Voters who do not have easy access to ballot drop off sites as a result of the Governor's order, or who cannot risk standing in line at a single site—that, as in Harris County will now have to serve hundreds of thousands of voters—because of the risks of contracting the virus will have no choice but to hope that their ballot is not among the 15-20% of first class mail that has been routinely subject to delivery delays by USPS. *See* Ex. 1 ¶ 6; Ex. 2 ¶¶ 5-6; Ex. 5 ¶¶ 4, 8; Ex. 6 ¶¶ 7-8; Ex. 7 ¶¶ 3-5; Ex. 8 ¶ 6. This, in turn, raises fears among voters about the integrity of the process, and the risk that they will be disenfranchised due to no fault of their own. Ex. 2 ¶ 4; Ex. 3 ¶¶ 6-7; Ex. 4 ¶¶ 6, 9, 13 Ex. 5 ¶ 8; Ex. 6 ¶¶ 9-10; Ex. 7 ¶ 4-5; Ex. 8 ¶ 7.

The Ballot Return Restriction does not impose uniform burdens on Texas voters: certain communities are impacted much more severely. Harris County alone covers over 1,703 square miles, making it larger geographically than the state of Rhode Island. The distance to drive across Harris County is equivalent to driving through Massachusetts; clear across all of Puerto Rico; or nearly all the way across Taiwan. A boat ride the distance of Houston is equivalent to a boat ride from Cleveland, Ohio, to the Canadian side of Lake Erie. As of July 2019, Harris County was home to over 4.7 million people. If it were a state, it would be the 25th most populous state–larger than Kentucky, Oregon, Iowa, or Nevada (among 20 others). Harris County has more people living in it than the states of Rhode Island, both Dakotas, Alaska, Vermont, and Wyoming combined.

Thus, limiting ballot drop off locations to one location for a county of this size, particularly in an elections regime such as Texas's where voters who are dropping off their ballots must do so during fixed hours and must hand their ballots to an elections administrator, Ex. 22, largely undoes the safety benefits in the pandemic of providing voters with a drop off location to begin with. Long lines are certain to form, and many of the vulnerable voters who are voting by mail to avoid the virus and standing in long lines at the polls will be unwilling or unable to stand in long lines, risking exposure, as if they had appeared at the polls to vote, to drop off their ballots. This may be particularly true of Texas's older and Latinx voters who have been disproportionately represented in Texas's COVID-19 related deaths. *See* COVID-19 Demographics, Texas Dep't of Health & Human Servs., https://dshs.texas.gov/coronavirus/TexasCOVID19Demographics.xlsx.asp (last visited Oct. 4, 2020).

### III.    ARGUMENT

The tests for determining whether a party is entitled to a temporary restraining order and whether a party is entitled to a preliminary injunction are the same. *Gonannies, Inc. v. Goupair.Com, Inc.*, 464 F. Supp. 2d 603, 607 (N.D. Tex. 2006). Plaintiffs are entitled to both forms

of relief because: (1) they are likely to succeed on the merits; (2) there is a substantial threat of irreparable injury if a permanent injunction is not issued; (3) the harm outweighs any injury to the Secretary because of an injunction; and (4) an injunction is in the public interest. *See, e.g.*, *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009).

**A.    Plaintiffs are likely to succeed on the merits of their claims.**

**1.    The Ballot Return Restriction unduly burdens Plaintiffs' First and Fourteenth Amendment rights.**

"There is more to the right to vote than the right to mark a piece of paper and drop it in a box or the right to pull a lever in a voting booth. The right to vote includes the right to have the ballot counted." *Reynolds v. Sims*, 377 U.S. 533, 555 n.29 (1964) (citation and quotation omitted). The Ballot Return Restriction imposes multiple barriers to casting a mail-in ballot that are unjustifiable, particularly during the present unprecedented public health crisis.

To determine whether a state law imposes an undue burden on the right to vote in violation of the Fourteenth Amendment, federal courts apply the *Anderson-Burdick* balancing test, which "weigh[s] 'the character and magnitude of the asserted injury' . . . against 'the precise interests put forward by the State as justifications for the burden imposed by its rule.'" *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 788-89 (1983)). When the burden is severe, the State's asserted interest must be compelling, and the challenged restriction must be narrowly tailored to advance it. *Tex. Indep. Party v. Kirk*, 84 F.3d 178, 182 (5th Cir. 1996). But even if the burden is less than severe, the challenged restriction must be supported by "interest[s] sufficiently weighty to justify the limitation." *Norman v. Reed*, 502 U.S. 279, 288-89 (1992). Thus, for all burdens, however slight, the Court must take "into consideration 'the extent to which [the State's] interests make it necessary to burden the plaintiff's rights.'" *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 788-89).

The burden imposed by the Ballot Return Restriction is severe. Voters who wish to use the single drop-off location in their county may be forced to wait in long lines to do so, which risks exposing them to COVID-19. *See supra* II.C. Waiting in line at a county's single drop-off location is largely infeasible for voters who are elderly, disabled, or immunocompromised and impossible for voters who lack access to transportation or cannot risk exposure to COVID-19.  *See supra* II.C. Those voters must now hope that USPS delivers their mail-in ballot to the county election office by the deadline despite widespread reports of delivery delays. *See supra* II.A. The delays in postal service, coupled with the fact that Texas rejects ballots that arrive more than one day after election day (even if postmarked before election day), have caused many voters to fear, quite reasonably, that their ballots will not arrive in time to be counted if they rely on USPS.  Each of these burdens on voting had been largely eliminated or minimized by the expansion of the drop-off locations. *See supra* II.A. What is worse, some voters may not even be aware of the Ballot Return Restriction, may plan to return their ballot at the drop-off locations they have been informed will exist, and will only find out those locations have been shuttered once it is too late for them to return their ballots by mail. *See supra* II.C.

Courts confronted with laws that similarly threaten disenfranchisement have held that such regulations impose a severe burden on the right to vote, even when relatively small numbers of voters are affected. *See, e.g.*, *Ne. Ohio Coal. for the Homeless v. Husted*, 696 F.3d 580, 597 (6th Cir. 2012) (disqualifying provisional ballots that constituted less than 0.3 percent of total votes inflicted "substantial" burden on voters); *Ga. Coal. for People's Agenda, Inc. v. Deal*, 214 F. Supp. 3d 1344, 1346 (S.D. Ga. 2016) (finding severe burden where 3,141 individuals were ineligible to register); *One Wis. Inst., Inc. v. Thomsen*, 198 F. Supp. 3d 896, 948-49 (W.D. Wis. 2016) (finding severe burden when fewer than 100 voters were disenfranchised). Even for voters who are not

11

disenfranchised, the burdens imposed by the Ballot Return Restriction do not pass constitutional muster. The focus of the inquiry is on how affected voters' "ability to cast a ballot is impeded by [the State's] statutory scheme." *Ohio NAACP v. Husted*, 768 F.3d 524, 541 (6th Cir. 2014); *see also Obama for Am.v. Husted*, 697 F. 3d 423, 433 (6th Cir. 2012) (holding burden of challenged voting practice was not "slight" even though it did not "absolutely prohibit early voters from voting").

At best, the Restriction imposes needless, and in some cases extremely significant, burdens on hundreds of thousands of Texas voters that cannot be justified by the state's purported interest in the sudden about-face. The only rationale Defendants have provided for imposing the Ballot Return Restriction is patently pretextual. Specifically, the Governor claims to have imposed the Ballot Return Restriction to "enhance[e] ballot security." Ex. 22. But they have not and cannot identify any evidentiary basis to support this rationale. Harris County, the most populous county in Texas, offered 11 drop-off locations during the July primary run-off election, Ex. 21 ¶ 9, with no perceivable ballot security issues. Whether voters can return their mail-in ballots at one county drop-off location or choose from one hundred locations, an election official is legally required to verify the voter's picture ID and the information on the ballot carrier envelope. Tex. Elec. Code § 86.006(a), (a-1), (b)-(c). At no point has Texas rescinded the felony penalties associated with third-party ballot delivery, Tex. Elec. Code § 86.006, or any of the other provisions that protect ballot integrity, *see, e.g.*, *id*. § 276.013; *id*. § 64.012. And the counties themselves have implemented detailed protocols for securing the integrity of mail ballots returned to drop off locations. Ex. 11, Ex. 21. Thus, Defendants' single reason for imposing the Ballot Return Restriction, plainly fails to outweigh the burden imposed.

Moreover, under *Anderson-Burdick* the Court cannot merely take Defendants' assertion at face-value. The existence of a state interest is a matter of proof. *Sherbert v. Verner*, 374 U.S. 398, 407 (1963); *see also Wood v. Meadows*, 117 F.3d 770, 776 (4th Cir. 1997) (discounting Virginia's purported interest because record before the court was "virtually barren of any evidence of the strength or legitimacy of the Commonwealth's interests"); *Duke v. Cleland*, 5 F.3d 1399, 1405 (11th Cir. 1993) (vacating dismissal because record was "devoid of evidence as to the state's interests" in the challenged restriction); *Soltysik v. Padilla*, 910 F.3d 438, 446 (9th Cir. 2018) (vacating dismissal where state's interest was "[w]ithout factual support"). For Defendants' purported interest to justify the burden imposed here, Defendants must demonstrate how counties accepting ballots at a few additional locations, applying exactly the same security measures, undermines ballot security. Not only can Defendants not demonstrate as much, the only evidence available proves exactly the opposite: Harris County offered 11 drop-off locations in the July primary runoff election. *See* Ex. 21 ¶ 9. And no ballots were compromised. Because Defendants cannot demonstrate that offering multiple of exactly the same drop-off locations compromises ballot security, Defendants can advance no legitimate interest in the Ballot Security Restriction.

The impact of the Ballot Return Restriction in Harris County demonstrates that it places an unconstitutional undue burden on mail-in voters. As discussed, before the Restriction, Harris County was planning on offering 12 ballot drop-off locations. *Id.* ¶ 21. Beyond the additional travel and the risk that some voters will not get the message that 10 of the 11 sites that had been publicized are now shuttered, the Restriction's congregation of all voters who wish to drop off their mail ballot in Harris County in one single location itself imposes burdens on voters, many of whom are voting by mail precisely to avoid that type of crowded voting experience, and the concomitant risk of exposure to the virus that it brings.

13

**2.  The Ballot Return Restriction violates Plaintiffs' right to equal protection.**

Texas cannot "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. "Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush v. Gore*, 531 U.S. 98, 104-05 (2000); *see also, e.g.*, *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1346 (11th Cir. 2020); *Hunter v. Hamilton Cnty. Bd. of Elections*, 635 F.3d 219, 235 (6th Cir. 2011). But the Ballot Return Restriction does exactly that by imposing a one-size-fits-all restriction on counties that are not remotely equitable in size or population. Under the Governor's newly announced restriction, counties that serve *millions* of voters are limited to only one drop off location to serve all of those voters, a ratio that the EAC recommendations demonstrate is woefully insufficient to adequately serve those voters. *See* Ex. 15. The voters in a county such as Harris will thus disproportionately face longer waits, and have to contend with more crowded drop off locations, than voters in counties with only a few thousand voters, where a single ballot drop off location may very well be sufficient to serve their needs safely. As such, the Restriction imposes "arbitrary and disparate treatment [on] voters" based on where they live. *Bush*, 531 U.S. at 106-07; *see also League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 478 (6th Cir. 2008) ("If true, these allegations could establish that Ohio's voting system deprives its citizens of the right to vote or severely burdens the exercise of that right depending on where they live in violation of the Equal Protection Clause.").

**3.  Defendants have violated the Ku Klux Klan Act, 42 U.S.C. § 1985(3).**

42 U.S.C. § 1985(3) "prohibits private conspiracies designed to interfere with persons' equal enjoyment and exercise of their civil rights. . . ." *United Bhd. of Carpenters & Joiners of Am., Local 610, AFL-CIO v. Scott*, 463 U.S. 825, 849 (1983). To make out a violation, a plaintiff must allege and prove: (1) a conspiracy; (2) for the purpose of depriving, either directly or

indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is injured in his person or property or deprived of any right or privilege of a citizen of the United States. *Id.* at 828-29 (1983). Here, Plaintiffs are likely to be able to succeed in proving all four elements.

First, Plaintiffs are likely to be able to prove that Defendants agreed, tacitly and explicitly, to suppress voting by limiting the number of drop box sites available, and that each Defendant shares in the "general conspiratorial objective." Defendants have sought to suppress voting at every turn this election, from refusing to permit those under 65 to vote by mail based on reasonable fears of contracting a deadly virus (and, indeed, threatening prosecution of them if they did so) to now suddenly and non-sensically limiting the ability to return vote by mail ballots even for those voters who meet one of the states' exceedingly limited rationales. There is literally no other logical explanation for this sudden about-face, drastically limiting the availability of ballot drop box locations, months after Defendants repeatedly made clear that multiple locations would be permitted, and even one day after the Attorney General made the very same representation to the Texas Supreme Court.

Second, Plaintiffs will likely prove that the conspiracy is directed at depriving, either directly or indirectly, voters, and in particular Democratic and minority voters, from equal protection of the laws. Defendants have arbitrarily and baselessly limited each county in Texas, no matter how large or small, to a single location to return mail-in ballots. This unnecessary restriction predictably and purposefully burdens voters in the state's most populous counties, which tend to be more diverse and more Democratic, than in more rural counties. *See Supra* II.C. Third, each co-conspirator has performed an act in furtherance of that conspiracy. Governor Abbott has issued

a proclamation limiting the locations where mail-in ballots can be dropped off to a single location in every county in the state, and the Secretary is enforcing that proclamation. Without immediate relief, Texas voters will suffer the deprivation of their right to vote on account of the co-conspirators' purposeful attempts to deny them equal protection.

**B.      Plaintiffs will suffer irreparable injury absent an injunction.**

Plaintiffs will suffer irreparable harm in the absence of the requested injunctive relief. *First*, the Ballot Return Restriction puts Plaintiffs, the voters they serve, and countless other Texas voters at significant risk of severe burden to their fundamental right to vote—up to and including disenfranchisement. If "constitutional rights are threatened or impaired, irreparable injury is presumed." *Husted*, 697 F.3d at 436; *see also Tex. Democratic Party v. Abbott*, No. CV SA-20-CA-438-FB, 2020 WL 2541971, at *32 (W.D. Tex. May 19, 2020) ("Voting is a constitutional right for those that are eligible, and the violation of constitutional rights for even a minimal period of time constitutes irreparable injury justifying the grant of a preliminary injunction"); *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *League of Women Voters of Fla., Inc. v. Detzner*, 314 F. Supp. 3d 1205, 1223 (N.D. Fla. 2018). Once the election comes and goes, "there can be no do-over and no redress." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014), cert. denied, 135 S. Ct. 1735 (2015). *Second*, if the Ballot Return Restriction remains in effect, the Organizational Plaintiffs must divert resources from other mission-critical efforts to help their members and constituencies overcome the burdens imposed by the law. Ex. 1 ¶ 11. This, too, constitutes irreparable harm. *See, e.g.*, *Ga. Coal. for People's Agenda, Inc. v. Kemp*, 347 F. Supp. 3d 1251, 1268 (N.D. Ga. 2020) (finding irreparable harm where "[p]laintiffs' organizational missions . . . will continue to be frustrated and organization resources will be diverted to [address the challenged law]" and "[s]uch mobilization opportunities cannot be remedied once lost").

C.      **The balance of the equities and the public interest favor an injunction.**

While Plaintiffs face infringement of core constitutional rights, enjoining the Ballot Return Restriction does not threaten injury to either Defendants or anyone else. And "it is 'always' in the public interest to prevent violations of individuals' constitutional rights." *TDP*, 2020 WL 2541971, at \*33 (citing *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981); *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013)); *see also Detzner*, 314 F. Supp. at 1224 ("[A]llowing for easier and more accessible voting for all segments of society serves the public interest."). The public interest is also served by mitigating the spread of COVID-19. Encouraging voters to cast mail ballots rather than stand in line and press into crowded polling places serves that interest. But the Ballot Return Restriction effectively compels mail-in voters in very populous counties to risk the very exposure they were voting by mail to avoid. That risk of danger to public health is substantial, imminent, and ongoing. Issuing an injunction would give Texas voters confidence that their right to vote is preserved even in these unprecedented times, and that they will be able to safely and successfully exercise the franchise, without undue burden.

## IV.    CONCLUSION

For these reasons, Plaintiffs respectfully request that the Court immediately enter an emergency restraining order preventing Defendants from enforcing the Ballot Return Restriction and, following an expedited briefing schedule and a hearing on the motion at the Court's convenience, preliminary enjoin Defendants from doing the same.


Dated:  October 5, 2020                            Respectfully submitted,

                                                   *Skyler M. Howton*
                                                   _____
                                                   Skyler M. Howton, TX# 24077907
                                                   PERKINS COIE LLP
                                                   500 North Akard St., Suite 3300
                                                   Dallas, TX 75201-3347

Telephone: (214) 965-7700
Facsimile: (214) 965-7799
showton@perkinscoie.com

Marc E. Elias*
John M. Devaney**
John M. Geise*
Stephanie Command*
PERKINS COIE LLP
700 Thirteenth Street, N.W., Suite 800
Washington, D.C. 20005-3960
Telephone: (202) 654-6200
Facsimile: (202) 654-6211
melias@perkinscoie.com
jdevaney@perkinscoie.com
jgeise@perkinscoie.com
scommand@perkinscoie.com

Danielle Sivalingam**
Gillian Kuhlmann*
PERKINS COIE LLP
1888 Century Park East, Suite 1700
Century City, California 90067
Telephone: (310) 788-9900
Facsimile: (310) 788-3399
dsivalingam@perkinscoie.com
gkuhlmann@perkinscoie.com

Jessica Frenkel**
PERKINS COIE LLP
1900 Sixteenth Street
Suite 1400
Denver, Colorado 80202-5255
Telephone: (303) 291-2300
Facsimile: (303) 291-2400
jfrenkel@perkinscoie.com

*Attorneys for Plaintiffs*
*Pro hac vice pending*
**Pro hac vice forthcoming*