## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | |
|---|---|
| LAURIE-JO STRATY; TEXAS ALLIANCE FOR RETIRED AMERICANS; and BIGTENT CREATIVE, <br><br> *Plaintiffs*, <br><br> v. <br><br> GREGORY ABBOTT, in his official capacity as Governor of the State of Texas; and RUTH HUGHS, in her official capacity as Texas Secretary of State, <br><br> *Defendants.* | CIVIL ACTION NO. 1:20-cv-01015-RP |

## DEFENDANT SECRETARY'S MOTION TO DISMISS

# Table of Contents

Table of Contents .............................................................................................................................ii

Introduction .....................................................................................................................................1

Background .......................................................................................................................................2

    I.    Texas's Election Code defines the scope of in-person delivery of mail-in ballots. ...................2

    II.   In response to the COVID-19 pandemic, Governor Abbott exercised his emergency powers to expand in-person ballot drops. ....................................................................................2

Argument ..........................................................................................................................................3

    I.    Plaintiffs' constitutional claims are barred by sovereign immunity. ...................................3

        A.   The Eleventh Amendment bars plaintiffs' damages claims. .........................................4

        B.   *Ex parte Young* does not apply to the Secretary in this case. .......................................5

    II.   No standing exists to bring this suit against the Secretary. .................................................5

        A.   Plaintiffs did not meet the threshold requirement of showing standing to sue. ....................5

        B.   The individual plaintiff does not allege harm sufficient to support standing.........................6

        C.   None of the Organizational Plaintiffs has associational standing.............................................7

        D.   None of the Organizational Plaintiffs has organizational standing. ..........................................9

        E.   The organizational plaintiffs also lack third-party standing. ....................................................11

    III.  Plaintiffs fail to state a claim upon which relief can be granted. .................................................12

        A.   Plaintiffs' Anderson-Burdick claim fails. ....................................................................12

        B.   Plaintiffs' arbitrary disenfranchisement claim fails.....................................................16

        C.   Plaintiffs' allegations of a conspiracy fail to state a claim.........................................17

    IV.  Abstention is warranted because related state-court litigation may resolve this case. ............18

Conclusion .....................................................................................................................................20

**Introduction**

Never before in any general election in Texas have counties accepted hand-delivered mail-in ballots at more than one location. Texas voters who chose to deliver their ballots themselves rather than put them in the mail, had to do so at a single location, and could do so only on election day.

On July 27, 2020, Governor Abbott vastly expanded voters' ability to hand-deliver their mail-in ballots.  He suspended Section 86.006(a-1) of the Texas Election Code to expand the time period for the in-person delivery of marked mail-in ballots—not just on election day, but during the entire period leading up to election day. The Governor amended his prior suspension on October 1, 2020, to make clear that during the added time period for in-person delivery of marked mail ballots, a voter who is delivering a marked mail ballot in person prior to election day must do so at a single early voting clerk's office location, and the early voting clerk's office must allow poll watchers to be present to observe any activity related to the in-person delivery of a marked mail ballot. To be clear, the suspension applies for the time period prior to election day; it leaves Section 86.006(a-1) of the Election Code unchanged on election day. As a result of the suspension, Texas voters do not have to wait until election day to deliver their mail-in ballots. And hundreds of thousands of Texas voters will have over *forty days* to deliver their marked ballots instead of just one.

As part of this expansion of voting opportunities, Governor Abbott has simply put in place the practice of requiring voters to deliver those ballots to a single location within the county with poll watchers present. For the first time during the July 2020 primary runoff elections, one county in Texas allowed voters to deliver ballots in more than one location. Just four counties in Texas wanted to continue that practice for the 2020 general election. Weighing the expanded opportunity for voters to deliver ballots early with the policy concerns of ballot security and uniformity of the administration of elections across the 254 counties in Texas, Governor Abbott proclaimed that counties can only accept

1

the early hand-delivery of marked mail-in ballots at one location that serves as the early voting clerk's office—as they had always done in general elections.

## Background

### I.   Texas's Election Code defines the scope of in-person delivery of mail-in ballots.

"The history of absentee voting legislation in Texas shows that the Legislature has been both engaged and cautious in allowing voting by mail." *In re State*, 602 S.W.3d 549, 558 (Tex. 2020). That engagement stretches to the delivery of mail-in ballots, a process the Legislature cabined with commonsense rules designed to ensure ballot security. Prior to 2015, voters had two choices to return mail-in ballots: mail and common or contract carrier. House Bill 1927, passed and signed in 2017, amended Section 86.006 to include in-person delivery on election day as a means of casting a mail-in ballot. Under Section 86.006 of the Texas Election Code, a "voter may deliver a marked ballot in person to the early voting clerk's office only while the polls are open on election day." In making this adjustment, the Legislature intended in-person delivery to be a limited option, available when circumstances make it all but impossible for voters to deliver their ballots on time by means of another method. Accordingly, state and local election officials have interpreted the exception narrowly in previous elections. Until this year, no early voting clerk organized multiple mail-in ballot delivery locations—let alone erecting curbside delivery stations in parking lots and parking garages—in a single county during a general election.

### II.   In response to the COVID-19 pandemic, Governor Abbott exercised his emergency powers to expand in-person ballot deliveries.

Following the emergence of the novel coronavirus, Governor Greg Abbott suspended provisions of the Texas Election Code pursuant to the Texas Disaster Act of 1975, TEX. GOV'T CODE § 418.016, which he determined would "prevent, hinder, or delay necessary action in coping with [the] disaster." The Governor's July 27, 2020 proclamation, among other things, suspended Section 86.006(a-1) so that voters could "deliver a marked mail ballot in person to the early voting clerk's

office prior to and including on election day." The proclamation expanded only the length of time in which a voter could hand-deliver his or her marked ballot, but it did not alter or otherwise affect the other applicable requirements dictated in the statute.

The Governor subsequently learned that a handful of early voting clerks planned to have multiple mail-in ballot delivery locations per county prior to election day. The expanded scope of the locations does not comport with the brief historical practice of delivery locations in Texas before the July 2020 primary runoffs, during which only one county allowed multiple delivery locations. It also became apparent that the counties who plan on expanding the number of delivery locations intend to implement inconsistent and often inadequate safeguards to preserve the integrity of the election, such as a lack of poll watchers overseeing ballot deliveries. The Governor therefore issued a second Proclamation on October 1, 2020 ("Proclamation") to make clear that the added time period for in-person delivery of marked mail ballots only applies when:

- Voters return their marked ballots at a single early voting clerk's office location that is publicly designated; and,

- the early voting clerk allows poll watchers the opportunity to observe any activity conducted at the early voting clerk's office location related to in-person delivery.

In doing so, the Governor advanced the State's weighty interests in clarifying any confusion caused by the July 27 order, reintroducing uniformity in the interpretation and application of the Election Code and ensuring ballot security.

## Argument

### I.   Plaintiffs' constitutional claims are barred by sovereign immunity.

"[T]he principle of state-sovereign immunity generally precludes actions against state officers in their official capacities, subject to an established exception: the *Ex parte Young* doctrine." *McCarthy ex rel. Travis v. Hawkins*, 381 F.3d 407, 412 (5th Cir. 2004) (citation omitted). *Ex parte Young* "rests on the premise—less delicately called a 'fiction'—that when a federal court commands a state official to

do nothing more than refrain from violating federal law, he is not the State for sovereign-immunity purposes." *Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 255 (2011) (citation omitted). It necessarily follows that for this exception to apply, the state official must have committed, or demonstrated a willingness to commit, some type of affirmative action contrary to federal law that the court can order the state official to cease performing. *See Ex parte Young*, 209 U.S. 123, 157 (1908); *City of Austin v. Paxton*, 943 F.3d 993, 1001–02 (5th Cir. 2019); *Morris v. Livingston*, 739 F.3d 740, 746 (5th Cir. 2014) (a proper defendant has both "the particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty"). Because the Secretary of State does not have a sufficient connection to the enforcement of the Proclamation, the claims here miss the mark.

### A.    The Eleventh Amendment bars plaintiffs' damages claims.

Plaintiffs are seeking relief against the Secretary only in her official capacity, as their complaint makes clear in its caption, its introductory text, and paragraph 20.[1] *See* ECF 1. Because plaintiffs have sued the Secretary in her official capacity, the real party in interest is the State of Texas, not the Secretary—entitling her to Eleventh Amendment immunity and barring any damages claim. *See, e.g.,* *Spec's Family Partners, Ltd. v. Nettles*, 972 F.3d 671, 681 (5th Cir. 2020). "Because state sovereign immunity has not been abrogated" the Plaintiffs "cannot bring a damages claim against [the Governor] in his official capacity." *Id.* Plaintiffs invoke 42 U.S.C. § 1985(3) in their prayer for damages, but that statute does not abrogate state sovereign immunity. *See, e.g.,* *Price v. Shorty*, 632 F. App'x 211, 212 (5th Cir. 2016) (per curiam). Thus, plaintiffs' claim for damages against the Governor in his official capacity must be dismissed.

---

[1] Plaintiffs have expressly limited their claims against the Secretary to her official capacity, but also seek damages as relief under 42 U.S.C. § 1985(3). Because qualified immunity applies only where a state actor is being sued in an individual capacity, qualified immunity is not applicable to Plaintiffs' claims as pleaded. In an abundance of caution, however, the Secretary asserts that qualified immunity would bar any individual capacity claim raised against her for damages in this case, and reserves the right to further brief qualified immunity if necessary. *See Southard v. Tex. Bd. of Criminal Justice*, 114 F.3d 539, 556 & n.30 (5th Cir. 1997).

4

**B.   *Ex parte Young* does not apply to the Secretary in this case.**

The Secretary does not enforce the Proclamation. *See* Tex. Gov't Code § 418.173.  Nor does she implement or enforce the Election Code provision that is the subject of the challenged provision. *See* Tex. Elec. Code § 86.006(a-1). That is instead the province of local law enforcement and the early voting clerk respectively. *See Id.* at § 83.001 (charging the early voting clerk with conducting early voting in each election); *see also* Decl. of Christopher G. Hollins, Harris County Clerk, *LULAC v. Abbott* (lead case) (Oct. 3, 2020), ECF 8-1 ¶ 3. Indeed, the failure to comply with an executive order issued pursuant to §§ 418.012 and 418.016 constitutes a separate criminal offense with a specified penalty. Tex. Gov't Code § 418.173. It is therefore enforced through criminal prosecution and falls entirely outside of the Secretary's delegated authority.

Additionally, even where a state official "has the authority to enforce" a law, a plaintiff must further allege that the state official "is likely to" enforce the law in a way that would "constrain" the plaintiff. *City of Austin*, 943 F.3d at 1001–02. A state official must have not only "the particular duty to enforce the statute in question" but also "a demonstrated willingness to exercise that duty." *Morris v. Livingston*, 739 F.3d 740, 746 (5th Cir. 2014). Here, the Secretary does not believe that she has that authority and so is unlikely to make such an effort, and the Plaintiffs have not plausibly alleged any facts suggesting that the Secretary "is likely to" enforce the Proclamation. Plaintiffs thus cannot "point[] to specific enforcement actions of" the Secretary that "warrant[s] the application of the *Young* exception." *City of Austin*, 943 F.3d at 1001.

**II.   No standing exists to bring this suit against the Secretary.**

**A.   Plaintiffs did not meet the threshold requirement of showing standing to sue.**

"[S]tanding is perhaps the most important of the jurisdictional doctrines." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) (quotation omitted). Courts persistently inquire into standing because "[w]ithout jurisdiction the court cannot proceed *at all* in any cause." *Steel Co. v. Citizens for a*

*Better Env't*, 523 U.S. 83, 94 (1998) (quotation omitted) (emphasis added). At the pleading stage, the individual plaintiffs must "clearly . . . allege facts demonstrating each element" of standing. *Spokeo, Inc. v. Robbins*, 136 S. Ct. 1540, 1547 (2016) (quotation omitted). Specifically, a plaintiff must show: (1) an actual or imminent, concrete and particularized "injury-in-fact"; (2) that is fairly traceable to the challenged action of the defendant; and (3) that is likely to be redressed by a favorable decision. *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000).

The organizational plaintiffs have two avenues to allege standing: (1) associational or (2) organizational. *See NAACP v. City of Kyle*, 626 F.3d 233, 237–38 (5th Cir. 2010). Organizational standing requires that the plaintiff establish injury, causation, and redressability. *Id.* For associational standing, the organization must show (1) that its members would independently have standing; (2) that the interests the organization is protecting are germane to the purpose of the organization; and (3) neither the claim asserted nor the relief requested requires participation of individual members. *Ctr. for Biological Diversity v. EPA*, 937 F.3d 533, 536 (5th Cir. 2019).

Because Plaintiffs are "invoking federal jurisdiction," they "bear[] the burden of establishing these elements." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

**B.     The individual plaintiff does not allege harm sufficient to support standing.**

The Individual Plaintiff has not identified a cognizable injury. Her claims instead rest on speculation about what impact external events, such as COVID-19, may have on the speed with which she receives and returns her mail-in ballot. Indeed, the very language Plaintiff Straty uses to describe her alleged injury reinforces the fact that any asserted harm is "conjectural or hypothetical" and not "actual or imminent." *Pub. Citizen, Inc. v. Bomer*, 274 F.3d 212, 217 (5th Cir. 2001) (citing *Lujan*, 504 U.S. at 560); *see also Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401 (2013) (distinguishing between a certainly impending injury and one built on subjective fear). Plaintiff Straty, for example, has concerns about exposing her parents to COVID-19 and alleges that she is aware of "reports of widespread

6

issues with USPS" causing her not to trust the mail. ECF 1 at ¶ 16. "Subjective fear," however, "does not give rise to standing." *Clapper*, 568 U.S. at 418.

But Plaintiff Straty seeks prospective relief in her Complaint. Accordingly, she must establish an "imminent" future injury to satisfy standing. *Lujan*, 504 U.S. at 564. The Supreme Court has repeatedly interpreted this to mean that a "threatened injury must be *certainly impending* to constitute injury in fact"— "[a]llegations of *possible* future injury are not sufficient." *Clapper*, 568 U.S. at 409 (quotations omitted). The rejection of a mail-in ballot as late is very rare. According the U.S. Election Assistance Commission, only 1.76 percent of mail-in ballots in the 2018 general election were rejected statewide.[2] Of that 1.76 percent, only a fraction was rejected because the ballot was received after the deadline. A less than 1% probability of injury is not "*certainly impending.*" *Clapper*, 568 U.S. at 409.

Nor has Plaintiff Straty pled facts establishing that her particular mail-in ballot will be rejected as late or is even more likely to be rejected as late than the typical mail-in ballot. She instead relies on the general proposition that she has heard "reports of widespread issues". ECF 1 ¶ 16. "[G]eneral data [] does not establish a substantial risk that Plaintiffs themselves will [be injured]; Plaintiff-specific evidence is needed." *Stringer v. Whtiley*, 942 F.3d 715, 722 (5th Cir. 2019). Hence, even if other voters in different jurisdictions were able to establish a likelihood of delay, that has no bearing on whether the Individual Plaintiff has standing. Allegations of "an imminent injury" must be "[p]laintiff-specific." *Stringer*, 942 F.3d at 722. "[F]uture injury to others is irrelevant; plaintiffs seeking injunctive relief must show a continuing or threatened future injury to themselves." *Id.* at 721.

### C.   None of the Organizational Plaintiffs has associational standing.

None of the Organizational Plaintiffs pleads facts establishing associational standing. A plaintiff cannot have associational standing unless one of its members independently satisfies the

---

[2] U.S. Election Assistance Commission, Election Administration and Voting Survey: 2018 Comprehensive Report at 14, https://www.eac.gov/sites/default/files/eac_assets/1/6/2018_EAVS_Report.pdf.

Article III standing requirements. *Ctr. for Biological Diversity*, 937 F.3d at 536. For this to occur, the plaintiff must establish two threshold facts. First, the plaintiff must establish that it has "members" within the meaning of the associational standing test articulated in *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 344 (1977) (requiring "indicia of membership"). Second, the plaintiff must identify specific members who have "suffered the requisite harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009).

Plaintiffs fail both tests. Although Organizational Plaintiffs describe themselves as having members in the colloquial sense, none assert facts establishing that its members "participate in and guide the organization's efforts," as is required for associational standing. *Ass'n for Retarded Citizens of Dall. v. Dall. Cty. Mental Health & Mental Retardation Ctr. Bd. of Trs.*, 19 F.3d 241, 244 (5th Cir. 1994); *see also Tex. Indigenous Council v. Simpkins*, No. 5:11-cv-315, 2014 WL 252024, at *3 (W.D. Tex. Jan. 22, 2014) (explaining that "'indicia of membership' consists of elect[ing] leadership, serv[ing] as the organization's leadership, and financ[ing] the organization's activities, including the case's litigation costs").

Even if they had established that they have members, Plaintiffs would still need to identify injured members. The Supreme Court has unequivocally held that the "requirement of naming the affected members has never been dispensed with" except "where *all* the members of the organization are affected by the challenged activity." *Summers*, 555 U.S. at 498–99. Here, Organizational Plaintiffs fail to explain what portion of their membership qualifies to vote by mail and whether any member intends to deposit their ballot at a delivery location. *See, e.g.*, ECF 1 ¶¶ 17, 18. Hence, this is not a situation where Organizational Plaintiffs can evade their obligation to identify specific members by pointing to a blanket harm. *See Summers*, 555 U.S. at 498 (holding that courts do not "engage in an assessment of statistical probabilities" when evaluating standing).

Despite this requirement, none of the Organizational Plaintiffs identify a specific member who has suffered a requisite injury in-fact on account of the Governor's Proclamation. To be sure, neither the Texas Alliance for Retired Americans (TARA) nor BigTent Creative (BigTent) assert that any member intends to deliver their voted mail ballot at a mail ballot delivery location that is not the early voting clerk office, and neither TARA nor BigTent names or identifies any member who does. *See Summers*, 555 U.S. at 498–99. The only individual identified in the Complaint is Laurie-Jo Straty, but the Complaint does not allege that she is a member of Organizational Plaintiffs. Moreover, even if Plaintiff Straty was a member, she could not support associational standing because she lacks individual standing for the reasons explained below.

Thus, regardless of whether Organizational Plaintiffs have members, as defined in *Hunt*, Plaintiffs could not acquire standing through them and their claims should be dismissed. *See City of Kyle*, 626 F.3d at 237 (requiring evidence of "a specific member"); *see also Ga. Republican Party v. SEC*, 888 F.3d 1198, 1203 (11th Cir. 2018); *Draper v. Healey*, 827 F.3d 1, 3 (1st Cir. 2016) (Souter, J.) ("[T]he complaint did not identify any member of the group" and "where standing is at issue, heightened specificity is obligatory at the pleading stage); *N.J. Physicians, Inc. v. President of U.S.*, 653 F.3d 234, 241 (3d Cir. 2011) (The plaintiffs lacked standing because the only member identified in the compliant did not suffer an injury in-fact.); *Disability Rights Wis., Inc. v. Walworth Cty. Bd. of Supervisors*, 522 F.3d 796, 804 (7th Cir. 2008) ("[A]dvocacy is only appropriately—and constitutionally—undertaken on behalf of another when that other has suffered an injury.").

### D.     None of the Organizational Plaintiffs has organizational standing.

Organizational Plaintiffs do not have organizational standing because they have not plausibly alleged that they, as organizations, will suffer injuries in-fact. Plaintiffs TARA and BigTent only claim that they would like to educate voters about more locations to deliver mail-in ballots and that they would like to educate voters about additional delivery locations (TARA) and avoid diverting resources.

ECF 1 ¶¶ 17, 18. But expressing desire for a different system (TARA) and invoking diversion of resources (BigTent) do not substitute for the requirement of a concrete, particularized injury.

Though the diversion of resources can constitute a requisite injury under certain circumstances, "[n]ot every diversion of resources to counteract [a] defendant's conduct . . . establishes an injury in fact." *City of Kyle*, 626 F.3d at 238. "The change in plans must still be in response to a reasonably certain injury imposed by the challenged law." *Zimmerman v. City of Austin*, 881 F.3d 378, 390 (5th Cir. 2018). Plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 402 (2013).

In this case, TARA does not allege that it has diverted resources (ECF 1 at ¶ 17) but BigTent argues that it "will be required to divert time and resources to educating employees and influencers" about how to overcome obstacles to voting. ECF 1 ¶ 18. However, spending resources to teach third parties about the law, on its own, is not an injury in-fact. *See Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1434 (D.C. Cir. 1995) (holding that a "self-serving observation that [plaintiff] has expended resources to educate its members" about the challenged law does not present an injury in fact). The expenditures to educate employees and the organization's communities must cause the organization to incur "'operational costs beyond those normally expended' to carry out its advocacy mission." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 920 (D.C. Cir. 2015) (quoting *Nat'l Taxpayers Union*, 68 F.3d at 1434). Neither TARA nor BigTent make such allegations.

In addition, to establish standing, "an organizational plaintiff must explain how the activities it undertakes in response to the defendant's conduct differ from its 'routine [] activities.'" *Def. Distributed v. U.S. Dep't of State*, 1:15-CV-372-RP, 2018 WL 3614221, at *4 (W.D. Tex. July 27, 2018) (quoting *City of Kyle*, 626 F.3d at 238). And it must "identify 'specific projects that [it] had to put on hold or otherwise curtail in order to respond to' the defendant's conduct." *Id.* (quoting *City of Kyle*, 626

F.3d at 238). Again, neither Organizational Plaintiff bothers. Rather, the Organizational Plaintiffs "only conjectured that the resources" they diverted "could have been spent on other unspecified [organizational] activities." *City of Kyle*, 626 F.3d at 239. That, however, is not enough. *See Def. Distributed*, 2018 WL 3614221, at *4 (ruling that projects must be described with "sufficient specificity to constitute an injury in fact").

### E.   The organizational plaintiffs also lack third-party standing.

Even if Organizational Plaintiffs had Article III standing, they would lack statutory standing. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127–28 n.3–4 (2014). Section 1983 provides a cause of action only when the plaintiff suffers "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. It does not provide a cause of action to plaintiffs claiming an injury based on the violation of a third party's rights. *See Coon v. Ledbetter*, 780 F.2d 1158, 1160 (5th Cir. 1986) ("[L]ike all persons who claim a deprivation of constitutional rights, [plaintiffs] were required to prove some violation of their personal rights.").

Section 1983 "incorporates, but without exceptions, the Court's 'prudential' principle that the plaintiff may not assert the rights of third parties." David P. Currie, *Misunderstanding Standing*, 1981 Sup. Ct. Rev. 41, 45. When "[t]he alleged rights at issue" belong to a third party, rather than the plaintiff, the plaintiff lacks statutory standing, regardless of whether the plaintiff has suffered his own injury. *Danos v. Jones*, 652 F.3d 577, 582 (5th Cir. 2011); *see also Conn v. Gabbert*, 526 U.S. 286, 292–93 (1999) (holding that a lawyer "clearly had no standing" to bring a secion 1983 claim because a plaintiff "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties").

Here, the Organizational Plaintiffs premise their claims on the right to vote. But Organizational Plaintiffs are artificial entities that do not have voting rights. "It goes without saying that political parties, although the principal players in the political process, do not have the right to

vote." *Vieth v. Pennsylvania*, 188 F. Supp. 2d 532, 546 (M.D. Pa. 2002). The Organizational Plaintiffs therefore are necessarily asserting the rights of third parties and cannot sue under section 1983.

Moreover, because this follows from the statute itself, Plaintiffs cannot invoke any prudential exceptions. *See Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 359 (2d Cir. 2016) ("Because Congress specified in the statute who may sue, prudential standing principles do not apply."); *see also* Currie, 1981 Sup. Ct. Rev. at 45. But even if Organizational Plaintiffs could invoke prudential-standing exceptions, their Complaint does not do so. Plaintiffs do not allege that they have "a 'close' relationship with" voters, and there is no reason to think voters face any "hindrance" to protecting their "own interests." *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004) (noting the Supreme Court has generally "not looked favorably upon third-party standing").

## III. Plaintiffs fail to state a claim upon which relief can be granted.

### A. Plaintiffs' Anderson-Burdick claim fails.

By alleging that the Proclamation violates the right to vote, Plaintiffs effectively argue that requiring counties to follow their prior practice—one delivery location per county—imposes an undue burden. That argument fails for two independent reasons: (1) the Proclamation does not encroach on the right to vote whatsoever; and (2) the Proclamation survives any *Anderson-Burdick* review because any burden is miniscule.

The Constitution does not include a freestanding right to vote in whatever manner Plaintiffs deem most convenient. When considering a challenge to the limited availability of absentee ballots, the Supreme Court distinguished "the right to vote" from the "claimed right to receive absentee ballots." *McDonald v. Bd. of Election Comm'rs of Chi.*, 394 U.S. 802, 807 (1969). It concluded that the plaintiffs' inability to vote by mail did not implicate the right to vote because it did not "preclude[] [the plaintiffs] from voting" via other methods. *Id.* at 808. That holding dooms Plaintiffs' *Anderson-Burdick* claim. *See also Crawford v. Marion County Election Bd.*, 553 U.S. 181, 209 (2008) (Scalia, J.,

concurring in the judgment) ("That the State accommodates some voters by permitting (not requiring) the casting of absentee or provisional ballots, is an indulgence—not a constitutional imperative that falls short of what is required.").

The State of Texas has gone out of its way to provide its citizens with an abundance of opportunities to cast their ballot. Voting by mail is but one. Texas has scheduled the early voting period to commence on October 13, 2020, and continue through the fourth day before election day. *See* Proclamation of the Governor, July 27, 2020.[3] This will furnish voters 19 days in which to cast an in-person ballot, including election day. Voters may cast their ballot in-person (including by curbside, if eligible) at any polling location in their home county during the early voting period (and often on election day).[4] Many voters will have the option of a hundred or more polling locations in which to choose,[5] each of which will be open a minimum of eight hours each day. *See* Tex. Elec. Code § 85.064.

In addition, Texas provides multiple options by which qualified voters may return their mail-in ballots, including by mail, by common or contract carrier, and by in-person delivery. TEX. ELEC. CODE 86.006(a). Because the challenged Proclamation does not affect Plaintiffs' numerous other options for voting, it does not affect the "right to vote," only the "claimed right" to have multiple options for in-person delivery of a mail-in ballot. *McDonald*, 394 U.S. 802, 807 (1969).

Moreover, the Governor's Proclamations make voting easier, not harder. Plaintiffs cannot claim that in-person delivery of mail-in ballots during the early voting period (an option that did not exist before the Governor allowed it by Proclamation) is impermissibly infringed by the Governor's Proclamation clarifying its scope. Plaintiffs attempt to create a pernicious one-way ratchet in which

---

[3] The period for early voting by personal appearance during a general election would ordinarily begin on the 17th day before election day, *see* TEX. ELEC. CODE § 85.001; however, Governor Abbott extended it in response to COVID-19 by means of an emergency proclamation.

[4] A list of all counties participating in the Countywide Polling Place Program can be found at the Secretary of State's websites, https://www.sos.state.tx.us/elections/laws/countywide-polling-place-program.shtml.

[5] Harris County, for example, has announced that it will host 120 early voting polling locations and 767 election day polling locations for the November general election, with the possibility of adding more between now and the start of the in-person voting period.

every emergency suspension of law creates a new "right to vote" that cannot be scaled back in light of new circumstances. That would impose significant burdens on Texas's ability to respond to the pandemic, and it is not required by *Anderson-Burdick*.

However, even if this Court concludes that the right to vote is implicated, the Proclamation easily passes muster under *Anderson-Burdick*, as any burden is *de minimis*, and the statute advances weighty State interests. To apply the *Anderson-Burdick* test, a court must "first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate." *Voting for Am., Inc. v. Steen*, 732 F.3d 382, 387 (5th Cir. 2013) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)). Then, the Court "must identify and evaluate the precise interest put forward by the State as justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights." *Id.* at 388 (quoting *Burdick v. Takushi*, 504 U.S. 428, 434 (1992)). When a state election law provision imposes only "reasonable, nondiscriminatory restrictions" upon the First and Fourteenth Amendment rights of voters, "the state's important regulatory interests are generally sufficient to justify" the restrictions. *Anderson*, 460 U.S. at 788.

Addressing each element in turn, the Governor's actions expanded Plaintiffs' ability to vote by mail. He did not curtail or burden it. Prior to his July 27 and October 1 proclamations, voters could deliver their ballots in-person only on election day. TEX. ELEC. CODE § 86.006(a-1). The Governor suspended that limitation, permitting voters to deliver their ballot to the early voting clerk as soon as their ballots were marked and ready. Significantly, the Proclamation did not eliminate any practice previously available to voters on election day. The Election Code only introduced in-person delivery as an option in 2015, and the State is aware of no county or political subdivision offering more than one delivery location before this year.

14

Nor is there any reason to suspect that voters will be unable to return their ballots by the deadline on account of the Proclamation. In addition to having a robust in-person voting period, Texas has taken care to ensure that voters who vote by mail have enough time to cast their ballot. The Election Code permits voters to submit their application for a ballot by mail as early as January 1 of the calendar year in which the election will be held. For voters who qualify by reason of age or disability, the State offers voters the option to submit an annual application, meaning that voters will receive a ballot for every relevant election held that year. If voters submit their application in a timely fashion, the Election Code requires the early voting clerk to distribute ballots to voters no less than 30 days before election day. Even assuming *arguendo* that complications from COVID-19 could cause intermittent delays, nothing in the Complaint suggests that a month is insufficient time for Plaintiffs to review, mark, and then return their ballots.

Moving onto the next *Anderson-Burdick* prong, the State's interests more than justify the supposed burden placed on voters. Election fraud, specifically vote-by-mail election fraud, has proven to be a frequent and enduring problem in Texas. *See Crawford.*, 553 U.S. 181, 195 n.12 (2008) (plurality) (noting that most of the documented cases of voter fraud were related to absentee voting); *Veasey v. Abbott*, 830 F.3d 216, 263 (5th Cir. 2016) (en banc) (noting that mail-in voting is "far more vulnerable to fraud, particularly among the elderly."). Limiting the number of in-person delivery locations reduces the risk of these criminal acts succeeding. *Crawford*, 553 U.S. at 196 (plurality) ("There is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters."). It enables election personnel to focus their resources and attention on a single location, and it prevents fraudsters from forum shopping should one delivery site have fewer safeguards or its personnel exhibit less prudence.

In addition, because the historical practice has been to limit the number of early voting clerk's offices to a single location per county, there is little uniformity among early voting clerks in interpreting

and implementing Section 86.006(a-1). This discrepancy has two chief consequences. First, procedures will vary between counties and even between delivery locations within a single county including precautions that must be taken to ensure the delivery process is both accessible and resistant to fraud. Second, the impromptu and haphazard implementation of additional delivery locations could result in disparate treatment among Texas voters since not every county has interpreted Section 86.006(a-1) the same way. The State therefore has an acute interest in clarifying the law, including the Governor's July 27 proclamation, and establishing uniformity in the way counties administer the election.

**B.      Plaintiffs' arbitrary disenfranchisement claim fails.**

Plaintiffs contend that the Proclamation violates the Equal Protection Clause, but this claim also fails as a matter of law. To start with, Plaintiffs' reliance on *Bush v. Gore* is misplaced. 531 U.S. 98, 104–05 (2000). First, the opinion in *Bush v. Gore* was "limited to the present circumstances" because "the problem of equal protection in election processes generally presents many complexities." *Id.* at 109. And as such the opinion has limited precedential value. See *League of United Latin Am. Citizens v. Abbott*, 951 F.3d 311, 317 (5th Cir. 2020) (doubting that *Bush v. Gore* could apply outside of those specific facts considering the Court's "express pronouncement").

The case is also readily distinguishable from the current controversy. First, the problem confronted in *Bush v. Gore* turned on the contention that inconsistent counting processes "led to unequal *evaluation* of ballots in various respects." 531 U.S. at 106 (emphasis added). That is, some votes were tallied, while others were not. *See id.* But here, the Plaintiffs allege that some voters will have more travel time than others, not that there is any risk of differing tabulations.  Second, in *Bush v. Gore*, the Court confronted a unique situation, where the "standards for accepting or rejecting contested ballots might vary not only from county to county but indeed within a single county from one recount team to another." 531 U.S. at 106. Here, in contrast, the Proclamation reestablishes a single universal rule that is easily administrable and applies statewide. The Proclamation in fact was issued in part to

advance uniformity by requiring each county to have a single location serving as the early voting clerk's office.

At most, Plaintiffs claim that the Proclamation will have a disparate impact on voters based on their geography. ECF 1 at ¶ 64. But that triggers no more than rational-basis review, which the Proclamation more than satisfies. *See, e.g.*, *Phillips v. Snyder*, 836 F.3d 707, 719 (6th Cir. 2016); *Decatur Liquors, Inc. v. District of Columbia*, 478 F.3d 360, 363 (D.C. Cir. 2007).

The fact that the Proclamation would survive rational basis review leads to the final reason why Plaintiff's claim fails as a matter of law. Namely, an action taken by the government cannot arbitrarily disenfranchise voters when it advances legitimate government interests. As explained above, the Governor had good reasons for suspending Section 86.001(a-1), such as expanding the opportunities for eligible voters to return a marked mail ballot in person prior to election day, but doing so in a manner that still provided for ballot security. Plaintiffs may disagree with these reasons, but the Proclamation is reasonable considering the State's interests in preserving uniformity and integrity in its elections.

## C.    Plaintiffs' allegations of a conspiracy fail to state a claim.

Plaintiffs cannot state a viable cause of action under 42 U.S.C. § 1985(3). Stating such a claim requires plausibly alleging: (1) a conspiracy involving two or more persons; (2) *for the purpose* of depriving, directly or indirectly, a person or class of persons of the equal protection of the laws; and (3) an act in furtherance of the conspiracy; (4) which causes injury to a person or property, or a deprivation of any right or privilege of a citizen of the United States. *Hilliard v. Ferguson*, 30 F.3d 649, 652–53 (5th Cir. 1994). "In so doing, the plaintiff must show that the conspiracy was motivated by a class-based animus." *Id.* at 653. This claim fails for manifold reasons.

*First*, Plaintiffs have made no allegations, and offered no evidence, that the purported conspiracy "was motivated by a class-based animus," or even what role the Secretary had in defining

the scope of the Proclamation.

Second, if Plaintiffs' allegations are true that this suit is against the Secretary in her official capacity only, then this suit is really against the State of Texas, not "persons" capable of conspiring. *See Will v. Mich. Dep't of State Police,* 491 U.S. 58, 63–71 (1989) (holding that a state is not a person under section 1983); *Small v. Chao,* 398 F.3d 894, 898 (7th Cir. 2005) (concluding that a lack of personhood under section 1983 equates to a lack of personhood under section 1985); *see also Washington v. Louisiana*, 425 Fed. App'x 330, 333 (5th Cir. 2011) (same). What's more, "[i]t is a long-standing rule in this circuit that a 'corporation cannot conspire with itself any more than a private individual can, and it is the general rule that the acts of the agent are the acts of the corporation.'" *Hilliard*, 30 F.3d at 653 (citation omitted). Thus, any conspiratorial acts taken by the Secretary are attributable to the State of Texas. Under section 1985, there can be no conspiracy between the State of Texas and its agents. *See id.*

*Third*, Plaintiffs do not even argue that the supposed conspiracy was motivated by racial animus. But the Fifth Circuit has held that "the only conspiracies actionable under section 1985(3) are those motivated by racial animus." *Cantu v. Moody*, 933 F.3d 414, 419 (5th Cir. 2019) (quoting *Deubert v. Gulf Fed. Sav. Bank*, 820 F.2d 754, 757 (5th Cir. 1987)).

At bottom, Plaintiffs' allegation of a conspiracy comes nowhere close to meeting the plausibility standard required to state a claim under section 1985.

## IV.    Abstention is warranted because related state-court litigation may resolve this case.

The Texas Supreme Court has not yet addressed a predicate question of state law that goes to the heart of this case. On October 7, 2020, the Texas Supreme Court left open whether the state constitution permits the Texas Governor to suspend the Election Code at all, but a case raising challenges like those presented here is percolating in state court and squarely presents that predicate question again. *See, e.g., In re Hotze*, No. 20-0739, slip op. at __ (Oct. 7, 2020), *available at*

https://www.txcourts.gov/media/1449868/200739.pdf; *The Anti-Defamation League, et al. v. Abbott*, No. D-1-GN-20-5550 (353rd Dist. Ct., Travis Cty., Tex. *filed* Oct. 5, 2020). Considering the uncertainty about a predicate question of state law, this Court should abstain under *Railroad Commission of Texas v. Pullman*, 312 U.S. 496 (1941). "The *Pullman* case establishes two prerequisites for *Pullman* abstention: (1) there must be an unsettled issue of state law; and (2) there must be a possibility that the state law determination will moot or present in a different posture the federal constitutional questions raised." *Palmer v. Jackson*, 617 F.2d 424, 428 (5th Cir. 1980). Each of these prerequisites is satisfied here.

First, the proclamations rest on the Governor's power to suspend "any regulatory statute prescribing the procedures for conduct of state business." TEX. GOV'T. CODE § 418.016. State-court litigants are currently challenging whether Section 418.016 is compatible with delegation limits in the Texas Constitution. *The Anti-Defamation League, et al. v. Greg Abbott*, No. D-1-GN-20-5550 (353rd Dist. Ct., Travis Cnty., Tex. *filed* Oct. 5, 2020). The issue is therefore not yet settled.

Second, if the Supreme Court of Texas strikes down the provision of the Disaster Act as an improper delegation, its ruling would put Plaintiffs' claims "in a different posture," if not moot them entirely. That is because if the plaintiffs' argument in *The Anti-Defamation League, et al. v. Abbott* is successful, then the challenged Proclamation would not have the force of law. Early voting procedures would be governed by Section 86.006(a-1), which, Plaintiffs contend, already permits the early voting clerk to organize multiple mail-in ballot, delivery locations per county on election day. In that event, there would be no need for this Court to rule on Plaintiffs' federal claims. *See, e.g.*, *Pullman*, 312 U.S. at 501 ("If there was no warrant in state law for the Commission's assumption of authority there is an end of the litigation; the constitutional issue does not arise.").

That the statute in need of state-court clarification is not being challenged in this case is immaterial. But for Section 418.016, the Governor could not issue the Proclamation which suspended

Section 86.006(a-1). A determination that it exceeded the state constitution, by necessity, resolves Plaintiffs' alleged injury. "[W]here the challenged statute is part of an integrated scheme of related constitutional provisions, statutes, and regulations, and where the scheme as a whole calls for clarifying interpretation by the state courts, we have regularly required the district courts to abstain." *Harris Cty. Comm'rs Court v. Moore*, 420 U.S. 77, 84 n.8 (1975). This case therefore presents an almost textbook illustration of the *Pullman* abstention doctrine. *Id.* at 84 ("Among the cases that call most insistently for abstention are those in which the federal constitutional challenge turns on a state statute, the meaning of which is unclear under state law.").

Indeed, in many respects, the case resembles the situation presented in *Texas Democratic Party v. Abbott*, 961 F.3d 389 (5th Cir. 2020). There, the district court considered a constitutional challenge over Texas's failure to extend mail-in voting to all voters in response the COVID-19 pandemic. Although the court's analysis turned on the interpretation of "disability" in Section 82.002 of the Election Code, the district court decided to proceed without waiting for guidance from the Supreme Court of Texas, which was, at the time, deliberating that very issue. On appeal, the Fifth Circuit chastened the district court's decision as "not well considered." *Id.* at 397 n.13. This is because the "forthcoming interpretation of state law could have made any federal constitutional ruling 'unnecessary.'" *Id.* at 417 (Costa, J., concurring) (quoting *Pullman*, 312 U.S. at 500). "The timing of the parallel litigation [also] made this such a strong case for abstaining." *Id.* at 418 (Costa, J., concurring).

## Conclusion

The Secretary respectfully requests that the Court dismiss Plaintiffs' Complaint.

Date: October 7, 2020

KEN PAXTON
Attorney General of Texas

Respectfully Submitted.

/s/ Patrick K. Sweeten
PATRICK K. SWEETEN
Associate Deputy for Special Litigation

TODD LAWRENCE DISHER
Deputy Chief for Special Litigation

WILLIAM T. THOMPSON
Special Counsel

ERIC A. HUDSON
Special Counsel

KATHLEEN T. HUNKER
Special Counsel

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548 (MC-009)
Austin, Texas 78711-2548
Tel.: (512) 936-1414
Fax: (512) 936-0545
patrick.sweeten@oag.texas.gov
todd.disher@oag.texas.gov
will.thompson@oag.texas.gov
eric.hudson@oag.texas.gov
kathleen.hunker@oag.texas.gov

COUNSEL FOR THE TEXAS SECRETARY OF STATE

## CERTIFICATE OF SERVICE

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on October 7, 2020, and that all counsel of record were served by CM/ECF.

/s/ Patrick K. Sweeten
PATRICK K. SWEETEN
Associate Deputy for Special Litigation