# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

LAURIE-JO STRATY; TEXAS ALLIANCE
FOR RETIRED AMERICANS; and BIGTENT
CREATIVE,

        Plaintiffs,

v.

GREG ABBOTT, in his official capacity as
Governor of Texas, RUTH HUGHS, in her
official capacity as Texas Secretary of State,

        Defendants.

Civil Action Case No. 1:20-cv-1015-RP

## DEFENDANTS' RESPONSE TO
## PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

Introduction...........................................................................................................................................1

Background..........................................................................................................................................2

    I.   The emergence of COVID-19 prompts an unprecedented response by the Governor...........2

    II.  Governor Abbott exercises his emergency powers to expand access to voting.........................2

    III. The Governor clarifies his earlier proclamation to advance uniformity and ballot integrity......3

Preliminary Injunction Standard.......................................................................................................5

Argument ............................................................................................................................................6

    I.   This Court should abstain from ruling on Plaintiffs' motion for preliminary injunction until the predicate state-law claims are resolved.........................................................................6

    II.  Plaintiffs are not entitled to restructure the allocation of state-law powers between the Governor and Texas counties through a federal lawsuit. ..............................................7

    III. Plaintiffs' constitutional claims are barred by sovereign immunity. ...................................8

        A.   *Ex parte Young* does not apply to the Governor in this case. ........................................9

        B.   *Ex parte Young* does not apply to the Secretary of State in this case. ....................................10

    IV. No standing exists to bring this suit against Defendants. ...............................................11

        A.   Plaintiffs did not meet the threshold requirement of showing standing to sue....................11

        B.   None of the Organizational Plaintiffs has associational standing...............................12

        C.   None of the Organizational Plaintiffs has organizational standing. .......................................14

        D.   The Organizational Plaintiffs also lack third-party standing.............................................16

        E.   The individual plaintiffs' alleged harm does not establish standing.......................................17

        F.   Alleged harms are neither traceable nor redressable..................................................20

    V.   Plaintiffs are not likely to succeed on the merits...........................................................21

        A.   Plaintiffs' *Anderson-Burdick* claim fails....................................................................21

            1.   The Proclamation expands Texans' ability to vote by mail. ..................................22

            2.   The Proclamation does not encroach on the right to vote....................................22

            3.   The Proclamation would pass scrutiny even if *Anderson-Burdick* applied............................25

        B.   Plaintiffs' arbitrary disenfranchisement claim fails.........................................................27

        C.   Plaintiffs' claims of a conspiracy fail. ....................................................................29

    VI. Should the injunction issue, the harm to the State will far outweigh the harm to Plaintiffs and will disserve the public interest. .........................................................................30

        A.   Plaintiffs are not entitled to maintain the "status quo" of normal operations during a worldwide pandemic. ....................................................................................................30

B.    The equitable factors tilt heavily against the issuance of an injunction......................................31

C.    The Court should not alter the election rules so close to the election....................................32

VII. Any injunction should be limited to Plaintiffs with standing. ........................................................33

VIII. ...........................................................The Court should stay any injunction that it grants.
........................................................................................................................................................34

Conclusion .........................................................................................................................................34

## Introduction

Plaintiffs do not argue that the Constitution requires any individual county to provide multiple ballot return locations. Indeed, they cannot make that argument because Texas counties have never allowed multiple ballot return locations during general elections, and the vast majority have no intention to do so for the 2020 general election. Rather, Plaintiffs filed this lawsuit because Governor Abbott expanded early voting opportunities in light of the ongoing pandemic, but not in the precise way that Plaintiffs wish. But the Governor's "decision either to keep or to make changes to election rules to address COVID–19 ordinarily should not be subject to second-guessing by an unelected federal judiciary, which lacks the background, competence, and expertise to assess public health and is not accountable to the people." *Andino v. Middleton*, No. 20A55, 592 U.S. __ (Oct. 5, 2020) (slip. op.) (Kavanaugh, J., concurring) (internal citations omitted).

Texas has consistently expanded access to in-person early voting. Since the November 1987 elections, Texans have had the opportunity to vote early during a two-week period prior to election day.  This "no excuses early voting" period is one of the most prmissive in the country. By proclamation on July 27, 2020, Governor Abbott expanded the number of days that Texas voters can hand-deliver mail-in ballots from one (election day) to over forty (any day up to and including election day) as a means to allow voters to safely cast a ballot in person during the ongoing COVID-19 disaster. Additionally, on October 1, 2020, the Governor proclaimed that poll watchers can observe the counties' receipt of hand-delivered marked mail ballots at the publicly-designated location in each county. No party challenges those aspects of the Governor's proclamations. Likewise, the Governor proclaimed that, before election day, counties can accept hand-delivered marked mail ballots only at a single location—as they had done during every general election from the inception of that delivery method.

Plaintiffs filed this lawsuit—and seek this preliminary injunction—not to assert a constitutional right to multiple ballot delivery locations, but to challenge Governor Abbott's ability to regulate where counties accept the in-person delivery of a marked mail ballot. That issue of state law is currently set for a hearing in Texas state court next week, and Plaintiffs have no right to use a federal lawsuit to challenge the distribution of state law powers among state and local officials. Regardless, Plaintiffs' claims are barred by sovereign immunity, they lack standing, and they are not likely to succeed on the merits.

As such, Governor Abbott and Secretary Hughs respectfully request that the Court deny Plaintiffs' motion for preliminary injunction, or in the alternative, abstain from ruling until the controlling issue of Texas law is decided in state court.

## BACKGROUND

### I.   The emergence of COVID-19 prompts an unprecedented response by the Governor.

The coronavirus pandemic reached the United States in early 2020 and Texas in March. The Governor first declared a statewide disaster on March 13, 2020. A disaster declaration, in typical circumstances, is strictly limited in both geography and duration. *See* TEX. GOV'T CODE § 418.014(c) (limiting a declared disaster to 30 days unless renewed). The COVID-19 pandemic, however, represents a "public health crisis of unprecedented magnitude." *In re Abbott,* 954 F.3d 772, 787 (5th Cir. 2020). In the ensuing six months, the declaration of disaster has been renewed multiple times. The Disaster Act further charges the Governor with "meeting" the "dangers to the state and people presented by disasters," TEX. GOV'T CODE § 418.011(1), and allows him to issue executive orders and proclamations with the "force and effect of law." *Id.* at § 418.012.

### II.   Governor Abbott exercises his emergency powers to expand access to voting.

Using the emergency powers granted by the Disaster Act, the Governor has taken numerous actions to protect Texans, including when they go to the polls. First, the Governor expanded the early-

voting period for all July 14 elections so "election officials can implement appropriate social distancing and safe hygiene practices." Ex. 2 at 2. Then, on July 27, the Governor issued a proclamation extending the early voting options for the November general election. In the July 27 Proclamation, the Governor found that "in order to ensure that elections proceed efficiently and safely . . . it is necessary to increase the number of days in which polling locations will be open during the early voting period, such that election officials can implement appropriate social distancing and safe hygiene practices." Ex. 3 at 2.

The July 27 Proclamation suspended two provisions of the Election Code:

- "Section 85.001(a) of the Texas Election Code to the extent necessary to require that, for any election . . . on November 3, 2020, early voting by personal appearance shall begin on Tuesday, October 13, 2020, and shall continue through the fourth day before election day"; and

- "Section 86.006(a-1) . . . to the extent necessary to allow a voter to deliver a marked mail ballot in person to the early voting clerk's office prior to and including on election day."

Ex. 3 at 3. Section 86.001(a-1) would otherwise permit personal delivery only on election day. By suspending that provision, the July 27 Proclamation's allowed a voter who was otherwise eligible to vote by mail to return the marked mail ballot, in-person, *at any time up to* and including election day. *See id.* The July 27 Proclamation did not address the delivery of mail ballots on election day and did not alter other applicable requirements in the Election Code, including the requirement that an individual returning a marked mail ballot in person to the early voting clerk's office[1] present a valid form of identification.

## III.   The Governor clarifies his earlier proclamation to advance uniformity and ballot integrity.

Over the last few weeks, a handful of early voting clerks announced plans to have multiple mail-in ballot delivery locations per county. Harris County was first, but the full impact of the July 27 expansion was not clear until late August and through September when it was reported that Travis

---

[1] Plaintiffs mistakenly interchange "drop boxes" with "drop off locations" throughout their motion. The distinction between the two is both factually and legally significant as "drop boxes" are not used or permitted anywhere in Texas, while there are 254 permitted "ballot delivery locations" (*i.e.*, early voting clerk offices, or "drop off locations").

County was using "an expansive view of the law" to come up with "creative" policies to organize multiple drive-through delivery sites as well. Ex. 11 at 1; Ex. 12 at 2. Travis County's early voting clerk issued an official announcement of additional locations on October 1, 2020. Fort Bend County followed suit, publicizing its policy change at a press conference on the same day. This practice has no history in Texas before the July 2020 primary runoffs, during which only one county out of 254 allowed multiple delivery locations and only on election day.[2] Ex. 1 ¶ 8. And it introduces a risk to ballot integrity that is different in both degree and kind than having the locations open on election day.

It also became apparent that the counties who plan on expanding the number of delivery locations intended to implement inconsistent safeguards to preserve the integrity of the election, such as a lack of poll watchers overseeing ballot deliveries. Ex. 1 ¶ 14; *see also* TEX. ELEC CODE § 33.051 (listing where poll workers are authorized to observe). The Governor therefore issued a second Proclamation on October 1, 2020, to make clear that the suspension of Section 86.006(a-1) applies only when: (1) voters return their marked ballots at a single, publicly designated early voting clerk's office; and (2) the early voting clerk allows poll watchers the opportunity to observe any activity conducted at that office related to the in-person delivery of mail ballots. Ex. 4 at 4. Doing so advanced the State's weighty interests in clarifying any confusion caused by the July 27 order, reintroducing uniformity in the interpretation and application of the Election Code, and ensuring ballot security.

Plaintiffs filed suit and this motion for preliminary injunction, asserting that the Governor's October 1 Proclamation violates the First and Fourteenth Amendment. Specifically, Plaintiffs challenge the October 1 Proclamation to the extent it conditions the suspension of Section 86.006(a-

---

[2] Chris Hollins, *Harris County Clerk Chris Hollins Announces Vote by Mail Drop-Off Locations Voters Can Drop Off Their Vote by Mail Ballots at 11 Locations Across the County on Election Day*, Harris County Clerk (press release) (July 13, 2020) ("This is the first time in recent history that there has been more than a single drop-off location in Harris County.") available at https://www.harrisvotes.com/PressReleases/Vote%20By%20Mail%20Drop-off_en-US.pdf.

1) on the early voting clerk designating a single delivery location for marked mail ballots. It does not challenge the requirement that the early voting clerk permit poll watchers to observe the hand delivery of mail ballots at the early voting clerk's office. Nor does it contend that the Constitution requires any individual county to provide multiple ballot return locations.

## PRELIMINARY INJUNCTION STANDARD

Before the Court may issue a preliminary injunction, the plaintiff must establish four "prerequisites": "(1) a substantial likelihood that plaintiff will prevail on the merits, (2) a substantial threat that plaintiff will suffer irreparable injury if the injunction is not granted, (3) that the threatened injury to plaintiff outweighs the threatened harm the injunction may do to defendant, and (4) that granting the preliminary injunction will not disserve the public interest." *Libertarian Party of Tex. v. Fainter*, 741 F.2d 728, 729 (5th Cir. 1984). "The burden of persuasion on all of the four requirements for a preliminary injunction is at all times upon the plaintiff." *Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 573 (5th Cir. 1974). That burden is heavy and requires "*a clear showing.*" *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (emphasis in original).

The Fifth Circuit "has repeatedly cautioned that a preliminary injunction is an *extraordinary remedy* which should not be granted unless the party seeking it has *clearly carried the burden of persuasion on all four requirements.*" *Voting for Am., Inc. v. Steen*, 732 F.3d 382, 386 (5th Cir. 2013) (quoting *Tex. Med. Providers Performing Abortion Servs. v. Lakey*, 667 F.3d 570, 574 (5th Cir. 2013)) (internal quotation marks omitted)) (emphases added). If the movant fails to establish any one of the four prerequisites to injunctive relief, relief will not be granted. *Women's Med. Ctr. of Nw. Hous. v. Bell*, 248 F.3d 411, 419 n.15 (5th Cir. 2001). Even when a movant satisfies each of the four factors, the decision whether to grant or deny a preliminary injunction remains discretionary with the district court. *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985). The decision to grant a preliminary injunction is to be treated as an exception rather than the rule. *Id.*

**ARGUMENT**

Plaintiffs seek the Court's permission to expand the in-person delivery of mail-in ballots in a manner never contemplated by the Texas Legislature. And Plaintiffs do not contend that the U.S. Constitution requires that either the State or counties must provide multiple ballot return locations per county or by population. The heart of their complaint is a question of Texas state law that is currently pending in front of a state court. And Plaintiffs cannot use a federal lawsuit to rearrange the allocation of state-law powers.

Moreover, even if Plaintiffs had that right, Plaintiffs have not met their burden of showing entitlement to the extraordinary remedy of a preliminary injunction. Sovereign immunity bars their suit. Plaintiffs lack standing to pursue their claims. Plaintiffs are unlikely to prevail on the merits. Plaintiffs cannot establish irreparable harm, and the harm to the public caused by an injunction outweighs its potential benefit to Plaintiffs.

**I.      This Court should abstain from ruling on Plaintiffs' motion for preliminary injunction until the predicate state-law claims are resolved.**

The Governor's authority under Texas state law to add conditions to his suspension of Section 86.001(a-1) that would limit counties from establishing multiple ballot delivery locations is being challenged right now in Texas state court. *See Anti-Defamation League Austin, Southwest v. Abbott*, D-1-GN-20-00555 (filed Oct. 5, 2020). Multiple parties have challenged the October 1 Proclamation in Travis County district court, arguing that it is *ultra vires* and a violation of the Texas Constitution. A temporary injunction hearing in that case is set for Tuesday, October 13, 2020. Were the state court to enjoin the challenged provision of the October 1 Proclamation, its ruling would put Plaintiffs' claims "in a different posture," if not moot them entirely. In that event, there would be no need for this Court to rule on Plaintiffs' federal claims. Thus, this Court should abstain ruling on Plaintiffs' motion for preliminary injunction under *Railroad Commission of Texas v. Pullman*, 312 U.S. 496 (1941).

Indeed, in many respects, the case resembles the situation presented in *Texas Democratic Party v. Abbott*, 961 F.3d 389 (5th Cir. 2020). There, the district court considered a constitutional challenge over Texas's decision not to extend mail-in voting to all voters in response to the COVID-19 pandemic. Although the court's analysis turned on the interpretation of "disability" in Section 82.002 of the Election Code, the district court decided to proceed without waiting for guidance from the Supreme Court of Texas. On appeal, the Fifth Circuit criticized the district court's decision as "not well considered." *Id.* at 397 n.13. The "forthcoming interpretation of state law could have made any federal constitutional ruling 'unnecessary.'" *Id.* at 417 (Costa, J., concurring) (quoting *Pullman*, 312 U.S. at 500). "The timing of the parallel litigation [also] made this such a strong case for abstaining." *Id.* at 418 (Costa, J., concurring). So too here.

## II.  Plaintiffs are not entitled to restructure the allocation of state-law powers between the Governor and Texas counties through a federal lawsuit.

Plaintiffs do not argue that the U.S. Constitution requires any individual county to provide multiple ballot return locations. What Plaintiffs really seek is for this Court to transfer power from the Governor to county officials. Under current Texas law, the Governor has discretion to exercise the authority the Texas Legislature granted to him under the Texas Disaster Act to suspend laws if strict compliance with those laws would in any way prevent, hinder, or delay necessary action in coping with a disaster. Here, the Governor utilized his disaster authority to expand opportunities for Texans to safely cast a ballot in the upcoming general election by suspending the limitation that a voter could only return a marked mail ballot to the early voting clerk's office on election day and establishing procedures for the return of such ballots at any time prior to election day. But Plaintiffs argue that the federal Constitution requires such discretion to lie with county officials. Put another way, Plaintiffs ask this Court to rearrange the internal structure and distribution of power in Texas government—a truly expansive upheaval of the status quo.

Plaintiffs, however, are not entitled to "impose on [Texas] any particular plan for the distribution of governmental powers." *Mayor of City of Philadelphia v. Educ. Equal. League*, 415 U.S. 605, 615 n.13 (1974); *see also Pittman v. Chicago Bd. of Educ.*, 64 F.3d 1098, 1101–02 (7th Cir. 1995) ("[T]he federal Constitution does not prescribe any particular separation of powers, or other internal structure, of state government."). That right resides with the people of Texas, who, through their duly elected representatives, entrusted the Governor to suspend or not suspend certain statutes in response to a public health emergency. Whatever limits the Constitution places on Texas's election regulations, it places those limits on the substantive regulations themselves, not the way Texas separates decision-making authority between state and local officials. *See Whalen v. United States*, 445 U.S. 684, 689 n.4 (1980); *Jones v. Morales*, 22 F.3d 1095, 1994 WL 199232, at *1 (5th Cir. 1994).

## III. Plaintiffs' constitutional claims are barred by sovereign immunity.

"[T]he principle of state-sovereign immunity generally precludes actions against state officers in their official capacities, subject to an established exception: the *Ex parte Young* doctrine." *McCarthy ex rel. Travis v. Hawkins*, 381 F.3d 407, 412 (5th Cir. 2004) (citation omitted). Because neither the Governor nor the Secretary enforces or implements the challenged Proclamation, that exception does not apply here.

*Ex parte Young* "rests on the premise—less delicately called a 'fiction'—that when a federal court commands a state official to do nothing more than refrain from violating federal law, he is not the State for sovereign-immunity purposes." *Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 255 (2011) (citation omitted). It necessarily follows that for this exception to apply, the state official must have committed, or demonstrated a willingness to commit, some type of affirmative action contrary to federal law that the court can order the state official to cease performing. *See Ex parte Young*, 209 U.S. 123, 157 (1908); *City of Austin v. Paxton*, 943 F.3d 993, 1001–02 (5th Cir. 2019); *Morris v. Livingston*,

739 F.3d 740, 746 (5th Cir. 2014) (a proper defendant has both "the particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty").

In other words, *Ex parte Young* allows suits only when the defendants have sufficient "connection" to enforcing the allegedly unconstitutional action. *City of Austin*, 943 F.3d at 997. Otherwise, the suit is effectively against the state itself and barred by sovereign immunity. *See Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 253 (2011). Should "a state actor or agency [be] statutorily tasked with enforcing the challenged law and a different official is the named defendant," then the requisite connection is absent and "[the court's] *Young* analysis ends." *City of Austin*, 943 F.3d at 998. Because neither the Governor, nor the Secretary of State have sufficient connections to the enforcement of the Proclamation, the claims here miss the mark.

### A.    *Ex parte Young* does not apply to the Governor in this case.

Plaintiffs' constitutional claims against the Governor are precluded by sovereign immunity. Although the Governor issued the October 1 Proclamation by means of his emergency powers, the statutory authority on which the Proclamation was based does not grant the Governor a corresponding duty to enforce the contents of his order. *See* TEX. GOV'T. CODE §§ 418.012, 418.016, 418.018(c). The Governor's proclamations "have the force and effect of law," without further action on his part. *Id.* at § 418.012. That duty instead falls to local law enforcement and, on special occasion, the Attorney General. *Id.* at § 418.173; TEX. ELEC. CODE §§ 31.006, 273.001. The Governor, as a consequence, lacks the necessary "connection" for *Ex parte Young* exception to apply.

The Fifth Circuit addressed this very issue in *In re Abbott*, 956 F.3d 696 (5th Cir. 2020). There, the court held that plaintiffs could not challenge a pandemic-related executive order by suing the Governor. "The power to promulgate law is not the power to enforce it." *Id.* at 709. And thus, a statute that empowers the Governor to "issue," "amend," or "rescind" executive orders cannot be read as the necessary "connection" to trigger the *Ex parte Young* exception. *Id.* This Court has already

considered the scope of *In re Abbott's* ruling and agreed that though the Governor promulgated the executive order, he could not enforce it such as to implicate *Ex parte Young. 6th St. Bus. Partners LLC v. Abbott*, 1:20-CV-706-RP, 2020 WL 4274589, at *5 (W.D. Tex. July 24, 2020). "By this reasoning, Plaintiffs may not rely on the *Ex parte Young* exception to obtain injunctive relief against [the Governor] in this case either." *Id.*

    **B.**    ***Ex parte Young* does not apply to the Secretary of State in this case.**

The Secretary likewise does not enforce the Proclamation. *See* TEX. GOV'T CODE § 418.173. Nor does she implement or enforce the Election Code provision that is the subject of the challenged provision. *See* TEX. ELEC. CODE § 86.006(a-1). That is instead the province of local law enforcement and the early voting clerk respectively. *See id.* § 83.001 (charging the early voting clerk with conducting early voting in each election). Indeed, the failure to comply with an executive order issued pursuant to §§ 418.012 and 418.016 constitutes a separate criminal offense with a specified penalty. TEX. GOV'T CODE § 418.173; Ex. 13 at 9. It is therefore enforced through criminal prosecution and falls entirely outside of the Secretary's delegated authority. Regarding the statutory provision, the mere fact that it is found in the Election Code does not establish a connection to the Secretary. *See Bullock v. Calvert*, 480 S.W.2d 367, 372 (Tex. 1972) (holding that Secretary's title "chief election officer" is not "a delegation of authority to care for any breakdown in the election process"); *In re Hotze*, No. 20-0739, 2020 WL 5934190 (Tex. Oct. 7, 2020) (Blacklock, J., concurring) (noting that the Secretary does not have authority "to issue her own orders to local election officials contradicting the Governor's").

Additionally, even where a state official "has the authority to enforce" a law, a plaintiff must further allege that the state official "is likely to" enforce the law in a way that would "constrain" the plaintiff. *City of Austin*, 943 F.3d at 1001–02. A state official must have not only "the particular duty to enforce the statute in question" but also "a demonstrated willingness to exercise that duty." *Morris v. Livingston*, 739 F.3d 740, 746 (5th Cir. 2014). Here, Plaintiffs have not proven that the Secretary "is

likely to" enforce the Proclamation. For one thing, the Secretary does not believe that she has that authority and so is unlikely to make such an effort. For another, according to Plaintiffs' own Motion and Complaint, the Secretary previously advised local election officials that mail-in ballots could be returned to any early-voting clerk office, which is what Plaintiffs want. *See* ECF 10-1 at 5; ECF 1 at ¶8. Plaintiffs thus cannot "point[] to specific enforcement actions of" the Secretary that "warrant[s] the application of the *Young* exception." *City of Austin*, 943 F.3d at 1001.

## IV.     No standing exists to bring this suit against Defendants.

Neither the Organizational Plaintiffs nor the Individual Plaintiff have made a clear showing that they have the necessary standing to maintain a preliminary injunction.

### A.     Plaintiffs did not meet the threshold requirement of showing standing to sue.

"[S]tanding is perhaps the most important of the jurisdictional doctrines." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) (quotation omitted). Courts persistently inquire into standing because "[w]ithout jurisdiction the court cannot proceed *at all* in any cause." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) (quotation omitted) (emphasis added). "Each element [of standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof"— "with the manner and degree of evidence required at the successive stages of the litigation" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). At the preliminary injunction stage, this means plaintiffs must make a "clear showing" that they have standing. *Barber v. Bryant*, 860 F.3d 345, 352 (5th Cir. 2017); *accord Tex. Democratic Party v. Abbott*, No. 20-50407, 2020 WL 5422917, at *4 (5th Cir. Sept. 10, 2020).

Specifically, Individual Plaintiff Laurie-Jo Straty must show: (1) an actual or imminent, concrete and particularized "injury in fact"; (2) that is fairly traceable to the challenged action of the defendant; and (3) that is likely to be redressed by a favorable decision. *See NAACP v. City of Kyle*, 626 F.3d 233, 237 (5th Cir. 2010). The Organizational Plaintiffs, on the other hand, have two avenues by

which to allege standing: (1) associational or (2) organizational. *See id.* at 237-38. Organizational standing requires that the plaintiff establish injury, causation, and redressability. *Id.* For associational standing, the organization must show (1) that its members would independently have standing; (2) that the interests the organization is protecting are germane to the purpose of the organization; and (3) neither the claim asserted nor the relief requested requires participation of individual members. *Ctr. for Biological Diversity v. United States Envtl. Prot. Agency*, 937 F.3d 533, 536 (5th Cir. 2019).

As the party "invoking federal jurisdiction," Plaintiffs "bear[] the burden of establishing these elements" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

### B.    None of the Organizational Plaintiffs has associational standing.

None of the Organizational Plaintiffs proves facts establishing associational standing. A plaintiff cannot have associational standing unless one of its members independently satisfies the Article III standing requirements. *Ctr. for Biological Diversity*, 937 F.3d at 536. For this to occur, the plaintiff must establish two threshold facts. First, the plaintiff must establish that it has "members" within the meaning of the associational standing test from *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 344 (1977) (requiring "indicia of membership"). Second, the plaintiff must identify specific members who have "suffered the requisite harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009).

Plaintiffs fail both tests. Although Organizational Plaintiffs describe themselves as having members, that is a legal conclusion. And none proves that its "members" "participate in and guide the organization's efforts," as is required for associational standing. *Ass'n for Retarded Citizens of Dall. v. Dall. Cty. Mental Health & Mental Retardation Ctr. Bd. of Trustees*, 19 F.3d 241, 244 (5th Cir. 1994); *see also Tex. Indigenous Council v. Simpkins*, No. 5:11-cv-315, 2014 WL 252024, at *3 (W.D. Tex. Jan. 22, 2014) (explaining that "'indicia of membership' consists of elect[ing] leadership, serv[ing] as the

organization's leadership, and finance[ing] the organization's activities, including the case's litigation costs").

Even if they had established that they have members, Plaintiffs would still need to identify injured members. The Supreme Court has unequivocally held that the "requirement of naming the affected members has never been dispensed with" except "where *all* the members of the organization are affected by the challenged activity." *Summers*, 555 U.S. at 498–99 (emphasis in original). Here, Organizational Plaintiffs fail to explain what portion of their membership qualifies to vote by mail and whether any member intends to deposit their ballot at a delivery location. *See, e.g.*, ECF 1 ¶¶ 17, 18. Organizational Plaintiffs cannot evade their obligations to identify specific members. *See Summers*, 555 U.S. at 499 (holding that courts do not "engage in an assessment of statistical probabilities" when evaluating standing).

Despite this requirement, none of the Organizational Plaintiffs identify a specific member who has suffered a requisite injury in-fact on account of the Governor's Proclamation. To be sure, neither the Texas Alliance for Retired Americans (TARA) nor BigTent Creative (BigTent) assert that any member intends to deliver their marked mail ballot at a delivery location that is not the early voting clerk office, and neither TARA nor BigTent names or identifies any member who does. *See Summers*, 555 U.S. at 498–99. The only individual identified in the Complaint is Laurie-Jo Straty, but the Complaint does not allege that she is a member of Organizational Plaintiffs. Moreover, even if Plaintiff Straty was a member, she could not support associational standing because she lacks individual standing for the reasons explained below.

TARA, in contrast, does identify three members, Richard Shaw, Ellen Stupak-Shaw, ad Ken Dearinger, in Plaintiffs' motion for preliminary injunction. None, however, faces a "certainly impending*"* injury as is required for standing, and Richard Shaw never states he intends to deliver his marked mail ballot to an early voting clerk office. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 402

(2013); *see* ECF 11-4. This is because their alleged harm is based on subjective fear, which provides no grounds for an injury in-fact. *Clapper*, 568 U.S. at 401 (distinguishing between a certainly impending injury and one built on subjective fear). By law, the Harris County clerk must issue ballots for timely requests at least 30 days before Election Day. TEX. ELEC. CODE § 86.004. That gives both individuals approximately one month to consider, complete, and return their ballot. *See Id.* at § 86.007. Nothing in the record supports Shaw, Stupak-Shaw, and Dearinger's fear that but for multiple in-person delivery locations, they would be unable to deliver their ballot in time for it to be counted. Moreover, even if the other identified persons were members, they could not support associational standing because they lack individual standing for the reasons explained below.

Thus, regardless of whether Organizational Plaintiffs have members, as defined in *Hunt*, Plaintiffs could not acquire standing through them and their claims should be dismissed. *See City of Kyle*, 626 F.3d at 237 (requiring evidence of "a specific member"); *see also Ga. Republican Party v. SEC*, 888 F.3d 1198, 1203 (11th Cir. 2018); *Draper v. Healey*, 827 F.3d 1, 3 (1st Cir. 2016) (Souter, J.) ("[T]he complaint did not identify any member of the group" and "where standing is at issue, heightened specificity is obligatory at the pleading stage); *N.J. Physicians, Inc. v. President of U.S.*, 653 F.3d 234, 241 (3d Cir. 2011) (The plaintiffs lacked standing because the only member identified in the compliant did not suffer an injury in-fact.); *Disability Rights Wis., Inc. v. Walworth Cty. Bd. of Supervisors*, 522 F.3d 796, 804 (7th Cir. 2008) ("[A]dvocacy is only appropriately—and constitutionally—undertaken on behalf of another when that other has suffered an injury.").

### C.    None of the Organizational Plaintiffs has organizational standing.

Organizational Plaintiffs do not have organizational standing because they have not plausibly alleged that they, as organizations, will suffer injuries in-fact. Plaintiffs TARA and BigTent do not claim to have suffered an injury in their own right. They claim that they would like to educate voters about more locations to deliver mail-in ballots and that they would like to educate voters about

14

additional delivery locations—in Dallas County—(TARA) and avoid diverting resources. ECF 1 ¶¶ 17, 18. But expressing desire for a different system (TARA) and invoking diversion of resources (BigTent) do not substitute for the requirement of a concrete, particularized injury.

Though the diversion of resources can constitute a requisite injury under certain circumstances, "[n]ot every diversion of resources to counteract [a] defendant's conduct . . . establishes an injury in fact." *City of Kyle*, 626 F.3d at 238. "The change in plans must still be in response to a reasonably certain injury imposed by the challenged law." *Zimmerman v. City of Austin*, 881 F.3d 378, 390 (5th Cir. 2018). Plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Clapper*, 568 U.S. at 402. Spending resources to teach third parties about the law, on its own, is not an injury in-fact. *See Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1434 (D.C. Cir. 1995) (holding that a "self-serving observation that [plaintiff] has expended resources to educate its members" about the challenged law does not present an injury in fact). The expenditures to educate employees and the organization's communities must cause the organization to incur "'operational costs beyond those normally expended' to carry out its advocacy mission." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 920 (D.C. Cir. 2015) (quoting *Nat'l Taxpayers Union*, 68 F.3d at 1434). Neither TARA nor BigTent make such allegations. TARA does submit a declaration from its Texas field organizer, ECF 11-2, but TARA cannot secure injunctive relief based on a theory not included in the complaint, and even if it could, its assertion of diversion of resources would fail for the reasons explained below.

In addition, to establish standing, "an organizational plaintiff must explain how the activities it undertakes in response to the defendant's conduct differ from its 'routine [] activities.'" *Def. Distributed v. United States Dep't of State*, 1:15-CV-372-RP, 2018 WL 3614221, at *4 (W.D. Tex. July 27, 2018) (quoting *City of Kyle*, 626 F.3d at 238). And it must "identify 'specific projects that [it] had to put on hold or otherwise curtail in order to respond to' the defendant's conduct." *Id.*

Again, neither Organizational Plaintiff bothers. Rather, the Organizational Plaintiffs "only conjectured that the resources" they diverted "could have been spent on other unspecified [organizational] activities." *City of Kyle*, 626 F.3d at 239. That, however, is not enough. *See Def. Distributed*, 2018 WL 3614221, at *4 (ruling that projects must be described with "sufficient specificity to constitute an injury in fact"). Finally, to the extent the Complaint could be read to suggest that the Proclamation impedes the Organizational Plaintiffs' missions to encourage "civic engagement" and voter participation, ECF 1 ¶¶ 17, 18, the asserted injury fails to confer organizational standing. The "abstract social interest in maximizing voter turnout . . . cannot confer Article III standing." *Fair Elections Ohio v. Husted*, 770 F.3d 456, 461(6th Cir. 2014). To the extent Plaintiffs claim an interest in the political consequences of which potential voters vote, they lack standing because federal courts do not hear "case[s] about group political interests." *Gill v. Whitford*, 138 S. Ct. 1916, 1933 (2018).

### D.    The Organizational Plaintiffs also lack third-party standing.

Even if Organizational Plaintiffs had Article III standing, they would lack statutory standing. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 n.3–4 (2014). Section 1983 provides a cause of action only when the plaintiff suffers "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. It does not provide a cause of action to plaintiffs claiming an injury based on the violation of a third party's rights. *See Coon v. Ledbetter*, 780 F.2d 1158, 1160 (5th Cir. 1986) ("[L]ike all persons who claim a deprivation of constitutional rights, [plaintiffs] were required to prove some violation of their personal rights.").

Section 1983 "incorporates, but without exceptions, the Court's 'prudential' principle that the plaintiff may not assert the rights of third parties." David P. Currie, *Misunderstanding Standing*, 1981 Sup. Ct. Rev. 41, 45. When "[t]he alleged rights at issue" belong to a third party, rather than the plaintiff, the plaintiff lacks statutory standing, regardless of whether the plaintiff has suffered his own injury. *Danos v. Jones*, 652 F.3d 577, 582 (5th Cir. 2011); *see also Conn v. Gabbert*, 526 U.S. 286, 292–93

(1999) (holding that a lawyer "clearly had no standing" to bring a § 1983 claim because a plaintiff "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties").

Here, the Organizational Plaintiffs premise their claims on the right to vote. But Organizational Plaintiffs are artificial entities that do not have voting rights. "It goes without saying that political parties, although the principal players in the political process, do not have the right to vote." *Vieth v. Pennsylvania*, 188 F. Supp. 2d 532, 546 (M.D. Pa. 2002). The Organizational Plaintiffs therefore are necessarily asserting the rights of third parties and cannot sue under § 1983.

Moreover, because this follows from the statute itself, Plaintiffs cannot invoke any prudential exceptions. *See Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 359 (2d Cir. 2016) ("Because Congress specified in the statute who may sue, prudential standing principles do not apply."); *see also* Currie, 1981 Sup. Ct. Rev. at 45. But even if Organizational Plaintiffs could invoke prudential-standing exceptions, their Complaint does not do so. Plaintiffs do not allege that they have "a 'close' relationship with" voters, and there is no reason to think voters face any "hindrance" to protecting their "own interests." *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004) (noting the Supreme Court has generally "not looked favorably upon third-party standing").

### E.   The individual plaintiffs' alleged harm does not establish standing.

Individual Plaintiff Straty cannot identify a cognizable injury. It is now clear that, Plaintiff Straty is a resident of, and registered voter in Dallas County, Texas. ECF 11-6 at ¶¶ 2, 4–8. Her declaration states: "Before Governor Abbott's proclamation, I was planning on dropping my ballot off at a drop-off location that would have taken me approximately five minutes to drive to from my house." *Id.* ¶ 5. But this is not simply not true. Never has Dallas County announced—let alone opened—multiple delivery locations. Take Dallas County Judge Clay Jenkins' word for it: "Dallas County won't be affected [by the Proclamation], as having one drop-off location for mail-in ballots is

standard here. The same can be said for Tarrant and Denton counties." Jacob Vaughn, *Abbott's Limits on Drop-off Locations for Mail-In Ballots Won't Affect Dallas County Directly*, Dallas Observer (Oct. 5, 2020) available at https://www.dallasobserver.com/news/trumps-diagnosis-flings-more-doubt-in-coronavirus-debate-11949951. Accordingly, Plaintiff's declaration proves that she cannot allege any harm, and thus has no standing.

Even if Dallas County were to use multiple delivery locations, her claims nevertheless rest on speculation about what impact external events, such as COVID-19, may have on the speed in which she receives and returns her mail-in ballot. Indeed, the very language Plaintiff Straty uses to describe her alleged injury reinforces the fact that any asserted harm is "conjectural or hypothetical" and not "actual or imminent." *Pub. Citizen, Inc. v. Bomer*, 274 F.3d 212, 217 (5th Cir. 2001) (citing *Lujan*, 504 U.S. at 560); *see also Clapper*, 568 U.S. at 401 (distinguishing between a certainly impending injury and one built on subjective fear). Plaintiff Straty, for example, has concerns about exposing her parents to COVID-19 and alleges that she is aware of "reports of widespread issues with USPS" causing her not to trust the mail. ECF 1 at ¶ 16. "Subjective fear," however, "does not give rise to standing." *Clapper*, 568 U.S. at 418.

But Plaintiff Straty seeks prospective relief in her Complaint. Accordingly, she must establish an "imminent" future injury to satisfy standing. *Lujan*, 504 U.S. at 564. The Supreme Court has repeatedly interpreted this to mean that a "threatened injury must be *certainly impending* to constitute injury in fact"— "[a]llegations of *possible* future injury are not sufficient." *Clapper*, 568 U.S. at 409 (emphasis in original) (quotations omitted). The rejection of a mail-in ballot as late is very rare. According the U.S. Election Assistance Commission, only 1.76 percent of mail-in ballots in 2018 general election were rejected statewide.[3] Of that 1.76 percent, only a fraction was rejected because

---

[3] U.S. Election Assistance Commission, Election Administration and Voting Survey: 2018 Comprehensive Report at 14, https://www.eac.gov/sites/default/files/eac_assets/1/6/2018_EAVS_Report.pdf.

the ballot was received after the deadline. A less than 1% probability of injury is not "*certainly impending*." *Clapper*, 568 U.S. at 409.

Nor has Plaintiff Straty asserted facts establishing that her particular mail-in ballot will be rejected as late or is even more likely to be rejected as late than the typical mail-in ballot. She instead relies on the general proposition that she has hears reports that the Postal Service has experienced "widespread issues," ECF 1 ¶ 16.   In the preliminary injunction she also relies on a letter sent by Postal Service to Secretary Hughs on July 30, 2020. *See* Mot. Prelim. Inj. at 4.  That letter, however, was sent to 46 states[4] and merely cautions that voters who apply to vote by mail close to the application deadline will have less time to receive, mark, and return their ballots before the ballot receipt deadline. ECF 11-13 at 1.  It makes no reference to expected delays in Texas or Plaintiffs' local area. On the contrary, the Postal Service confirms that domestic mail is typically delivered between 2 to 5 business days.[5] *Id.* "[G]eneral data [] does not establish a substantial risk that Plaintiffs themselves will [be injured]; Plaintiff-specific evidence is needed." *Stringer v. Whitley*, 942 F.3d 715, 722 (5th Cir. 2019). Hence, even if other voters in different jurisdictions were able to establish a likelihood of delay that has no bearing on whether Plaintiff Straty has standing. "[F]uture injury to others is irrelevant; plaintiffs seeking injunctive relief must show a continuing or threatened future injury to themselves." *Id.* at 722.

It is also worth noting that Plaintiff Straty should not fall into the category of voters referenced in the July 30th letter, as she knew that she intended to vote by mail and presumably applied well in advance. The same is true for Ellen Stupak-Shaw. See ECF 11-5 at ¶ 5 ("over two weeks ago, I

---

[4] Alison Durkee, *Postal Service Warns Mail-In Ballots In 46 States May Not Be Delivered In Time*, Forbes, Aug. 14, 2020, available at https://www.forbes.com/sites/alisondurkee/2020/08/14/postal-service-usps-warns-mail-in-ballots-in-46-states-may-not-be-delivered-in-time-election/#5e5aa47117e6.

[5] The Postal Service adamantly insists that it has the resources and capabilities to process and timely deliver all election-relating mailings, notwithstanding COVID-19. Ex. 6 at 1. In support of this statement, it explained, "If all Americans vote by mail this year—330 million ballots over the course of an election would be only 75% of what we deliver in a single day." Ex. 5.

submitted my mail ballot application"). Under the Election Code, a qualified voter may apply to vote by mail as early as January 1st. And because both are over 65-years-old, they had the option of submitting an annual application. TEX. ELEC. CODE § 86.0015. The Election Code also requires early voting clerks to issue voters their balloting material no later than 30 days before Election Day if their application is accepted at least a week before then—far longer than the amount of time recommended by USPS. *Id.* at § 86.004. Thus, if Plaintiffs struggle to meet the ballot receipt deadline, the blame lies in their failure to utilize the options that the Election Code grants them. In such a scenario, "when, as here, the plaintiff alleges only an injury at some indefinite future time, and the acts necessary to make the injury happen are at least partly within the plaintiff's own control," the Court cannot find the plaintiffs' injuries actual and imminent without "stretch[ing]" the requirement "beyond the breaking point." *Lujan*, 504 U.S. at 564.

> **F. Alleged harms are neither traceable nor redressable.**

Plaintiffs also lack standing to sue for the additional reason that the Governor and Secretary's actions do not cause Plaintiffs' alleged injuries; nor will an injunction against them prevent the Proclamation's enforcement. In the course of their Complaint, Plaintiffs do not point to a single action taken (or that could be taken) by the Secretary that has resulted in Plaintiffs' alleged injuries. Their only assertion is that the Secretary is "the chief election officer of the state" who "is responsible for the administration and implementation of election laws in Texas," including the Proclamation. ECF 1 ¶ 20. But that does not mean that the Secretary is responsible for enforcing the Governor's proclamation.

As explained above in Section I, neither the Governor nor the Secretary of State have authority to enforce the requirements of the Governor's executive order, should local election authorities violate it. For that reason, the Governor and the Secretary do not cause—and any relief ordered against them would not redress—the Plaintiffs' asserted injuries. *See In re Hotze*, No. 20-0739, 2020 WL 5934190

(Tex. Oct. 7, 2020) (Blacklock, J., concurring) ("Even if the petitioners are injured by the Governor's adjustment of these statutory rules pursuant to his emergency powers, that injury is not traceable to the Secretary of State, who neither conducts early voting nor receives hand-delivered mail-in ballots."); *Okpalobi v. Foster*, 244 F.3d 405, 426 (5th Cir. 2001) (en banc) ("The requirements of *Lujan* are entirely consistent with the long-standing rule that a plaintiff may not sue a state official who is without any power to enforce the complained-of statute."). Plaintiffs' Complaint, in short, "confuses [a] *statute*'s immediate coercive effect on the plaintiffs with any coercive effect that might be applied by the *defendants*." *Okpalobi*, 244 F.3d at 426; *see also 6th St. Bus. Partners LLC*, 2020 WL 4274589, at *3 (holding that injuries stemming from an executive order were not traceable to the Governor because he lacked the ability to enforce). In the interest of brevity, the Secretary asserts that this Court's analysis under *Ex parte Young* also bears on the standing analysis. *See City of Austin*, 943 F.3d at 1003.

## V.     Plaintiffs are not likely to succeed on the merits

Even assuming Plaintiffs could overcome these jurisdictional flaws, Plaintiffs have not demonstrated a substantial likelihood of success on the merits for any of their claims. Their application for preliminary injunction must therefore be denied.

### A.     Plaintiffs' *Anderson-Burdick* claim fails.

As explained above, Plaintiffs do not challenge the number of delivery locations in any county. Instead, they challenge the Governor's authority to utilize his disaster authority to suspend a statute that would uniformly apply statewide rather than delegate discretion to county officials. *See supra* Part II. That decision does not impose any burden on the right to vote. The manner in which state authority is divided between state and local officials does not affect, much less burden, the right to vote.

But even if Plaintiffs were challenging the number of delivery locations in a particular county, their claim would fail on the merits. Requiring counties to follow their prior practice—one in-person delivery location per county—does not impose an undue burden on anyone, especially not voters who

live in counties that have continued to follow that prior practice. First, the Proclamation does not encroach on the right to vote whatsoever. Second, the Proclamation survives any *Anderson-Burdick* review because any burden is *de minimis.*

### 1.     The Proclamation expands Texans' ability to vote by mail.

The Governor's Proclamations took a mechanism for returning marked ballots that has existed only since September 1, 2015 and expanded its availability—making it easier for Individual Plaintiffs and others to vote. *See* Ex. 1 ¶¶ 4,6,7. Prior to the Governor's July 27 and October 1 Proclamations, Texas law permitted the in-person delivery of marked mail-in ballots only on Election Day. TEX. ELEC. CODE § 86.006(a-1). The July 27 Proclamation, however, suspended that limitation, permitting voters to deliver their ballots to the early voting clerk as soon as their ballots were marked and ready. Ex. 1 ¶ 5. Even with the subsequent clarification, which confined the suspension to a single delivery site, voters have greater access to in-person delivery now than in any preceding general election.

By asking this Court to enjoin the October 1 Proclamation, Plaintiffs want to utilize the benefits of the Governor's Proclamations, but without abiding by the Proclamations' restrictions or conditions. In effect, Plaintiffs want to create a pernicious one-way ratchet, in which every emergency suspension of law creates a new "right to vote" that cannot be scaled back in light of new circumstances. Further, based on the declarations submitted, Plaintiffs may even be seeking for the court to force counties to open multiple locations. *See e.g.*, ECF 11-8 (seeking multiple locations in Nueces County even with no history of more than one delivery location). That would impose significant burdens on Texas's ability to respond to the pandemic, and it is not required by *Anderson-Burdick.*

### 2.     The Proclamation does not encroach on the right to vote.

The Constitution does not include a freestanding right to vote in whatever manner Plaintiffs deem most convenient. When considering a challenge to the limited availability of absentee ballots,

the Supreme Court distinguished "the right to vote" from the "claimed right to receive absentee ballots." *McDonald v. Bd. of Election Comm'rs of Chi.*, 394 U.S. 802, 807 (1969). It concluded that the plaintiffs' inability to vote by mail did not implicate the right to vote because it did not "preclude[] [the plaintiffs] from voting" via other methods. *Id.* at 808. That holding dooms Plaintiffs' *Anderson-Burdick* claim.[6] *See also Crawford v. Marion County Election Bd.*, 553 U.S. 181, 209 (2008) (Scalia, J., concurring in the judgment) ("That the State accommodates some voters by permitting (not requiring) the casting of absentee or provisional ballots, is an indulgence—not a constitutional imperative that falls short of what is required.").

The State of Texas has gone out of its way to provide its citizens with an abundance of opportunities to cast their ballot. Voting by mail is but one. Texas has scheduled the early voting period to commence on October 13, 2020 and continue through the fourth day before election day. *See* Ex. 3 at 3.[7] This will furnish voters 19 days in which to cast an in-person ballot, including election day. Voters may cast their ballot in-person(including by curbside, if eligible)[8] at any polling location in their home county during the early voting period (and often on election day).[9] Many voters will have

---

[6] It is not adequate rebuttal to *McDonald* to assert that the voters affected by the Proclamation already have a right to vote by mail under Texas law and that the issue is therefore whether the Proclamation represents an unconstitutional abridgement. As highlighted elsewhere in this response, Plaintiffs do not contend that the Constitution requires counties to provide multiple delivery locations for voters to be able to access and exercise mail-in voting. They instead demand that the state have no say over whether a county provides such option. If the failure to provide satellite delivery locations does not constitute an unconstitutional abridgement, then logic dictates that the State prohibiting counties from doing so does not constitute unconstitutional abridgement either. What Plaintiffs demand is convenience on their terms. *McDonald*, however, states plainly that "constitutional safeguards are not thereby offended simply because some [individuals] . . . find voting more convenient than appellants." 394 U.S. at 810.

[7] The period for early voting by personal appearance during a general election would ordinarily begin on the 17th day before election day, *see* TEX. ELECT. CODE § 85.001; however, Governor Abbott extended it in response to COVID-19 by means of an emergency proclamation. *See also* Ex. 1 ¶ 3.

[8] Texas recognizes that not all voters can enter a polling location without physical assistance or without endangering their health. Accordingly, the Election Code requires each polling location to offer curbside voting, which permits voters to cast their ballots without ever leaving their car. §§ 64.009, 85.034. This option exposes voters to no more (and often less) human interaction than delivering their ballots by personal delivery. Voters may exercise this option throughout the extended early voting period and on election day.

[9] A list of all counties participating in the Countywide Polling Place Program can be found at the Secretary of State's websites, https://www.sos.state.tx.us/elections/laws/countywide-polling-place-program.shtml.

the option of a hundred or more polling locations in which to choose,[10] each one of which will be open a minimum of eight hours each day. *See* Tex. Elec. Code § 85.064. In addition, Texas provides multiple options by which qualified voters may return their mail-in ballots, including by mail, by common or contract carrier, and by in-person delivery. TEX. ELEC. CODE § 86.006(a). Indeed, Plaintiff states that "drop-off locations are available in at least 34 states and Washington, D.C." ECF 10-1 at 5 (citing Plaintiff's Ex. 16). And Texas is one of those states. Thus, even assuming the Proclamation made it more difficult for some voters to deliver their marked ballot in person, voters still have a full and robust spectrum of alternative options which they may pursue instead. In other words, the challenged Proclamation does not affect the "right to vote," only the "claimed right" to have multiple options for in-person delivery of a mail-in ballot. *McDonald*, 394 U.S. at 807.

Just two days ago, the Seventh Circuit upheld an Indiana law limiting voting by mail. It explained that even "[i]f Indiana's law granting absentee ballots to elderly voters changed or even disappeared tomorrow, all Hoosiers could vote in person this November, or during Indiana's twenty-eight-day early voting window, just the same." *Tully v. Okeson*, No. 20-2605, 2020 WL 5905325, at *3 (7th Cir. Oct. 6, 2020). As the Sixth Circuit has explained, "there is no constitutional right to an absentee ballot." *Mays v. LaRose*, 951 F.3d 775, 792 (6th Cir. 2020). The same logic applies here. Because Plaintiffs have so many options for voting, a proclamation tweaking the procedures for one of them does not burden the right to vote.

"[T]he Court has not discarded *McDonald*, *sub silentio* or otherwise." *Tex. Democratic Party v. Abbott*, 961 F.3d at 406. The Fifth Circuit continues to apply *McDonald* when defining the scope of the right to vote. *See id.* at 409 (distinguishing the "right to vote" from "a claimed right to receive absentee ballots"); *Tex. Democratic Party*, 2020 WL 5422917, at *12 ("[T]he right to vote in 1971 did

---

[10] Harris County, for example, has announced that it will host 120 early voting polling locations and 767 election day polling locations for the November general election, with the possibility of adding more between now and the start of the in-person voting period. *See generally* Ex. 7; Ex. 8.

not include a right to vote by mail."). Plaintiffs' citations do not support their claims here. Notably, they do not cite any binding, let alone persuasive authority on their broad "disenfranchisement" claims. See ECF 10-1 at 11–13

### 3.    The Proclamation would pass scrutiny even if *Anderson-Burdick* applied.

Even if this Court concludes that the right to vote is implicated, the Proclamation easily passes muster under *Anderson-Burdick*, as any burden is *de minimis*, and the statute advances weighty State interests. To apply the *Anderson-Burdick* test, a court must "first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate." *Voting for Am., Inc. v. Steen*, 732 F.3d 382, 387 (5th Cir. 2013) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)). Then, the Court "must identify and evaluate the precise interest put forward by the State as justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights." *Id.* (quoting *Anderson*, 460 U.S. at 789). When a state election law provision imposes only "reasonable, nondiscriminatory restrictions" upon the rights of voters, "the state's important regulatory interests are generally sufficient to justify" the restrictions. *Anderson*, 460 U.S. at 788.

Addressing each element in turn, the Governor's Proclamation expanded Plaintiffs' ability to vote by mail. He did not curtail or burden it. *See Supra* at III.A.1. Furthermore, although the October 1 Proclamation conditioned the suspension of Section § 86.006(a-1) on the early voting clerk confining in-person delivery to a single office, neither the July 27 or October 1 Proclamations apply to election day. Ex. 1 ¶ 11. The counties may therefore organize multiple delivery locations on election day for voters to utilize, to the extent the practice is authorized by the Election Code. The Proclamation did not curtail or take away any option otherwise permitted under Texas law.

Nor is there any reason to suspect that voters will be unable to return their ballots by the deadline on account of the Proclamation. In addition to having a robust in-person early voting period,

Texas has taken care to ensure that voters who vote by mail have sufficient time to cast their ballot. The Election Code permits voters to submit their application for a ballot by mail as early as January 1 of the calendar year in which the election will be held. TEX. ELEC. CODE § 84.007(c). For voters who qualify by reason of age or disability, the State offers voters the option to submit an annual application. *Id.* § 86.0015. If voters submit their application in a timely fashion, the Election Code requires the early voting clerk to distribute ballots to voters no less than 30 days before election day. *Id.* § 86.004(a). Even assuming *arguendo* that complications from COVID-19 could cause intermittent delays, nothing in the Complaint suggests that a month is insufficient time for Plaintiffs to review, mark, and then return their ballots.

Moving on to the next *Anderson-Burdick* prong, the State's interests more than justify the supposed burden placed on voters. Election fraud, specifically vote-by-mail election fraud, has proven to be a frequent and enduring problem in Texas. *See Crawford.*, 553 U.S. 181, 196 n.12 (2008) (plurality) (noting that most of the documented cases of voter fraud were related to absentee voting); *Veasey v. Abbott*, 830 F.3d 216, 263 (5th Cir. 2016) (en banc) (noting that mail-in voting is "far more vulnerable to fraud, particularly among the elderly"). In the last Legislative Session alone, the Texas Legislature heard testimony from district attorneys and law enforcement about coordinated efforts to steal and harvest votes. Tex. S. State Affairs Comm. Hearing, 86th Leg., R.S. (Mar. 18, 2019).

Limiting the number of in-person delivery locations reduces the risk of these criminal act succeeding. *Crawford*, 553 U.S. at 196 (plurality) ("There is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters."). It enables election personnel to focus their resources and attention on a single location, and it prevents fraudsters from forum shopping should one in-person delivery site have fewer safeguards or its personnel exhibit less prudence. To put it mildly, the State believes it to be much more manageable to have poll watchers

and other personnel scrutinize the delivery process at one location than up to a dozen locations over the course of a 40-day period.

In addition, because the historical practice has been to limit the number of in-person delivery sites to a single location per county, there is little uniformity among early voting clerks in interpreting and implementing Section 86.006(a-1). This discrepancy has two chief consequences. First, procedures will vary between counties and even between delivery locations within a single county including precautions that must be taken to ensure the delivery process is both accessible and resistant to fraud. Second, the impromptu and haphazard implementation of additional in-person delivery locations could result in disparate treatment among Texas voters since not every county has interpreted Section 86.006(a-1) the same way. The State therefore has an acute interest in clarifying the Governor's July 27 proclamation and establishing uniformity in the manner in which counties administer the election.

### B.      Plaintiffs' arbitrary disenfranchisement claim fails.

Plaintiffs contend that the October 1 Proclamation violates the Equal Protection Clause, but this claim also fails. To start with, Plaintiffs' reliance on *Bush v. Gore* is misplaced. 531 U.S. 98, 104-05 (2000). The opinion in *Bush v. Gore* was "limited to the present circumstances" because "the problem of equal protection in election processes generally presents many complexities." *Id.* at 109. And as such the opinion has limited precedential value. See *League of United Latin Am. Citizens v. Abbott*, 951 F.3d 311, 317 (5th Cir. 2020) (doubting that *Bush v. Gore* could apply outside of those specific facts considering the Court's "express pronouncement").

The case is also readily distinguishable from the current controversy, as is the other two cases Plaintiffs cite. In *Bush v. Gore*, the Court confronted a unique situation, where the "standards for accepting or rejecting contested ballots might vary not only from county to county but indeed within a single county from one recount team to another." 531 U.S. at 106. Here, in contrast, the Proclamation reestablishes a single universal rule that is easily administrable and applies statewide. The

Proclamation in fact was issued in part to eliminate disparate treatment and advance uniformity by requiring each county to have the same number of in-person delivery locations.

First, Plaintiffs cite *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1346 (11th Cir. 2019) but fail to note their citation is a dissenting opinion. Second, *League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 478 (6th Cir. 2008), includes a parade of horrible not alleged here: twelve hour wait times until 4:00a.m., inadequate voting machines causing 10,000 people to not vote, poll workers refusing to assist disabled voters, ballots not distributed with proper instructions that caused "22% of the provisional ballots cast to be discounted." Here, the only alleged similarity is that Plaintiffs may have longer wait-times.[11] But no one posits that there would be constant fourteen-hour wait-times everyday though election day. Third, in *Hunter v. Hamilton County Bd. of Elections*, the case involved "concerns" about the arbitrary "review of provisional ballots by local boards of elections." 635 F.3d 219, 235 (6th Cir. 2011). Here, however, the argument is that the State has not gone far enough in removing incidental barriers to voting, not that the State imposed an additional qualification that invidiously denies voters the franchise. At most, Plaintiffs reference that the Proclamation will have a disparate impact on voters based on their geography. But that triggers no more than rational-basis review, which the Proclamation more than satisfies. *See, e.g.*, *Phillips v. Snyder*, 836 F.3d 707, 719 (6th Cir. 2016); *Decatur Liquors, Inc. v. District of Columbia*, 478 F.3d 360, 363 (D.C. Cir. 2007).

The fact that the Proclamation would survive rational basis review leads to the final reason why Plaintiff's claim fails as a matter of law. Namely, an action taken by the government cannot arbitrarily disenfranchise voters when it advances legitimate government interests. As explained above, the Governor had good reasons for clarifying that his earlier proclamation did not permit the early voting clerk to organize multiple in-person delivery locations per county. Plaintiffs may disagree with

---

[11] Multiple counties keep track of wait times on their website. Harris County, for example, has an interactive feature that allows voters to enter in a polling location and determine the wait time. This allows the voter to determine which polling location would be most convenient to him or her. Ex. 9.

these reasons, but the Proclamation is reasonable in light of the State's interests in preserving uniformity and integrity in its elections.

### C.        Plaintiffs' claims of a conspiracy fail.

"To start, there is no conspiracy involving two or more persons." *Tex. Democratic Party v. Abbott*, 961 F.3d at 410 (finding plaintiffs' claim was "likely meritless"). Plaintiffs cannot prove a viable cause of action under 42 U.S.C. § 1985(3). Such a claim requires: (1) a conspiracy involving two or more persons; (2) *for the purpose* of depriving, directly or indirectly, a person or class of persons of the equal protection of the laws; and (3) an act in furtherance of the conspiracy; (4) which causes injury to a person or property, or a deprivation of any right or privilege of a citizen of the United States. *Hilliard v. Ferguson*, 30 F.3d 649, 652–53 (5th Cir. 1994). "In so doing, the plaintiff must show that the conspiracy was motivated by a class-based animus." *Id.* at 653. This claim fails for manifold reasons.

*First*, Plaintiffs have offered no evidence that the purported conspiracy "was motivated by a class-based animus," or even what role the Secretary had in defining the scope of the Proclamation.

*Second*, if Plaintiffs' allegations are true that this suit is against the Secretary in her official capacity only, then this suit is really against the State of Texas, not "persons" capable of conspiring. *See Will v. Mich. Dep't of State Police,* 491 U.S. 58, 63–71 (1989) (holding that a state is not a person under section 1983); *Small v. Chao,* 398 F.3d 894, 898 (7th Cir. 2005) (concluding that a lack of personhood under section 1983 equates to a lack of personhood under section 1985); *see also Washington v. Louisiana*, 425 Fed. App'x 330, 333 (5th Cir. 2011) (same). What's more, "[i]t is a long-standing rule in this circuit that a 'corporation cannot conspire with itself any more than a private individual can, and it is the general rule that the acts of the agent are the acts of the corporation.'" *Hilliard*, 30 F.3d at 653 (citation omitted). Thus, any conspiratorial acts taken by the Secretary are attributable to the State of Texas. Under section 1985, there can be no conspiracy between the State of Texas and its agents. *See id.*

*Third*, Plaintiffs do not even argue or present any facts that the supposed conspiracy was motivated by racial animus. But the Fifth Circuit has held that "the only conspiracies actionable under section 1985(3) are those motivated by racial animus." *Cantu v. Moody*, 933 F.3d 414, 419 (5th Cir. 2019) (quoting *Deubert v. Gulf Fed. Sav. Bank*, 820 F.2d 754, 757 (5th Cir. 1987)).

## VI.   Should the injunction issue, the harm to the State will far outweigh the harm to Plaintiffs and will disserve the public interest.

Even if Plaintiffs could demonstrate a substantial likelihood that they will prevail on the merits, they also must establish an irreparable injury, that the threatened injury outweighs any damage that the injunction may cause the opposing party, and that the injunction will serve the public interest. *Allied Mktg. Group, Inc. v. CDL Mktg., Inc.*, 878 F.2d 806, 809 (5th Cir.1989). As explained above, Plaintiffs cannot establish an irreparable injury because they have not proven that Texas is infringing on their rights arising under the First and Fourteenth Amendments and the Voting Rights Act. But even if they could establish an injury—one due to personal preference and geographical distance— Plaintiffs' injury would pale in consideration to the harm suffered by Texas should an injunction issue. The equitable factors of the injunctive relief analysis tilt heavily against the issuance of an injunction.

### A.   Plaintiffs are not entitled to maintain the "status quo" of normal operations during a worldwide pandemic.

As an initial matter the "purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Benisek v. Lamone*, 138 S. Ct. 1942, 1945 (2018) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395, (1981)). But the status quo has been in a constant state of flux during this pandemic. As Chief Judge Rosenthal noted in denying a motion for preliminary injunction, this pandemic presents a "complex, rapidly evolving situation." *Russell v. Harris Cty.*, 2020 WL 1866835, at *13 (S.D. Tex. April 14, 2020). "The Executive Order is not permanent." *Id.* "Disrupting a process that strives to recognize the different interests and concerns is an added risk of intruding with a temporary restraining order that is backed by the threat of contempt." *Id.*

"Institutions charged with safeguarding the public and upholding the Constitution have an extraordinary and difficult task, made more difficult and more consequential during this pandemic." *Id.* The Governor's "ability to continue to adjust its policies [would be] significantly hampered by [a] preliminary injunction, which locks in place a set of policies for a crisis that defies fixed approaches." *See Valentine v. Collier*, 956 F.3d 797, 803 (5th Cir. 2020). Defendants ask this Court to deny Plaintiffs' request for preliminary injunctive relief that would "freeze" a status quo that is anything but static.

**B.    The equitable factors tilt heavily against the issuance of an injunction.**

In contrast to inconvenience claimed by Plaintiffs, enjoining the Governor's Proclamation will have serious adverse effect on both the State and public. Texas has a weighty interest in the equal, fair, and consistent enforcement of its laws. *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) ("[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.") (citations omitted). The "inability [for a State] to enforce its duly enacted [laws] clearly inflicts irreparable harm on the State." *Abbott v. Perez*, 138 S. Ct. 2305, 2324 n.17 (2018); *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 734 F.3d 406, 419 (5th Cir. 2013) (recognizing that, when a duly enacted law cannot be enforced, "the State necessarily suffers the irreparable harm of denying the public interest in the enforcement of its laws").

The State also has a strong interest in ensuring orderly and secure elections. *See Eu v. San Francisco Cty. Democratic Cent. Comm.,* 489 U.S. 214, 231 (1989) (Texas "indisputably has a compelling interest in preserving the integrity of its election process."); *Crawford*, 553 U.S. at 196 (plurality) ("There is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters.") State officials play an "active role" in managing elections, *see Storer v. Brown*, 415 U.S. 724, 730 (1974), and it would inflict a significant injury on the State if the Court were to prevent the State from prescribing the conduct of its elections. *See Maryland*, 567 U.S. at 1303.

These interests are heightened here, as the challenged Proclamation not only falls within the State's discretion to conduct elections, but it also reflects the State's determination on how to respond to an ongoing health emergency. "[T]he Constitution 'principally entrusts the safety and the health of the people to the politically accountable officials of the States.' When those officials 'undertake[ ] to act in areas fraught with medical and scientific uncertainties,' their latitude 'must be especially broad.'" *Andino*, 592 U.S. at ___ (slip op., at 2) (Kavanaugh, J., concurring) (citations omitted) (alteration in original). "It follows that a State legislature's decision either to keep or to make changes to election rules to address COVID–19 ordinarily 'should not be subject to second guessing by an unelected federal judiciary, which lacks the background, competence, and expertise to assess public health and is not accountable to the people.'" *Andino*, 592 U.S. at ___ (slip op., at 2) (Kavanaugh, J., concurring) (quoting *South Bay United Pentecostal Church v. Newsom*, 590 U. S. ___, ___ (slip op., at 2)).

## C.   The Court should not alter the election rules so close to the election.

"For many years, this Court has repeatedly emphasized that federal courts ordinarily should not alter state election rules in the period close to an election." *Andino v. Middleton*, 592 U.S. ___, ___ (slip op., at 2) (Oct. 5, 2020) (Kavanaugh, J., concurring) (citing *Purcell v. Gonzalez*, 549 U. S. 1 (2006) (per curiam)). In *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam), the Court relied on "considerations specific to election cases" to caution against federal court interference with impending state elections. It explained that "[c]ourt orders affecting elections . . . can themselves result in voter confusion and consequent incentive to remain away from the polls. As an election draws closer, that risk will increase." *Id.* at 4–5. *See also Veasey v. Abbott*, 830 F.3d 216, 243 (5th Cir. 2016) (en banc) (declining to grant immediate relief on a Voting Rights Act claim even though several months remained before the general election). The Court's warning applies equally here, as adding another change on top of the Governor's Proclamation will confuse voters on which policy is in effect. *See* Dana DeBeauvoir's Mot. for Leave, *Texas Democratic Party v. Abbott*, No. 20-50407 (filed May 21, 2020)

("The public confusion caused by the back and forth issuance of trial court orders and stays of those orders by appellate courts. . . interferes with" the processes set up in preparation for an election.).

Plaintiffs emphasize that they filed suit soon after the Governor's proclamation issued, but the *Purcell* principle is not a statute of limitations. It limits the remedial authority of a federal court, even when a plaintiff acts quickly. It does not apply to the Governor, and it is not abrogated when the Governor concludes he must act relatively close to an election. The executive branch of government must be able to act with "dispatch" during "the most critical emergencies of the state." Federalist No. 70. Judicial involvement "close in time to the election," far from being necessary, is "strongly disfavored." *Texas All. for Retired Americans v. Hughs*, No. 20-40643, 2020 WL 5816887, at *2 (5th Cir. Sept. 30, 2020).

## VII.   Any injunction should be limited to Plaintiffs with standing.

Even if the Court could grant injunctive relief, it would necessarily be limited to the Plaintiffs. Plaintiffs appear to seek relief covering every Texas voter using this method of delivering mail-in ballots, but "neither declaratory nor injunctive relief can directly interfere with enforcement of contested statutes or ordinances except with respect to the particular federal plaintiffs." *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931 (1975). As the Fifth Circuit recently explained, when plaintiffs do "not sue as class representatives," a "district court lack[s] authority to enjoin enforcement of [the challenged law] as to anyone other than the named plaintiffs." *In re Abbott*, 954 F.3d 772, 786 n.19 (5th Cir. 2020) (citing *Doran*, 422 U.S. at 931). "The fundamental problem with [Plaintiffs' requested] injunction is that plaintiffs lack standing to seek—and the district court therefore lacks authority to grant—relief that benefits third parties." *McKenzie v. City of Chicago*, 118 F.3d 552, 555 (7th Cir. 1997). An injunction prohibiting enforcement of Texas law as to non-plaintiffs would be improper.[12]

---

[12] Plaintiffs cannot use associational standing to evade the limits that would be placed on an action by their purported members. *See Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 24 (2000). "The remedy must of course be limited to the inadequacy that produced the injury in fact that the plaintiff

**VIII.   The Court should stay any injunction that it grants.**

If the Court grants Plaintiffs' motion, the Court should stay any injunction. Federal Rule of Civil Procedure 62(d) provides that "[w]hile an appeal is pending from an interlocutory order or final judgment that grants, continues, modifies, refuses, dissolves, or refuses to dissolve or modify an injunction, the court may suspend, modify, restore, or grant an injunction." Courts "consider four factors in deciding whether to grant a stay pending appeal: (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 734 F.3d 406, 410 (5th Cir. 2013).

For the reasons explained above, Defendants are likely to prevail on the merits, and a stay would promote the public interest without injuring other parties. An injunction against enforcement of Texas law would irreparably injure the State and her officials. *See Tex. All. for Retired Americans*, 2020 WL 5816887, at *4; *Valentine v. Collier*, 956 F.3d 797, 803 (5th Cir. 2020) (per curiam).

CONCLUSION

Governor Abbott and Secretary Hughs respectfully request that the Court deny Plaintiffs' motion for a preliminary injunction.

---

has established." *Lewis v. Casey*, 518 U.S. 343, 357 (1996). Any injunction granted must be limited to the relief their identified members could obtain. *See Conservation Law Found. of New England, Inc. v. Reilly*, 950 F.2d 38, 41 (1st Cir. 1991) (rejecting "nationwide relief" for an associational plaintiff and limiting injunctive relief to what the plaintiff's ten identified members would have been able to obtain).

Date: October 8, 2020

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

/s/ Patrick K. Sweeten
PATRICK K. SWEETEN
Associate Deputy for Special Litigation

TODD LAWRENCE DISHER
Deputy Chief, Special Litigation Unit

WILLIAM T. THOMPSON
Special Counsel

ERIC A. HUDSON
Special Counsel

KATHLEEN T. HUNKER
Special Counsel

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548 (MC-009)
Austin, Texas 78711-2548
Tel.: (512) 936-1414
Fax: (512) 936-0545
patrick.sweeten@oag.texas.gov
todd.disher@oag.texas.gov
will.thompson@oag.texas.gov
eric.hudson@oag.texas.gov
kathleen.hunker@oag.texas.gov

**COUNSEL FOR THE TEXAS SECRETARY OF STATE**

## CERTIFICATE OF SERVICE

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on October 8, 2020, and that all counsel of record were served by CM/ECF.

/s/ Patrick K. Sweeten
PATRICK K. SWEETEN
Associate Deputy for Special Litigation