IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| TEXAS LEAGUE OF UNITED LATIN AMERICAN CITIZENS, NATIONAL LEAGUE OF UNITED LATIN AMERICAN CITIZENS, LEAGUE OF WOMEN VOTERS OF TEXAS, RALPH EDELBACK, and BARBARA MASON,<br><br>        Plaintiffs,<br><br>v.<br><br>GREG ABBOTT, in his official capacity as Governor of Texas, RUTH HUGHS, in her official capacity as Texas Secretary of State, DANA DEBEAUVOIR, in her official capacity as Travis County Clerk, CHRIS HOLLINS, in his official capacity as Harris County Clerk, JOHN M. OLDHAM, in his official capacity as Fort Bend County Elections Administrator, and LISA RENEE WISE, in her official capacity as El Paso County Elections Administrator,<br><br>        Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | 1:20-CV-1006-RP<br>(lead case) |
| LAURIE-JO STRATY, TEXAS ALLIANCE FOR RETIRED AMERICANS, and BIGTENT CREATIVE,<br><br>        Plaintiffs,<br><br>v.<br><br>GREGORY ABBOTT, in his official capacity as Governor of the State of Texas, and RUTH HUGHS, in her official capacity as Texas Secretary of State,<br><br>        Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | 1:20-CV-1015-RP |

# ORDER

Before the Court are Plaintiffs Texas League of United Latin American Citizens, National League of United Latin American Citizens, League of Women Voters of Texas, Ralph Edelbach, and Barbara Mason's Motion for Temporary Restraining Order ("TRO") and Preliminary Injunction, (Mot. TRO, Dkt. 15),[1] and Governor Greg Abbott ("Governor Abbott") and Secretary Ruth Hugh's ("Secretary Hughs") Motion to Dismiss, (Mot. Dismiss, Dkt. 31). On October 6, 2020, this Court consolidated the TRO with the motion for temporary restraining order and preliminary injunction filed in a related case[2] for the limited purpose of simultaneously resolving the requests for preliminary injunctive relief in both cases.[3] (Case No. 1:20-cv-1015, Order, Dkt. 21). Having considered the briefing, the arguments made at the hearing, the evidence, and the relevant law, the Court will issue a preliminary injunction and grant in part and deny in part the Motion to Dismiss.

## I.      BACKGROUND

The pending motions for temporary restraining order and preliminary injunction arise from Governor Abbott's October 1, 2020 proclamation prohibiting Texas counties from providing absentee voters with more than one location where they can return completed absentee ballots in

---

[1] The Court incorporates Plaintiffs' contemporaneously filed Amended Motion for a Temporary Restraining Order and Preliminary Injunction, Dkt. 20.

[2] *Laurie-Jo Straty, et al. v. Gregory Abbott, et al.*, 1:20-CV-1015-RP (W.D. Tex. filed Oct. 2, 2020).

[3] In this Order, the Court will refer to the parties as follows:
(1) Plaintiffs Texas League of United Latin American Citizens, National League of United Latin American Citizens, League of Women Voters of Texas, Ralph Edelbach, Barbara Mason, (together, "LULAC Plaintiffs");
(2) Laurie-Jo Straty, Texas Alliance for Retired Americans, BigTent Creative (together, "Straty Plaintiffs");
(3) LULAC Plaintiffs and Straty Plaintiffs (together, "Plaintiffs"); and
(4) Greg Abbott, in his official capacity as Governor of the State of Texas ("Governor Abbott"), Ruth Hughs, in her official capacity as Texas Secretary of State ("Secretary Hughs") (together, the "State"), Dana DeBeauvoir ("DeBeauvoir"), in her official capacity as Travis County Clerk, Chris Hollins ("Hollins"), in his official capacity as Harris County Clerk, John M. Oldham ("Oldham"), in his official capacity as Fort Bend County Elections Administrator, and Lisa Renee Wise ("Wise"), in her official capacity as El Paso County Elections Administrator (together, the "County Clerks").
Although named as defendants, the County Clerks have filed documents and taken positions in the case that support Plaintiffs' arguments.

person (the "October 1 Order").[4] Governor Abbott's October 1 Order came on the heels of his July 27, 2020 proclamation (the "July 27 Order"), which allowed voters "to deliver a marked mail ballot in person . . . prior to and including on election day," at one or more locations.[5] Plaintiffs move for a preliminary injunction based on their claims that the October 1 Order places an undue burden on the right to vote under the First and Fourteenth Amendments and violates the Equal Protection Clause of the Fourteenth Amendment. The LULAC Plaintiffs also argue that the October 1 Order violates the Voting Rights Act. (Am. Compl, Dkt. 16, at 19).[6] The Straty Plaintiffs separately bring a cause of action under the Ku Klux Klan Act. (1-20-cv-1015, Compl., Dkt. 1, at 18).

### A.    Before the July 27, 2020 Proclamation

Before Governor Abbott issued his July 27 Order, the rules governing absentee ballots emanated from the Texas Election Code. Under Section 86.006(a-1), an absentee voter could "deliver a marked ballot in person to the early voting clerk's office only while the polls are open on election day" if they presented "an acceptable form of identification." Tex. Elec. Code § 86.006 (2017). Due to the Covid-19 pandemic, the Governor also declared a state of disaster for the State of Texas on March 13, 2020.[7]

### B.    The July 27, 2020 Proclamation

On July 27, 2020, Governor Abbott issued an executive order allowing (1) in-person early voting to begin on October 13 and (2) absentee ballots to be delivered "in person to the early voting

---

[4] Proclamation by the Governor of the State of Texas, Oct. 1, 2020, *available at* https://gov.texas.gov/uploads/files/press/PROC_COVID-19_Nov_3_general_election_IMAGE_10-01-2020.pdf.

[5] Proclamation by the Governor of the State of Texas, July 27, 2020, *available at* https://gov.texas.gov/uploads/files/press/PROC_COVID-19_Nov_3_general_election_IMAGE_07-27-2020.pdf.

[6] All docket cites refer to the record in the lead case *LULAC, et al. v. Gregory Abbott, et al.*, 1:20-CV-1006-RP (W.D. Tex. filed Oct. 1, 2020), unless otherwise noted.

[7] Proclamation by the Governor of the State of Texas, Ma. 13, 2020, *available at* https://gov.texas.gov/uploads/files/press/DISASTER_covid19_disaster_proclamation_IMAGE_03-13-2020.pdf.

clerk's office prior to" election day. (Am Compl., Dkt. 16, at 9; 1-20-cv-1015, July 27 Order, Dkt. 11-18). In issuing the July 27 Order to allow absentee voters expanded opportunities to return their ballots in person, Governor Abbott recognized the need to allow greater options to return absentee ballots in person to "ensure that elections proceed efficiently and safely." (*Id.*). Allowing greater options for in-person delivery of absentee ballots aligns with the U.S. Election Assistance Commission's recommendation that there be at least one ballot return center for every 15,000 to 2,000 registered voters, with added return centers in "communities with [historically] low vote by mail usage" such as Texas. (1-20-cv-1015, Compl., Dkt. 1, at 14–15).

The July 27 Order allowed voters to return their completed ballots on Election Day and during the early voting period beginning October 13, 2020 to the ballot return centers that are available "before, during, and after business hours in the weeks leading up to the election so that voters may quickly and efficiently submit their completed ballots as their schedules allow." (1-20-cv-1015, Compl., Dkt. 1, at 3). The July 27 Order did not place limits on the number of ballot return centers counties were permitted to operate, allowing elected county officials in each Texas county to determine whether to have additional ballot return centers during the early voting period and how many ballot return centers to open. (1-20-cv-1015, Mot. TRO, Dkt. 10-1, at 5; 1-20-cv-1015, July 27 Order, Dkt. 11-18; 1-20-cv-1015, Resp. Mandamus Brief, Dkt. 15-1, at 6, 38). If a county opened one or more ballot return centers, the county's ballot return centers and the employees who worked in those offices would be subject to the same election laws and rules. (Hollins Supp. Decl., Dkt. 51-1, at 1; Oldham Decl., Dkt. 21, at 8; DeBeauvoir Decl., Dkt. 18, at 7). Governor Abbott's July 27 Order did not loosen the statutory restrictions on how an absentee ballot is completed, transported, submitted, processed, secured, or stored. *See, e.g.,* Tex. Elec. Code § 86.011 (describing actions the voting clerk takes upon receipt of an absentee ballot).

After Governor Abbott issued his July 27 Order, State of Texas officials confirmed on several occasions that absentee ballots could be returned to any ballot return center in one's county. For example, on August 26, 2020, an attorney in the Elections Division of the Secretary of State's office stated that in-person delivery of an absentee ballot "may include satellite offices of the early voting clerk." (1-20-cv-1015, Email Dkt. 11-20, at 38). On September 30, 2020, Texas Attorney General Ken Paxton ("Attorney General Paxton") and Kyle Hawkins, the Solicitor General of Texas ("Solicitor General Hawkins") submitted that statement from the Elections Division attorney as an exhibit in support of their brief filed with the Supreme Court of Texas in another case involving the July 27 Order. (Resp. Mandamus Brief, Dkt. 11-21, at 38). In that brief, Attorney General Paxton and Solicitor General Hawkins explained to the Texas Supreme Court that nothing in the Election Code or the July 27 Order precluded county officials from having more than one ballot return center. (*Id.*). They also specifically confirmed that "the Secretary of State has advised local officials that the [Texas] Legislature has permitted ballots to be returned to any early-voting clerk office." (*Id.*).

In response to Governor Abbott's July 27 Order and with assurances from Secretary Hughs, Attorney General Abbott, and Solicitor General Hawkins, counties designed, publicized, and began operating ballot return centers to ensure the safety of absentee voters who are "older, sick, or have disabilities that prevent them from voting in person, and are thus at particularly high risk of COVID-19." (Am Compl., Dkt. 16, at 10). Several counties decided to offer multiple ballot return centers because "the size of some counties would make it difficult, if not impossible, for some voters to return their ballots to election administration headquarters in each county." (1-20-cv-1015, Compl., Dkt. 1, at 13). For example, on August 14, 2020, the Harris County Clerk announced his intention to open eleven ballot return centers to accept absentee ballots during early voting. (Mot.

TRO, Dkt. 15, at 2). On October 1, 2020, the Fort Bend County Clerk announced his plan to accept absentee ballots at five locations. (1-20-cv-1015, Houston Chron., Dkt. 11-24, at 4).

### C.    The October 1, 2020 Proclamation

On October 1, 2020, after voting had already begun, Governor Abbott changed the rules and—in contradiction to his July 27 Order and the assurances by other state officials including Secretary Hughs, Attorney General Paxton, and Solicitor General Hawkins—ordered county election officials to offer their absentee voters no more than one ballot return center per county. (Am. Compl., Dkt. 16, at 1; 1-20-cv-1015, Mot. TRO, Dkt. 15, at 3; Oct. Proc. Dkt. 11-23).[8] Governor Abbott cited a need to "add ballot security protocols for when a voter returns a marked mail ballot to the early voting clerk's office" as his reasoning for issuing the October 1 Order. (Mot. TRO, Dkt. 15, at 3; 1-20-cv-1015, Compl., Dkt. 1, at 13).

The October 1 Order only impacts absentee voters who, as defined by Texas law, either (1) will be away from their county on Election Day and during early voting; (2) are sick or have a disability; (3) are 65 years of age or older on Election Day; or (4) are confined in jail, but eligible to vote. Tex. Elec. Code §§ 82.001, 82.002, 82.003, 82.004. Texas is expected to witness an "unprecedented surge in mail voting" in the November election. (1-20-cv-1015, Mot. TRO, Dkt. 10-1, at 3).

Governor Abbott gave county officials less than 24 hours to close their ballot return centers. (Am. Compl., Dkt. 16, at 11; Mot. TRO, Dkt. 15, at 3). Because voting had already begun when Governor Abbott issued his October 1 Order, he had to specify that absentee ballots cast at previously available ballot return centers would remain valid and be counted. (Mot. TRO, Dkt. 15, at 3). As will be discussed more fully below, Governor Abbott's about-face not only impacted the

---

[8] Proclamation by the Governor of the State of Texas, Oct. 1, 2020, *available at* https://gov.texas.gov/uploads/files/press/PROC_COVID-19_Nov_3_general_election_IMAGE_10-01-2020.pdf.

County Clerks and their offices but also disrupted the plans of absentee voters who had begun making their voting plans in response to the July 27 Order that had been in effect for months. (*Id.* at 13; *see e.g.*, Mason Decl., Dkt. 15-11, at 2; 1-20-cv-1015, Rosas Decl., Dkt. 11-8 at 3). Many of these absentee voters planned to cast their ballots at a ballot return center to avoid unnecessary exposure to Covid-19 by voting in person, avoid driving long distances to return their ballots, and avoid the delays involved with mailing their ballots through the U.S. Postal Service ("USPS").

### D.      The Covid-19 Pandemic

On March 13, 2020, President Trump declared a national state of emergency in the face of the outbreak of Covid-19 in the United States. (Am. Compl., Dkt. 16, at 8). That same day, Governor Abbott declared a state of disaster in Texas. (*Id.*). In April 2020, Governor Abbott issued a stay-at-home order and postponed local elections scheduled for May until November to avoid further spread of the disease. (1-20-cv-1015, Compl., Dkt. 1, at 2). As of October 2020, Texas has also recorded over 750,000 Covid-19 cases and almost 16,000 deaths due to the virus. (Am Compl., Dkt. 16, at 8). Texas's infection rate tripled during the summer months and is expected to resurge this fall and winter. (*Id.* at 9).

Covid-19 has had disproportionate effects on certain communities. Texans over the age of 65, who are allowed by statute to vote absentee, are particularly vulnerable to the virus. (*Id.*). Texans over the age of 65 represent approximately 70% of coronavirus deaths, or 10,800 of the 16,000 total deaths in Texas, despite making up only 13% of the total Texas population. (*Id.*; 1-20-cv-1015, Compl., Dkt. 1, at 2). The Latino population in Texas also has suffered a disproportionate share of Covid-19 fatalities. While the Latino community constitutes 39.7% of the Texas population, they represent 56% of Covid-19 deaths. (Am Compl., Dkt. 16, at 8).

Because voting in person risks exposing voters to Covid-19, many more voters who qualify to vote absentee have chosen, or will choose, to cast an absentee ballot in the November election.

(1-20-cv-1015, Mot. TRO, Dkt. 10-1, at 3). However, widespread delays in the USPS have left voters "increasingly concerned" that their mailed ballots will not reach election officials in time to be counted. (1-20-cv-1015, Compl., Dkt. 1, at 11-12).

      **E.**      **USPS Delays**

The spread of coronavirus among USPS workers and an ongoing budgetary crisis has led to "substantial and high-profile delays" for mail delivered through USPS in Texas and around the country in recent months. (Am. Compl., Dkt. 16, at 15; 1-20-cv-1015, Compl., Dkt. 1, at 11). As of mid-August, 10% of all postal workers had tested positive for Covid-19, significantly reducing USPS staff. (1-20-cv-1015, Compl., Dkt. 1, at 11). In addition, operational changes have limited overtime hours available to employees who are able to work and decommissioned mail processing equipment. (*Id.* at 11). These problems have led to a "sharp decrease" in the USPS's delivery performance. (1-20-cv-1015, Mot. TRO, Dkt. 10-1, at 4). Because large numbers of Americans have chosen to vote by mail to reduce their exposure to Covid-19, the USPS will be handling a much higher volume of mail than usual in the run-up to the November election. (1-20-cv-1015, Compl., Dkt. 1, at 11.). Data collected by Harris County indicates that delivery of absentee ballots by mail will take "more than [a] few days and often more than a week." (Hollins Supp. Decl., Dkt. 51-1, at 2).

Specifically, the USPS has publicly warned state officials that election mail will be delayed in Texas. (1-20-cv-1015, Compl., Dkt. 1, at 2; USPS Letter, Dkt. 15-9, at 2). The USPS recommends voters to submit their request for an absentee ballot at least fifteen days before Election Day "and preferably long before that time" to ensure timely delivery of ballots. (USPS Letter, Dkt. 15-9, at 2). Under Texas law, however, voters can request absentee ballots up to eleven days before Election Day. (1-20-cv-1015, Compl., Dkt. 1, at 11; USPS Letter, Dkt. 15-9, at 3). Election officials will count all ballots received by Election Day, or those postmarked by 7:00 p.m. on Election Day that are delivered the next day. (1-20-cv-1015, Compl., Dkt. 1, at 10). On July 20, 2020, Thomas Marshall,

the General Counsel and Executive Vice President of USPS, notified Secretary Hughs that Texas's absentee ballot deadlines "are incongruous with the Postal Service's delivery standards," and "certain state-law requirements and deadlines appear to be incompatible with [USPS's] delivery standards and the recommended [15-day] timeframe noted above." (USPS Letter, Dkt. 15-9, at 3).

USPS also warned that "there is a significant risk that . . . a completed ballot postmarked on or near Election Day will not be delivered in time to meet the state's receipt deadline of November 4." (*Id.*). USPS requested that "election officials keep [USPS's] delivery standards and recommendations in mind when making decisions as to the appropriate means used to send a piece of Election Mail to voters, and when informing voters how to successfully participate in an election where they choose to use the mail." (*Id.*).

F.   **Impact of the October 1 Order**

The Court finds that the October 1 Order has already impacted voters or will impact voters by (1) creating voter confusion; (2) causing absentee voters to travel further distances, (3) causing absentee voters to wait in longer lines, (4) causing absentee voters to risk exposure to the coronavirus when they hand deliver their absentee ballots on Election Day, and (5) causing absentee voters, if they choose not to return their ballots in person to avoid exposure to Covid-19, to face the risk that their ballots will not be counted if the USPS is unable to timely deliver their ballot after its been requested or unable to timely return their completed ballot. These burdens fall disproportionately on voters who are elderly, disabled, or live in larger counties. (Mot. TRO, Dkt. 15, at 4–6; 1-20-cv-1015, Mot. TRO, Dkt. 10-1, at 9; Lincoln Amicus Brief, Dkt. 53, at 8; Disability Rights Amicus Brief, Dkt. 52, at 6–7).

Voters are now unsure if they can safely return their absentee ballots and have concerns that their ballots may not be counted. (Hollins Decl., Dkt. 8-1, at 7; Oldham Decl., Dkt. 21, at 5 ("[T]he last-minute change to election procedures is causing voter confusion."); Mason Decl., Dkt. 15-11, at

2; Golub Decl., Dkt. 15-12, at 2 ("[T]he uncertainty this last-minute change to the elections process presents puts my ability to have my vote counted into jeopardy.")). The publication of news reports alerting the public to the effects of the July 27 Order further set expectations among voters and caused them to rely on the July 27 Order in making their voting plan. (DeBeauvoir Decl., Dkt. 18, at 3–6). The State contends that the October 1 Order serves to "clarify[] any confusion caused by the July 27 order," yet presents no evidence that anyone, let alone voters, were confused by the July 27 Order. (See Mot. Dismiss, Dkt. 31, at 3).

Because of the October 1 Order, voters who choose to return their absentee ballot in person are forced to consider "whether they need to risk their health and vote in person to ensure their vote is counted or find a way to hand deliver their ballot to one distant location." (Hollins Supp. Decl., Dkt. 51-1, at 2). Voters who choose the latter option will have to travel significantly farther to return their ballots. (Golub Decl., Dkt. 15-12, at 2 ("[T]his restriction has unduly burdened me because of the increased distance I will now have to travel to submit my completed mail-in ballot in person.")). This poses a greater challenge to those living in larger, more populous counties, such as Harris County, where the lone ballot return center "could be more than fifty miles away." (Hollins Decl., Dkt. 8-1, at 7; Berg Decl., Dkt. 15-18, at 3 ("[I]t can take up to an hour roundtrip to get to the [Harris County early voting clerk's office] and back from my home.")).

An hour-long trip is particularly burdensome for older or disabled voters, who may not have access to transportation or be able to spend long periods of time traveling. (Chimene Decl., Dkt. 15-17, at 3 ("[D]ifficulties [to members attempting to access early voting clerk's office] include accessing transportation and traveling long distances from their homes."); Golub Decl., Dkt. 15-12, at 3 ("["It is very possible that the time and effort this process will take may exceed my limitation on stamina, and afterwards, I will be far too exhausted to drive home.")).

Even if voters manage to make the longer trip to their county's lone ballot return center, they will likely face "massive lines to return ballots in person." (Hollins Decl., Dkt. 8-1, at 7; Oldham Decl., Dkt. 14, at 5 (anticipating "massive lines" as a result of the October 1 Order"); Chimene Decl., Dkt. 15-17, at 3 ("[L]imiting the number of drop-off locations to a single location in each county will result in crowding and long lines."); Mason Decl., Dkt. 15-11, at 2 (expressing concern about an "hours long effort to return my ballot in person"); Berg Decl., Dkt. 15-18, at 3 ("I am concerned that with only one drop-off location there will be crowding and congestion at the drop-off site.")). Disabled voters who choose to return their ballot to their single county location risk experiencing "significant fatigue and pain" due to travel distance and wait time. (Disability Rights Amicus Brief, Dkt. 36-1, at 5; 1-20-cv-1015; Straty Decl., Dkt. 11-6, at 1; Golub Decl., Dkt. 15-12, at 3).

Traveling longer distances and waiting in lines at the ballot return offices "may pose a unique challenge" to absentee voters who are elderly or disabled. (Chimene Decl., Dkt. 15-17, at 3). Because poll workers are exempt from the statewide mask mandate, the elderly or disabled face an increased risk of contracting Covid-19 if they are forced to return their ballots to a single, likely crowded ballot return center. (*Id.* ("Poll watchers [who are exempt from statewide requirements to wear masks] will create an addition risk of exposure for our elderly members and members with disabilities."); Mason Decl., Dkt. 15-11, at 2 (voting at the single county return ballot office may "increase my risk of exposure to COVID-19")).

The Court finds that the October 1 Order also directly burdens election officials. County officials have allocated resources and selected ballot return centers in reliance on the July 27 Order. (Oldham Decl., Dkt. 21, at 4; Travis County Amicus Brief, Dkt. 44-1, at 6). For example, in Fort Bend County, which encompasses portions of the Houston suburbs and vast rural areas, John Oldham ("Oldham"), the Fort Bend County Elections Administrator, advised the Court about his

11

office's "efforts to mitigate" the confusion and logistical complications created by the October 1 Order. (Oldham Advisory, Dkt. 46, at 3; Oldham Decl., Dkt. 21, at 6, at 7 (stating that election officials are administratively burdened by "having to change our voter education materials and our staff training"); Hollins Decl., Dkt. 8-1, at 8–9 (explaining that the October 1 Order "burdens the Clerk's Office administratively and was [] extremely disruptive.")). The October 1 Order also jeopardizes county efforts to accommodate disabled voters as required by the United States Department of Justice. (Hollins Supp. Decl., Dkt. 51-1, at 3 (stating that "last minute orders to change our management practices [make] it more difficult to comply with the DOJ settlement agreement" and adequately accommodate disabled voters)).

The October 1 Order also puts the health of election workers at risk, by increasing their likelihood of exposure to the coronavirus. (DeBeauvoir Decl., Dkt. 18, at 9 (expressing fear that October 1 Order "will make both election workers and voters less safe"); Oldham Advisory, Dkt. 1, at 3–4 (citing County Commissioner finding that multiple return ballot locations provide a "safe environment for all of our workers at the election polls")).

G.    **The State's Interests**

The State argues that the October 1 Order, issued under Governor Abbott's powers pursuant to the Texas Disaster Act, serves to prevent voter confusion and fraud, and promotes purported uniformity of election laws. The state alleges that, despite its clear pronouncements that counties could decide whether to open additional ballot return centers during the early voting period under the Election Code and, (Resp. Mandamus Brief, Dkt. 15-2, at 6, 38), the July 27 Order caused confusion among counties and a lack of uniformity among the application of the Election Code among counties. (Resp. TRO, Dkt. 43, at 28–29). As discussed above, the County Clerks did not have any discretion on how an absentee ballot is completed, transported, submitted, processed, secured, or stored. The State has presented no evidence of confusion over the July 27 Order, though

12

the record reflects substantial confusion has been caused by the October 1 Order. (Hollins Decl., Dkt. 8-1, at 7; Oldham Decl., Dkt. 21, at 5; DeBeauvoir Decl. 18, Dkt. 18, at 3–6; Mason Decl., Dkt. 15-11, at 2; Golub Decl., Dkt. 15-12, at 2).

The record also reflects that the implementation of ballot return centers was uniform across counties. (Hollins Decl., Dkt. 8-1, at 9–12; Oldham Decl., Dkt. 21, at 7–8; DeBeauvoir Decl., Dkt. 18, at 10). At the hearing on Plaintiffs' preliminary injunction motions, counsel representing the County Clerks confirmed that all ballot return centers in their counties comply with all training and procedures required by state law to protect ballot integrity. (Hearing Trans., October 8, 2020, at 39:15–41:7). Rather, under the July 27 Order, the County Clerks exercised discretion only in deciding whether to have additional ballot return centers, which, as explained at the hearing, made sense given that one Texas county only has about 150 registered voters whereas Harris County has millions of registered voters making it difficult, if not impossible, for Harris County to safely collect absentee ballots from a single location during early voting. (Hearing Trans., October 8, 2020, at 82:23–83:6).

The State asserts, with no factual support, that limiting ballot return centers is necessary to "ensur[e] ballot security." (Resp. TRO, Dkt. 43, at 4). At the hearing, counsel for the County Clerks confirmed that the security protocols at return ballot centers were no different than those at the central ballot return centers, except to the extent the central centers served additional purposes. (Hearing Trans., October 8, 2020, at 39:15–41:7). Not only are the security procedures consistent between satellite and central ballot return locations, they are consistent across counties who chose to utilize satellite ballot return centers. The State did not rebut the County Clerks' evidence or attorney argument regarding their compliance with state-mandated election protocols that already ensure ballot integrity.

In fact, the State's proffered reason of ballot security is a pretext. On the one hand, the State argues that satellite ballot return centers cannot be used during the early voting period because of ballot security concerns. Yet, the State authorizes counties to use satellite ballot return centers on Election Day without regard to those ballot security concerns. It is perplexing to the Court that the State would simultaneously assert that satellite ballot return centers do not present a risk to election integrity on Election Day but somehow do present such a risk in the weeks leading up to November 3, 2020. The State's own approval of counties using satellite ballot return centers on Election Day belies their assertion that those same ballot return centers present ballot security concerns.

Moreover, the undisputed testimony from the County Clerks reflects that the existence of additional ballot return centers that are subject to existing, uniform protocols do not pose a threat to ballot security. (Oldham Decl., Dkt. 21, at 6 ("Reducing the drop-off locations from four to one will not enhance security of the ballots in any way"); Hollins Decl., Dkt. 8-1, at 8 (the October 1 Order "will not enhance voter security in any way.")). The procedures for ballots returned to a satellite ballot return center is as follows: (1) the voter signs a roster (just as they would when voting in-person), (2) the voter presents valid identification to comply with Section 63.0101 (just as they would when voting in-person), and (3) the voter signs the carrier envelope (just as they would when sending their ballot by mail). (Hollins Decl., Dkt. 8-1, at 6). As explained by Christopher Hollins, the Harris County Clerk: "Ballots are then placed in a 'mail ballot tub.' This is a locked ballot box designed by our long-time vote-by-mail director, which has a slit large enough for a ballot carrier envelope but small enough that fingers or tools cannot be forced inside the box to tamper with ballots. The box is sealed by tamper-proof seals. Working in pairs, staff delivers these sealed, tamper-proof boxes to the ballot return headquarters daily for processing. (*Id.*).

The County Clerks stated that "voters returning mail-in ballots in person is more secure than returning by mail" and "any concern about security of in-person drop-off of mail ballots is

unfounded." (Oldham Decl., Dkt. 21, at 8; Hollins Decl., Dkt. 8-1, at 11). In fact, the County Clerks explained that returning ballots through satellite return ballots center is "more secure than returning by mail" because (1) there is no risk of tampering or loss in the mail and (2) voters are required to present identification when returning their ballot. (Hollins Supp. Decl., Dkt. 51-1, at 1; Oldham Decl., Dkt. 21, at 8; DeBeauvoir Decl., Dkt. 18, at 7). Accordingly, the Court finds that the October 1 Order does not promote ballot security.

### H.      The Parties

#### 1.      The LULAC Plaintiffs

Plaintiff League of United Latin American Citizens ("LULAC") is a national membership organization dedicated to protecting the civil rights of Latinos, including voting rights. (Am Compl., Dkt. 16, at 3). Plaintiff Texas LULAC has over 20,000 members, including registered voters planning to vote absentee in the upcoming election. (*Id.*). Texas LULAC regularly engages in voter registration, voter education, and other endeavors aimed at increasing civic engagement amongst its members. (*Id.*). Texas LULAC asserts that the October 1 Order will force it to "divert resources away from its ongoing efforts to mobilize its members and their communities to vote and towards educating voters about the impact" of the October 1 Order. (*Id.* at 4).

Plaintiff League of Women Voters of Texas ("LWVTX") is a non-profit membership organization dedicated to nonpartisan, grassroots civic engagement to "encourage its members and all Texans to be informed and active participants in government," including by participating in elections. (*Id.*). LWVTX has approximately 3,000 members, many of whom plan to vote absentee and drop off their absentee ballot at a drop box. (*Id.*). Due to the Covid-19 pandemic and delays in mail delivery by the USPS, many LULAC, Texas LULAC, and LWVTX members plan to vote absentee and return their ballots to an in-person ballot return center to ensure that their votes are counted. (*Id.*).

15

Plaintiff Mexican American Legislative Caucus, Texas House of Representatives ("MALC")
is a non-profit and non-partisan organization serving members of the Texas House of
Representatives and their staff on matters of interest to the Mexican-American community. (*Id.* at 5).
Plaintiff Texas Legislative Black Caucus ("TLBC") is a non-profit and non-partisan organization
serving members of the Texas House of Representatives and their staff on matters of interest to the
African-American community. (*Id.* at 5–6). MALC and TLBC each have at least one member who
planned to return their absentee ballot to one of the satellite drop-off locations. (*Id.*). MALC and
TLBC are in the process of devoting resources to voter education. (*Id.*).

Plaintiff Ralph Edelbach is an 82-year-old Texas voter who plans to vote by mail in the
upcoming November election and had previously planned return his ballot to one of the eleven
Harris County ballot return centers. (*Id.* at 6). As a result of the October 1 Order, Mr. Edelbach will
have to travel to the lone ballot return location that is 36 miles from his home and 72 miles
roundtrip. (*Id.*). Prior to the October 1 Order, the nearest ballot return center was less than half the
distance—16 miles—from his home. (*Id.*).

Plaintiff Barbara Mason is a 71-year old Texas voter who planned to use one of Travis
County's four ballot return centers to submit her absentee ballot for the November 3, 2020 election.
(*Id.*). As a result of the October 1 order, Ms. Mason will have to drive 30 minutes each way to the
nearest ballot return center. (*Id.* at 7). Ms. Mason is also concerned that she "may be forced to
unnecessarily expose herself to COVID-19" to return her ballot to the lone ballot return location.
(*Id.*). Other voters in similar circumstances have already returned their ballots at the previously
authorized ballot return centers. (*Id.*).

### 2.      The Straty Plaintiffs (1-20-cv-1015)

Laurie-Jo Straty is a 65-year-old resident of Dallas County. (1-20-cv-1015, Compl., Dkt. 1, at
6). Ms. Straty's multiple sclerosis, which renders her immunocompromised and thus at higher risk of

contracting the coronavirus, prevents her from voting in person. (*Id.*). As a caretaker for her 90-year-old parents, Ms. Straty fears that voting in person might risk exposing her parents and others at their assisted living center to the coronavirus. (*Id.*). Ms. Straty is also unable to stand in line because of an inflamed Achilles tendon that would cause her significant pain. (*Id.*). Prior to the October 1 Order, Ms. Straty planned to cast her ballot at a ballot return center 5 minutes from her home. (*Id.*). Because of the October 1 Order, Ms. Straty will now have to travel 20 minutes and risk having to stand in line due to "congestion at the single drop off location in the county." (*Id.*). Ms. Straty does not want to vote by mail given the widespread delays facing the USPS. (*Id.*).

Texas Alliance for Retired Americans ("TARA") is a non-profit organization with over 145,000 members, who are retirees from the public sector, private sector unions, community organizations, and individual activists. (*Id.* at 6–7). TARA's mission is to "ensure social and economic justice and the full civil rights that retirees have earned after a lifetime of work." (*Id.*). TARA asserts that the October 1 Order frustrates its mission because it "deprives individual members of the right to vote and have their votes counted." (*Id.* at 7). In addition, TARA believes the October 1 Order further frustrates TARA's mission because it will need to divert resources to "present voters with a feasible alternative to returning mail-in ballots" since there are no longer convenient locations for returning absentee ballots. (*Id.*).

BigTent Creative ("BigTent") is a non-profit, non-partisan voting registration and get-out-the vote technology organization. BigTent's efforts include registering new voters and publishing up-to-date information for voters whose primaries have been postponed, as happened in Texas in the spring. (*Id.*). Because of the October 1 Order, BigTent has had to divert resources away from its routine activities to "educating its employees and influencers, updating the Texas-specific pages on its website to account for the [October 1 Order], and funding influencer social media posts to inform Texas voters" about the impacts of the October 1 Order. (*Id.*). BigTent states that any

17

resources spent educating voters on how to comply with the October 1 Order "necessarily" takes away from its "get-out-the-vote efforts." (*Id.*).

## II.   LEGAL STANDARD

### A.   Rule 12(b)(1)

Federal Rule of Civil Procedure 12(b)(1) allows a party to assert lack of subject matter jurisdiction as a defense to suit. Fed. R. Civ. P. 12(b)(1). Federal district courts are courts of limited jurisdiction and may only exercise such jurisdiction as is expressly conferred by the Constitution and federal statutes. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). A federal court properly dismisses a case for lack of subject matter jurisdiction when it lacks the statutory or constitutional power to adjudicate the case. *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998). "The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001). "Accordingly, the plaintiff constantly bears the burden of proof that jurisdiction does in fact exist." *Id.* In ruling on a Rule 12(b)(1) motion, the court may consider any one of the following: (1) the complaint alone; (2) the complaint plus undisputed facts evidenced in the record; or (3) the complaint, undisputed facts, and the court's resolution of disputed facts. *Lane v. Halliburton*, 529 F.3d 548, 557 (5th Cir. 2008).

### B.   Motion for Preliminary Injunction

A preliminary injunction is an extraordinary remedy, and the decision to grant such relief is to be treated as the exception rather than the rule. *Valley v. Rapides Par. Sch. Bd.*, 118 F.3d 1047, 1050 (5th Cir. 1997). This remedy is granted only if a plaintiff demonstrates (1) likelihood of success on the merits; (2) irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the plaintiff's favor; and (4) that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The party seeking injunctive relief carries the burden of

persuasion on all four requirements. *PCI Transp. Inc. v. W. R.R. Co.*, 418 F.3d 535, 545 (5th Cir. 2005). However, even when a movant establishes each of the four requirements, "the decision whether to grant or deny a preliminary injunction remains within the Court's discretion[.]" *Sirius Comput. Sols. v. Sparks*, 138 F. Supp. 3d 821, 836 (W.D. Tex. 2015).

## III.   DISCUSSION

### A.   Plaintiffs' Standing

The State argues that Texas LULAC, LULAC, LWVTX, MALC, TLBC, TARA, and BigTent ("organizational Plaintiffs")[9] The State argues that the organizational Plaintiffs do not have standing to challenge the October 1 Order because they have failed to show an injury-in-fact and their purported injuries are speculative. (Resp. TRO, Dkt. 43, at 11–21). Under Article III of the Constitution, federal court jurisdiction is limited to cases and controversies. U.S. Const. art. III, 2, cl. 1; *Raines v. Byrd*, 521 U.S. 811, 818 (1997). A key element of the case-or-controversy requirement is that a plaintiff must establish standing to sue. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

To establish Article III standing, a plaintiff must demonstrate that she has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* at 560–61. "For a threatened future injury to satisfy the imminence requirement, there must be at least a 'substantial risk' that the injury will occur." *Stringer v. Whitley*, 942 F.3d 715, 721 (5th Cir. 2019) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)).

---

[9] Recognizing that the reader may not recall the full names of these organizations, the Court restates them here: Texas League of United Latin American Citizens ("Texas LULAC"), National League of United Latin American Citizens ("LULAC"), League of Women Voters of Texas ("LWVTX"), Mexican American Legislative Caucus, Texas House of Representatives ("MALC"), Texas Legislative Black Caucus ("TLBC"), Texas Alliance for Retired Americans ("TARA"), and BigTent Creative ("BigTent").

The purpose of these requirements is to ensure that plaintiffs have "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination." *Massachusetts v. EPA*, 549 U.S. 497, 517 (2007) (quoting *Baker v. Carr*, 369 U.S. 186 (1962) (internal quotation marks removed). The standing requirements are heightened somewhat in the context of a motion for a preliminary injunction, in which case a plaintiff must make a "clear showing" that she has standing to maintain the preliminary injunction. *Barber v. Bryant*, 860 F.3d 345, 352 (5th Cir. 2017) (citing *Winter*, 555 U.S. at 22). However, "in the context of injunctive relief, one plaintiff's successful demonstration of standing 'is sufficient to satisfy Article III's case-or-controversy requirement.'" *Tex. Democratic Party v. Abbott*, No. 20-50407, 2020 WL 5422917, at *4 (5th Cir. Sept. 10, 2020) (quoting *Texas v. United States*, 945 F.3d 355, 377–78 (5th Cir. 2019). Further, "[t]he injury alleged as an Article III injury-in-fact need not be substantial; it need not measure more than an identifiable trifle. This is because the injury in fact requirement under Article III is qualitative, not quantitative, in nature." *OCA-Greater Hous. v. Texas*, 867 F.3d 604, 612 (5th Cir. 2017) (quotations omitted).

Organizations can establish the first standing element, injury-in-fact, under two theories: "associational standing" or "organizational standing." *Id.* at 610; *Tenth St. Residential Ass'n v. City of Dallas, Texas*, 968 F.3d 492, 500 (5th Cir. 2020). Associational standing requires that the individual members of the group each have standing and that "the interest the association seeks to protect be germane to its purpose." *Tenth St. Residential Ass'n v. City of Dallas, Tex.*, 968 F.3d 492, 500 (5th Cir. 2020).

By contrast, "organizational standing" does not depend on the standing of the organization's members. The organization can establish standing in its own name if it "meets the same standing test that applies to individuals." *OCA-Greater Houston*, 867 F.3d at 610. The Supreme Court has recognized that when an organization's ability to pursue its mission is "perceptibly impaired"

because it has "diverted significant resources to counteract the defendant's conduct," it has suffered an injury under Article III. *N.A.A.C.P. v. City of Kyle, Tex.*, 626 F.3d 233, 238 (5th Cir. 2010) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982)). An organization can demonstrate injury "by [alleging] that it had diverted significant resources to counteract the defendant's conduct; hence, the defendant's conduct significantly and 'perceptibly impaired' the organization's ability to provide its 'activities—with the consequent drain on the organization's resources.'" *Id.* "The fact that the added cost has not been estimated and may be slight does not affect standing, which requires only a minimal showing of injury." *Crawford v. Marion Cty. Election Bd.*, 472 F.3d 949, 951 (7th Cir. 2007), *aff'd*, 553 U.S. 181, 128 (2008).

The organizational Plaintiffs in this case have sufficiently demonstrated organizational standing. LULAC and Texas LULAC regularly engage in "voter registration, voter education, and other activities and programs designed to increase voter turnout among its members and their communities." (Am. Compl., Dkt. 16, at 3). As a result of the October 1 Order, Texas LULAC asserts it will have to divert resources away from ongoing voting efforts to educating its members and the community about the changes resulting from the October 1 Order. (*Id.* at 4). Similarly, LWVTX asserts that will be required to "divert resources away from LWVTX's existing get-out-the-vote efforts" as a result of educating its members and the public about the change. (Chimene Decl., Dkt. 15-7, at 6). The Mexican American Legislative Caucus, Texas House of Representatives ("MALC") and Texas Legislative Black Caucus ("TLBC") asserts that they, along with some of their members, were in the process of devoting resources to educate voters about mail-in voting, including drop off locations. (Am. Compl., Dkt. 16, at 5).

TARA and its individual members intend to engage in voter assistance and has been participating in "Dallas Votes, a coalition seeking, in part, to guarantee more drop-off locations." (Case No. 1:20-cv-1015, Compl., Dkt. 1, at 6–7). BigTent Creative is a get-out-the-vote technology

organization whose mission is to use technology for political engagement and voter turnout. (*Id.*).
BigTent alleges it will be required to divert time and resources to educating its employees and
updating its materials and funding social media education campaigns. (*Id.* at 8). Each organization
has demonstrated that the sudden change resulting from the October 1 Ordinance requires them to
adjust their voter education efforts for their members and the public.

The State contends that "spending resources to teach third parties about the law, on its own,
is not an injury in-fact." (Resp. TRO, Dkt. 43, at 15 (citing *Nat'l Taxpayers Union, Inc. v. United States*,
68 F.3d 1428, 1434 (D.C. Cir. 1995)). However, the Fifth Circuit has found organizational standing
when an organization spends "additional time and effort [] explaining the Texas [voting] provisions
at issue" because "addressing the challenged provisions frustrates and complicates its routine
community outreach activities." *OCA-Greater Houston*, 867 F.3d at 610 (finding organizational
standing where the organization had "calibrated its outreach efforts to spend extra time and money
educating its members about these Texas [voting] provisions" and the "Texas statutes at issue
'perceptibly impaired' [the organization's] ability to 'get out the vote' among its members").

Alternatively, Plaintiff organization have sufficiently demonstrated associational standing.
LULAC and Texas LULAC allege that "many eligible Texas LULAC members intend to vote
absentee" as a result of the Covid-19 pandemic and reported USPS delays. (Am. Compl., Dkt. 16, at
3–4). Similarly, the LWVTX asserts that many of its members plan to vote absentee, including by
using a ballot return box. (*Id.*). Plaintiffs attest that many LULAC and LWVTX members who are
eligible to vote absentee will be unable to do so at the central ballot return center, leaving them with
only two options: to vote by mail with "well reported delays in mail" or "risk deadly exposure to
COVID-19" by voting in person. (*Id.* at 4–5). Additionally, MALC and TLBC assert that at least one
of their members intended to submit their ballot at a ballot return center. (*Id.*). Similarly, TARA
attests that TARA's mission is frustrated because the October 1 Order deprives its members of the

right to vote and makes it more difficult for them to effectively associate. (Case No. 1:20-cv-1015, Compl., Dkt. 1, at 6–7).

The State argues that for associational standing an organization must show its members "participate in and guide the organization's efforts." (Resp. TRO, Dkt. 43, at 15). However, this is not a requirement for traditional membership organizations. For instance, the State relies on *Ass'n for Retarded Citizens of Dallas v. Dallas Cty. Mental Health & Mental Retardation Ctr. Bd. of Trustees*, 19 F.3d 241 (5th Cir. 1994), which found that the plaintiff organization bore "no relationship to traditional membership groups because most its 'clients'—handicapped and disabled people—are unable to participate in and guide the organization's efforts." *Id.* at 244. The State also cites *Tex. Indigenous Council v. Simpkins*, No. SA-11-CV-315-XR, 2014 WL 252024 (W.D. Tex. Jan. 22, 2014), where an organization that did "not have traditional members," because the plaintiff "testified that he alone makes all membership decisions and keeps the membership roster in his own head," there are heightened requirements for demonstrating membership. *Id.* at *3. In contrast, the organizational Plaintiffs in this case have testified that they have numerous participating members. (See e.g. Chimene Decl., Dkt. 15-17, 1-20-cv-1015, Bryant Decl., Dkt. 11-2).

Further, it is sufficient at this stage that the organizational Plaintiffs have alleged that some of their members have suffered an injury, even without naming specific members. *See Hancock Cnty. Bd. of Supervisors v. Ruhr*, 487 F. App'x 189, 198 (5th Cir. 2012) ("We are aware of no precedent holding that an association must set forth the name of a particular member in its complaint in order to survive a Rule 12(b)(1) motion to dismiss based on lack of associational standing."). Plaintiffs also need not assert that all of their members were injured, it is sufficient that some of them intended to vote using the ballot return boxes and were injured. *See Tex. All. for Retired Ams. v. Hughs*, No. 5:20-CV-128, 2020 WL 5747088, at *8 (S.D. Tex. Sept. 25, 2020) (finding standing where "TARA's

membership is composed of 145,000 Texans, a portion of whom are too young to qualify to vote by mail").

Here, however, each organization has alleged that some of its members have been injured by the October 1 Order. This injury is concrete because they have asserted that they intended to vote using a ballot return box which has since been removed. For instance, one 73-year-old LWVTX member who lives with multiple sclerosis explained that traveling to the only drop off location in Harris County will take as much as an hour each way, nearly double the distance it would have taken to access the ballot return box location she previously intended to use. (Golub Decl., Dkt. 15-12).

The State further argues that the organizational Plaintiffs lack standing to bring their suit under Section 1983 because they are enforcing the rights of third parties. (Resp. TRO, Dkt. 43, at 16–17). However, "[organizational] plaintiffs have standing to sue for voting rights violations using Section 1983 as a vehicle for *remedial*, not monetary, relief." *Texas All. for Retired Americans*, 2020 WL 5747088, at *9 (citing *Ass'n of Am. Physicians & Surgeons, Inc. v. Texas Med. Bd.*, 627 F.3d 547, 551 (5th Cir. 2010) (association had standing to assert Section 1983 claims on behalf of members in seeking prospective declaratory and injunctive relief)). As the Court has found that the organizational Plaintiffs sufficiently demonstrate organizational and associational standing, standing on behalf of a third party is not an issue.

The individual Plaintiffs in these cases, Ralph Edelbach, Barbara Mason, and Laurie-Jo Straty, have also individually demonstrated standing. Each plaintiff contends that they suffered an injury-in-fact because they intended to vote using a ballot return center in their county, which has subsequently become more difficult since locations were reduced, requiring them to travel farther or risk USPS delays or risk their health by voting in person. (Mason Decl., Dkt. 15-11; Edelbach Decl., Dkt. 17; Case No. 1:20-cv-1015, Straty Decl., Dkt. 11-6). This is sufficient to demonstrate they have been injured and is more than an "identifiable trifle." *OCA-Greater Hous.*, 867 F.3d at 612 (finding an

injury in fact where voter plaintiffs were "forced to vote in person and risk contracting or spreading COVID-19"). The individual Plaintiffs range from 65 to 82 years old, and each cites concerns about exposure to the coronavirus. (*See, e.g.*, Mason Decl., Dkt. 15-11 ("I don't want to be outside of my house so long in order to deliver my ballot that I would need to use public restroom facilities, which I am not doing to protect myself from exposure to COVID-19.")).

The State argues that this harm from USPS delays is merely speculative and based on a "subjective fear." (Resp. TRO, Dkt. 43, at 21). Plaintiffs have provided sufficient evidence to legitimize their concerns about absentee ballots arriving too late to be counted. (*See* USPS Letter, Dkt. 15-9, at 2–3). The State asserts that 1.76% of mail-in ballots were rejected in Texas in 2018. (*Id.*). This rejection rate, not insignificant, may result in even more ballots being rejected in this election where substantially more voters are casting absentee ballots. (Hollins Decl., Dkt. 8-1, at 4–5 (explaining Harris County has received "more than 200,000 applications to vote by mail, more than double the total mail-in ballots received in prior elections")). Additionally, there "is no requirement that a plaintiff demonstrate that he or she is certain to have her ballot rejected." *Richardson v. Texas Sec'y of State*, No. SA-19-CV-00963-OLG, 2020 WL 5367216, at *8 (W.D. Tex. Sept. 8, 2020). Plaintiffs demonstrated harm by showing that they intended to vote using ballot centers that have since been removed, and this is further bolstered by their showing that alternative voting methods risk their ballot arriving late or exposure to the coronavirus.

Turning next to whether Plaintiffs' harms are traceable and redressable, the State contests that Governor Abbott and Secretary Hugh's actions did not cause Plaintiffs' injuries and they cannot enforce the October 1 Order.[10] (Resp. TRO, Dkt. 43, at 23). With regards to Governor Abbott, the Fifth Circuit has found that "[t]he power to promulgate law is not the power to enforce it." *In Re*

---

[10] The State does not contest that the alleged traceability and redressability requirements are met as to the County Clerks.

*Abbott*, 956 3d. 696, 709 (5th Cir. 2020). Following *Abbott*, as the Court is bound to do, the Court agrees that Plaintiffs' claims against Governor Abbott are barred because Plaintiffs cannot establish that Governor Abbott caused their enforcement-based injury or that enjoining certain activities by Abbott would redress their injury. Accordingly, Plaintiffs have not met their burden to establish Article III standing to litigate their claims against Abbott in federal court. However, the Court declines to extend *In Re Abbott* to Secretary Hughs, as discussed below with respect to the Eleventh Amendment. Because the Secretary of State is tasked with enforcing election laws in Texas, the traceability and redressability requirements for Article III standing are satisfied with respect to claims against Secretary Hughs. *OCA-Greater Houston v. Texas*, 867 F.3d 604, 613 (5th Cir. 2017) ("[A] challenge to Texas voting law is, without question, fairly traceable to and redressable by the State itself and its Secretary of State").

Therefore, the Court finds that Plaintiffs have made a clear showing that *Lujan*'s requirements for standing are met at this stage in the litigation. Plaintiffs have plausibly alleged an injury in fact (undue burden on member voters and diversion of resources ), which is fairly traceable to the conduct of the Defendants, except for Governor Abbott(those responsible for issuing and implementing the October 1 Order), and a favorable order from this Court (enjoining the implementation of the October 1 Order) would redress Plaintiffs' injuries. Nothing more is required.

### B.     Eleventh Amendment

The State argues that Plaintiffs' claims against Governor Abbott and Secretary Hughs are barred by sovereign immunity under the Eleventh Amendment. (Mot. Dismiss, Dkt. 31, at 4). The Eleventh Amendment typically deprives federal courts of jurisdiction over "suits against a state, a state agency, or a state official in his official capacity unless that state has waived its sovereign immunity or Congress has clearly abrogated it." *Moore v. La. Bd. of Elementary & Secondary Educ.*, 743 F.3d 959, 963 (5th Cir. 2014). However, under the *Ex parte Young* exception to sovereign immunity,

lawsuits may proceed in federal court when a plaintiff requests prospective relief against state officials in their official capacities for ongoing federal violations. 209 U.S. 123, 159–60 (1908). Thus, "[t]here are three basic elements of an *Ex parte Young* lawsuit. The suit must: (1) be brought against state officers who are acting in their official capacities; (2) seek prospective relief to redress ongoing conduct; and (3) allege a violation of federal, not state, law." *Williams ex rel. J.E. v. Reeves*, 954 F.3d 729, 736 (5th Cir. 2020).

"For the [*Ex parte Young*] exception to apply, the state official, 'by virtue of his office,' must have 'some connection with the enforcement of the [challenged] act, or else [the suit] is merely making him a party as a representative of the state, and thereby attempting to make the state a party.'" *City of Austin*, 943 F.3d at 997 (quoting *Young*, 209 U.S. at 157); *see also Abbott*, 956 F.3d at 708 ("*Ex parte Young* allows suits for injunctive or declaratory relief against state officials, provided they have sufficient 'connection' to enforcing an allegedly unconstitutional law."). Absent such a connection, "the suit is effectively against the state itself and thus barred by the Eleventh Amendment and sovereign immunity." *Abbott*, 956 F.3d at 709.

While "[t]he precise scope of the 'some connection' requirement is still unsettled," the Fifth Circuit has stated that "it is not enough that the official have a '*general* duty to see that the laws of the state are implemented.'" *Texas Democratic Party*, 961 F.3d at 400–01 (quoting *Morris v. Livingston*, 739 F.3d 740, 746 (5th Cir. 2014)). And "[i]f the official sued is not 'statutorily tasked with enforcing the challenged law,' then the requisite connection is absent and '[the] *Young* analysis ends.'" *Abbott*, 956 F.3d at 709 (quoting *City of Austin*, 943 F.3d at 998). Where, as here, "no state official or agency is named in the statute in question, [the court] consider[s] whether the state official actually has the authority to enforce the challenged law." *City of Austin*, 943 F.3d at 998.

The State argues that the *Ex parte Young* exception does not apply to Governor Abbott and Secretary Hughs because they do not have the power to enforce the October 1 Order, and thus lack

a sufficient "connection" to the order. (Mot. Dismiss, Dkt. 31, at 5). In *In Re Abbott*, the Fifth

Circuit found that the *Ex Parte Young* exemption did not apply to a challenge to a pandemic-related

executive order because "[t]he power to promulgate law is not the power to enforce it." Under

current Fifth Circuit law, the Court agrees that Abbott cannot be sued in this case for injunctive

relief under the *Ex parte Young* exception.

As previously noted, the Fifth Circuit reached this very issue in *Abbott* on a petition for a

writ of mandamus directed to this very Court. After the District Court entered a second TRO

against Abbott, exempting various categories of abortion from GA-09, Abbott filed a petition for a

writ of mandamus, contending, among other things, that "the district court violated the Eleventh

Amendment by purporting to enjoin [Abbott]." *Abbott*, 956 F.3d at 708. The Fifth Circuit agreed

that the Eleventh Amendment required Abbott's dismissal and admonished the District Court for

failing "to consider whether the Eleventh Amendment requires dismissal of the Governor or

Attorney General because they lack any 'connection' to enforcing GA-09 under *Ex parte Young*." *Id.*

at 709.

While the District Court concluded that Abbott had "some connection to GA-09 because of

his statutory authority [under] Texas Government Code § 418.012," the Fifth Circuit read this

provision narrowly, concluding that while § 418.012 empowers the Governor to "issue," "amend,"

or "rescind" executive orders, it does not empower him  to "enforce" them. *Id.*; *see also* Tex. Gov't

Code § 418.012. Because "[t]he power to promulgate law is not the power to enforce it," the Fifth

Circuit held that Abbott "lack[ed] the required enforcement connection to GA-09" and thus could

not be enjoined under the *Ex parte Young* exception to sovereign immunity. *Abbott*, 956 F.3d at 709.

By this reasoning, Plaintiffs may not rely on the *Ex parte Young* exception to obtain injunctive relief

against Abbott in this case either.

The Court reaches a different conclusion with respect to Secretary Hughs. The Court is unwilling to extend *In Re Abbott* to Secretary Hughs in the absence of such direction from the Fifth Circuit. Secretary Hughs serves as the Chief Election Office for Texas and is tasked with "*ensuring the uniform application and interpretation of election laws throughout Texas.*" Tex. Elec. Code § 31.001(a); *OCA-Greater Houston*, 867 F.3d at 613 (Texas Secretary of State serves as the 'chief election officer of the state.'"). The State argues that Secretary Hughs lacks enforcement authority because she does not specifically implement the Election Code provision at issue and is "unlikely to make [] an effort" to enforce the October 1 Order. (Mot. Dismiss, Dkt. 31, at 6).

However, the Texas Election Code clearly tasks the Secretary with enforcing election laws in Texas by preparing directives for local and state authorities, and empowers her to order those who impede on voting rights to " correct the offending conduct" and "seek enforcement of [that] order" through the attorney general. Tex. Elec. Code §§ 31.003, 31,005. In addition, the Fifth Circuit has held that suits challenging Texas voting laws are properly brought against the Secretary of State. *OCA-Greater Houston v. Texas*, 867 F.3d at 613 ("[A] challenge to Texas voting law is, without question, fairly traceable to and redressable by the State itself and its Secretary of State"); *Lewis v. Hughs,* No. 5:20-CV-00577-OLG, 2020 WL 4344432, at *8 (W.D. Tex. July 28, 2020), *aff'd and remanded*, No. 20-50654, 2020 WL 5511881 (5th Cir. Sept. 4, 2020) (stating that the Secretary had "the requisite connection to the challenged [voting] restrictions for *Ex parte Young* to apply.").

The State also contends that enforcement of the October 1 Order stems from Governor Abbott's emergency powers under the Texas Disaster Act of 1975, and as such, enforcement "constitutes a criminal offense" that can only be enforced by local prosecutors. (Mot. Dismiss, Dkt. 31, at 6). Even if the Court accepts this assertion, Governor Abbott's September 17, 2020 Executive Order explicitly states that "failure to comply with any executive order issue during the COVID-19 disaster"…"may be subject to regulatory enforcement." Executive Order No. GA-30, Sept. 17,

29

2020; Tex. Elec. Code § 418.016. Given the regulatory powers entrusted to the Secretary of State under the Texas Election Code, the Court finds that Secretary Hughs bears a sufficient enforcement connection to the October 1 Order under either the Election Code or the Texas Disaster Act, or a combination of the two.

Secretary Hughs also has demonstrated her willingness to enforce Governor Abbott's recent executive orders. The State admits that Secretary Hughs recently advised county officials on how to comply with the July 27 Order, evincing her willingness to "make an effort" to ensure local election officials comply with the Governor Abbott's proclamations. (Mot. Dismiss, Dkt. 31, at 6; 1-20-cv-1015, Email, Dkt. 11-20, at 2). For all these reasons, the Court rejects the State's argument that *Ex parte Young* does not apply to Secretary Hughs.

C.      **Pullman Abstention**

The State contends that the Court should exercise its discretion to abstain from ruling on the merits of Plaintiffs' claims until resolution of the pending state court case challenging Governor Abbott's authority to suspend the Texas Election Code. (Mot. Dismiss, Dkt. 43, at 32). The Supreme Court's landmark Pullman decision established that "a federal court may, and ordinarily should, refrain from deciding a case in which state action is challenged in federal court as contrary to the federal constitution if there are unsettled questions of state law that may be dispositive of the case and avoid the need for deciding the constitutional question." *United Home Rentals, Inc. v. Tex. Real Estate Com.*, 716 F.2d 324, 331 (5th Cir. 1983) (citation omitted).

Two elements must be met for *Pullman* abstention to apply: (1) the case must present an unsettled question of state law, and (2) the question of state law must be dispositive of the case or would materially alter the constitutional question presented. *Harman v. Forssenius*, 380 U.S. 528, 534 (1965). The purpose of *Pullman* abstention is to "avoid unnecessary friction in federal-state functions, interference with important state functions, tentative decisions on questions of state law,

and premature constitutional adjudication." *Id.*  However, *Pullman* abstention is not "an automatic rule applied whenever a federal court is faced with a doubtful issue of state law" but rather considered on "a case-by-case basis." *Baggett v. Bullit*, 1964, 377 U.S. 360, at 376 (1964).

In assessing whether to exercise its discretion, the Court must "take into consideration the nature of the controversy and the particular right sought to be enforced." *Edwards v. Sammons*, 437 F.2d 1240, 1243 (5th Cir. 1971). In *Harman*, the Supreme Court upheld the district court's decision not to abstain from ruling on the constitutionality of a voting law pending decision of state law questions in the state courts given "the nature of the constitutional deprivation alleged and the probable consequences of abstaining."  380 U.S. at 537. The Supreme Court similarly declined to exercise its discretion to abstain in *Baggett*  where abstention would "delay[] ultimate adjudication on the merits" in such a way as to "inhibit the exercise of First Amendment freedoms." 377 U.S. at 379–380.

Here, the Court is similarly concerned that given the alleged violations and irreparable harm that may result from a delay in resolution militates against exercising its discretion under the *Pullman* doctrine.  Because there is "[n]o right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live" the Court finds that the alleged violation of Plaintiffs' right to vote is of sufficient importance for the Court to issue its ruling. *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964)).

In addition, the parties in this case represented to the Court that the pending state court temporary restraining order will be heard next week. This Court cannot predict whether the state court will rule immediately or take days or weeks. The need for adjudication of Plaintiffs' claims is immediate; any delay risks irreparable violation of the a right that the Supreme Court has called "the essence of a democratic society."  *Reynolds v. Sims*, 377 U.S. 533, 555 (1964). The Court concludes that abstention under this doctrine would not be appropriate here.

D.     **Motion for Preliminary Injunction**

As a general matter, the Court is cognizant that under *Purcell v. Gonzalez*, 549 U.S. 1, 6 (2006),

district courts should not ordinarily alter election rules on the eve of an election. *See also Republican*

*Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207, 206 L. Ed. 2d 452 (2020). In *Purcell*, the

Supreme Court reversed a lower court's order enjoining the implementation of a proposition, passed

by ballot initiative two years earlier, that required voters to present identification when they voted on

election day. In reversing the lower court, the Court emphasized that the injunction was likely to

cause judicially-created voter confusion in the face of an imminent election. *Purcell*, 549 U.S. at 2, 6.

Relying in part on *Purcell*, in *Republican National Committee*, the Court similarly stayed a lower court's

injunction that extended "the date by which ballots may be cast by voters." 140 S. Ct. 1205, 1207

(2020). Here, however, the concern that troubled the Supreme Court in *Purcell* and *Republican*

*National Committee*—judicially-created confusion—is not present. *See Self Advocacy Sols. N.D. v. Jaeger*,

No. 3:20-CV-00071, 2020 WL 2951012, at *11 (D.N.D. June 3, 2020) (finding the same).

Plaintiffs' requested injunction does not require the Court to overturn a voter-approved

ballot initiative or change election deadlines. Nor does the Court's injunction lead to the problems

identified by other courts that ruled on voting procedures shortly before an election. *See, e.g., Veasey*

*v. Perry*, 769 F.3d 890, 893–95 (5th Cir. 2014) (staying trial court's decision to grant injunction

enjoining implementation of existing voter identification requirement when state introduced

evidence that adopting new procedure nine days before voting begins would require it to "train

25,000 polling officials at 8,000 polling stations about the new requirements" imposed by the trial

court); *Democratic Nat'l Comm. v. Bostelmann*, 451 F. Supp. 3d 952, 974 (W.D. Wis. 2020) (invoking

*Purcell* in deciding not to "delay the date of an impending, state-wide election"); *Fair Maps Nevada v.*

*Cegavske*, No. 320CV00271MMDWGC, 2020 WL 2798018, at *16 (D. Nev. May 29, 2020) ("[The

*Purcell*] principle is particularly pertinent where plaintiffs ask courts to 'impose large-scale changes to the election process.'").

Here, the Court has been asked, by Plaintiffs and Defendant County Clerks, to reduce or eliminate what would amount to *executive*-caused voter confusion on the eve of an election. Governor Abbott's unilateral decision to reverse his July 27 Order after officials already began sending out absentee ballots and just days before the start of early voting in Texas has caused voter confusion. (*See e.g.* Hollins Decl., Dkt. 8-1, at 7). Even without declaratory evidence, it is apparent that closing ballot return centers at the last minute would cause confusion, especially when those centers were deemed safe, authorized, and, in fact, advertised as a convenient option just months ago. As such, the Court's injunction supports the *Purcell* principle that courts should avoid issuing orders that cause voters to become confused and stay away from the polls. 549 U.S. 1, 4–5.

To the extent that this Court's injunction to reinstate the ballot return centers does potentially cause confusion, the Court is satisfied that it would be minimal and outweighed by the increase in voting access. Since Governor Abbott closed previously-sanctioned centers, there is confusion: (1) confusion resulting from a voter trying to cast a ballot at a center she thought was open—because it used to be—but which is now closed or (2) confusion resulting from a voter trying to cast a ballot at a center that she thought was recently closed but is now open again.[11] Between these two choices, the Court is of the opinion that the second scenario is the more favorable and just choice: it is the only choice that restores the status quo and likely reduces confusion on the eve of an election, and it results in a greater chance that a ballot can be cast at a ballot return center that was previously available to voters—after being vetted as safe and secure and publicly touted as a

---

[11] Because ballot return centers were ordered closed just one week ago, it is more likely that people would face scenario (1) since voters are less likely to have heard about such a recent change.

viable option to exercise voting rights. *See Ely v. Klahr*, 403 U.S. 108, 113 (1971) (affirming district court decision where "the court chose what it considered the lesser of two evils").

       1.      **Likelihood of Success on Merits**

      Plaintiffs seek a preliminary injunction on their claims that the October 1 Order infringes on Plaintiffs' fundamental right to vote and their right to equal protection. To show a substantial likelihood of success on the merits of their claims, Plaintiffs must present a prima facie case that the burden imposed by the October 1 Order violates Plaintiffs' constitutional rights under the First and Fourteenth Amendments. *See Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 582 (5th Cir. 2013) ("To show a likelihood of success, the plaintiff must present a prima facie case, but need not prove that he is entitled to summary judgment."). Here, Plaintiffs have established a substantial likelihood of success on their claims under the First and Fourteenth Amendments.

       a.      **Plaintiffs' Undue Burden Claims**

      Plaintiffs contend that the October 1 Order places an undue burden on their right to vote under the First and Fourteenth Amendments. The Court applies the *Anderson–Burdick* standard to Plaintiffs' claims, weighing 'the character and magnitude of the asserted injury' . . . against 'the precise interests put forward by the State as justifications for the burden imposed by its rule.'" *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 788-89 (1983)). Under this standard, the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights. *Id.* at 434.

      Regulations imposing severe burdens on plaintiffs' rights are subject to strict scrutiny and must be narrowly tailored and advance a compelling state interest. *Burdick*, 504 U.S. at 434. When a state law imposes a "slight" burden on the right to vote, relevant and legitimate interests of sufficient weight may justify that burden. *Burdick*, 504 U.S. at 434; *Norman v. Reed*, 502 U.S. 279, 288–289

(1992) (requiring "corresponding interest sufficiently weighty to justify the limitation"). In challenges that fall between either end of these extremes, the Court applies the *Anderson-Burdick* standard. *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 788-89). There is no "litmus test" to separate valid from invalid voting regulations; courts must weigh the burden on voters against the state's asserted justifications and "make the 'hard judgment' that our adversary system demands." *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 190, (2008) (Stevens, J., announcing the judgment of the Court).

The Court first considers "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendment." *Anderson*, 460 U.S. at 789. Here, while the burdens imposed on Plaintiffs' right to vote are not severe, they are more than "slight." Because of the October 1 Order, absentee voters must choose between risking exposure to coronavirus to deliver their ballots in-person or disenfranchisement if the USPS is unable to deliver their ballots on time—which USPS has publicly stated it cannot guarantee under Texas's current vote-by-mail deadlines. (*See* USPS Letter, Dkt. 15-9).

Absentee voters in Texas are particularly vulnerable to the coronavirus because they are largely elderly or disabled, and thus face a greater risk of serious complications or death if they are exposed to the virus. (Am. Compl., Dkt. 16, at 8; 1-20-cv-1015, Compl., Dkt. 1, at 2). By limiting ballot return centers to one per county, older and disabled voters living in Texas's largest and most populous counties must travel further distances to more crowded ballot return centers where they would be at an increased risk of being infected by the coronavirus in order to exercise their right to vote and have it counted. (Mot. TRO, Dkt, at 15–16). Indeed, Governor Abbott's July 27 Order addressed those very concerns by allowing counties to accept absentee ballots delivered in person during the early voting period and on Election Day to multiple ballot return centers. (DeBeauvoir Decl., Dkt, 18, at 8 (the "multiple locations [authorized by the July 27 Order] ease the burden on

those most clearly entitled to and most likely to need this accommodation—the disabled and  the elderly.").

If absentee voters choose not to deliver their ballot in person to avoid the risk of contracting coronavirus and becoming ill from, or potentially dying from, Covid-19, they must then risk disenfranchisement if the USPS is unable to deliver their ballots in time. Since Texas state voting deadlines are currently "incongruous" with USPS guidelines on how much time is needed to timely deliver ballots, absentee voters who request mail-in ballots within the Texas timeframe cannot be assured that their votes will be counted. (*See* USPS Letter, Dkt. 15-9, at 2–3).  By forcing absentee voters to risk infection with a deadly disease to return their ballots in person or disenfranchisement if the USPS is unable to deliver their ballots in time, the October 1 Order imposes a burden on an already vulnerable voting population that is somewhere between "slight" and "severe."

As such, the Court must apply the *Anderson-Burdick* standard to weigh that burden against "'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick*, 504 U.S. at 434, (quoting *Anderson*, 460 U.S. at 789). While the Court here has found the burden on Plaintiffs to be between severe and slight, it notes that irrespective of whether the burden is classified as "severe," "moderate," or even "slight," the burdensome law "must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation." *Richardson v. Texas Sec'y of State*, No. SA-19-CV-00963-OLG, 2020 WL 5367216, at *35 (W.D. Tex. Sept. 8, 2020) (quoting *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1352 (11th Cir. 2009) (quoting *Crawford*, 553 U.S. at 191, 128).[12]

---

[12] The State cites to *McDonald v. Bd. of Election Comm'rs*, 394 U.S. 802, 89 (1969), for the proposition that rational basis is the appropriate standard when a state denies absentee ballots to some citizens and not others. (Resp. TRO, Dkt. 43, at 24). Plaintiffs contend *McDonald* is no longer good law. (Mot. TRO, Dkt. 15, at 10). The Court does not find *McDonald* instructive. There, incarcerated individuals challenged a state's denial of the right to vote absentee, and the Court found no evidence on record of a violation to the "claimed right to

In conducting this analysis, the Court "cannot speculate about possible justifications" for the challenged statute, but instead "'must identify and evaluate the precise interests put forward by the [State] as justifications for the burden imposed by its rule.'" *Reform Party of Allegheny Cty. v. Allegheny Cty. Dep't of Elections*, 174 F.3d 305, 315 (3d Cir. 1999) (quoting *Anderson*, 460 U.S. at 789). In addition, the Fifth Circuit has recently noted the importance of preventing last-minute changes to the election rules on the "on the eve of an election," or as here, during an election. *See Texas All. for Retired* Americans, 2020 WL 5816887, at *2; *Texas Democratic Party v. Abbott*, 961 F.3d 389, 412 (5th Cir. 2020).

The State advances only vague interests in promoting ballot security and uniformity, and alleviating voter confusion. (Resp. TRO, Dkt. 43, at 28–29). The state suggests that the October 1 Order serves to clarify the July 27 Order and promote uniformity because "not every county has interpreted Section 86.000(a-1) in the same way." (Resp. TRO, Dkt. 43, at 28–29). While certain counties have chosen to implement the July 27 suspension of Section 86.000(a-1) differently, there is simply no credible evidence on the record of confusion among counties or voters as to the effect or proper implementation of the July 27 Order. As set out above, the State and counties interpreted the July 27 Order to mean that counties could accept absentee ballots during the early voting period at one or multiple ballot return centers.

To reiterate, on August 26, 2020, an attorney in the Elections Division of the Secretary of State's office explicitly wrote that "[u]nder the Governor's July 27, 2020 proclamation, for this November election, hand-delivery process is not limited to election day and may occur at any point after the voter receives and marks their ballot by mail. Because this hand-delivery process can occur

---

receive absentee ballots." *McDonald*, 394 U.S. at 807. Plaintiffs here do not suggest that they have a right to an absentee ballot but rather that they have been inhibited from exercising rights already granted by the State, which the October 1 Order removes in such a way that burdens their ability to vote and ensure that vote is counted. *See Reynolds v. Sims*, 377 U.S. 533, 555 n.29 (1964).

at the early voting clerk's office, *this may include satellite offices of the early voting clerk*." (Brief, Dkt. 15-2, at 38, italics added). The State even submitted that statement from the Secretary of State's office as an exhibit to its brief to the Texas Supreme Court on September 30, 2020, (*id.* at 10), in support of its contention that "the Secretary of State has advised local officials that the Legislature has permitted ballots to be returned to any early-voting clerk office," (*id.* at 38). These statements belie any contention that there was confusion or lack of uniformity in the interpretation of Section 86.000(a-1). In fact, the October 1 Order is the true source of confusion and disparate treatment among voters.

Weighing the State's proffered ballot security concerns against the burdens imposed on absentee voters, the Court finds that Defendants have not presented any credible evidence that their interests outweigh these burdens. The State says the October 1 Order serves to "enhance voter security." (1-20-cv-1015, Oct. Proc., Dkt. 11-23, at 3). To be sure, "[t]here is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters . . . . While the most effective method of preventing election fraud may well be debatable, the propriety of doing so is perfectly clear." *Crawford,* 553 U.S. at 196. This does not mean, however, that the State can, by merely asserting an interest in promoting ballot security, establish that that interest outweighs a significant burden on voters.

At the hearing, the State did not provide any actual examples of voter fraud or refute Plaintiffs' recitation of the security measures implemented pursuant to law at ballot return centers. Rather, the State implied that its mere invocation of "ballot security" was sufficient to establish a "weighty state interest" in burdening its most vulnerable voters. As Plaintiffs point out, existing procedures already serve to prevent voter fraud, which the Court notes is uncommon in Texas in the context of hand-delivery of absentee ballots. (1-20-cv-1015, Compl., Dkt. 1, at 13; Hollins Decl., Dkt. 8-1, at 11; DeBeauvoir Decl., Dkt. 18, at 7; Lincoln Project Amici, Dkt. 34-1, at 10 (citing

Heritage Foundation Election Fraud Database demonstrating "how exceedingly infrequent fraudulent use of absentee ballot occurs" in Texas)).

In fact, Harris County used multiple ballot return centers for mail-in ballots in its July runoff election earlier this year, which resulted in "no security or other logistical issues." (1-20-cv-1015, Hollins Decl., Dkt. 11-22, at 3-4). The State likewise does not allege that Harris County encountered security issues at its ballot return centers during the July election. In the face of testimony that ballot integrity procedures are uniform among ballot return centers within and across counties, the State also fails to explain why procedures at ballot return centers would be different or insufficient compared to those implemented at the one location mandated by the October 1 Order. At the hearing, the State argued that multiple ballot return offices were only authorized on Election Day but failed to explain how ballot security at the satellite ballot return centers would be any different, much less inferior, before Election Day versus on Election Day. Allowing the State to rely on the pretextual talisman of promoting ballot security in imposing burdensome restrictions on vulnerable voters would render enforcement of voting rights through the Courts illusory.

Lastly, the Court notes that the State admits that Governor Abbott's authority to issue the July 27 Order and October 1 Order stems from his powers under the Texas Disaster Act, which grants the Governor the power to "suspend the provisions of any regulatory statute prescribing the procedures for conduct of state business or the orders or rules of a state agency if strict compliance with the provisions, orders, or rules would in any way prevent, hinder, or delay necessary action in coping with a disaster." Tex. Gov't Code § 418.016.  While the Texas Legislature has given the Governor "emergency powers to temporarily change the law to protect public health and safety" in the face of the Covid-19 pandemic, it "has most definitely not given the Governor authority to act in a legislative capacity to revise and modify the operation of state law—even disaster declaration-based state law—on grounds divorced from public safety and health issues." (Travis Cty. Amicus Brief,

Dkt. 44-1, at 2–3). The State's justifications for the October 1 Order's limitation on ballot return centers bear no relationship to protecting public health and safety.

The State's justifications for the October 1 Order do not present a sufficiently relevant and legitimate interest in light of the burden it imposes on Plaintiffs. Plaintiffs have thus met their burden in showing that the October 1 Order likely violates their fundamental right to vote under the First and Fourteenth Amendments.

      **b.**      **Plaintiffs' Equal Protection Claims**

Plaintiffs argue that the October 1 Order violates the Equal Protection Clause of the Fourteenth Amendment because it imposes arbitrary and disparate burdens it places on voters based on where they live. While the State argued at the hearing that limiting ballot return centers to one per county, regardless of county size, serves uniformity, this ignores the disparate impact such a measure has upon voters. (Mot. TRO, Dkt. 15, at 24–25). The State mischaracterizes Plaintiffs' claims as accusing the State of not going "far enough in removing incidental barriers to voting," (Resp. TRO, Dkt. 31, at 29), to avoid the reality that because the State already granted absentee voters "the franchise" to vote at a satellite ballot return center, it may not now draw lines that "are inconsistent with the Equal Protection Clause of the Fourteenth Amendment." *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 665 (1966). Having considered the evidence presented by both parties, the Court finds that Plaintiffs have satisfied their burden in showing they are likely to succeed in their claim that the October 1 Order treats absentee voters disparately based on their county of residence without proper justification.

It is well-settled law that the disparate treatment of voters based on county of residence violates the Equal Protection Clause of the Fourteenth Amendment. *Moore v. Ogilvie*, 394 U.S. 814, 818–19, (1969) (striking down law that applied "rigid, arbitrary formula to sparsely settled counties and populous counties alike, contrary to the constitutional theme of equality among citizens in the

exercise of their political rights"); *Gray v. Sanders*, 372 U.S. 368, 379 (1963) (holding that voting system that weighted "the rural vote more heavily than the urban vote and weights some small rural counties heavier than other larger rural counties" violated Equal Protection Clause). Here, uncontested testimony from the organizational Plaintiffs and their members shows that absentee voters living in larger, more populous counties are necessarily treated differently than other similarly situated voters in smaller, less populated counties under the October 1 Order.

This disparate treatment is evident in the increased distance, increased wait time, and increased potential for exposure to the coronavirus experienced by absentee voters living in larger, more populous counties. (Mot. TRO, Dkt. 15, at 28; *see, e.g.*, 1-20-cv-1015, Bryant Decl., Dkt. 11-2, at 4 ("[D]istance to only designated early voting clerk's office in a county might be significant for many members who may not be able to find transportation."); Mason Decl., Dkt. 15-11, at 2; Golub Decl., Dkt. 15-12, at 3; Chimene Decl., Dkt. 15-17, at 3 (explaining that the October 1 Order has "guaranteed certain voters 'two, five, or 10 times' or more absentee voting resources than others")).

While the State contends that one month is sufficient time to cast a ballot by mail, this unjustifiably requires absentee voters who do not wish to risk experiencing fatigue or pain or contracting the coronavirus to vote earlier than those similarly situated but residing in smaller, less populous counties in order to ensure their vote is counted. *Reynolds*, 377 U.S. at 562 ("It has been repeatedly recognized that all qualified voters have a constitutionally protected right to vote, and to have their votes counted.").

When, as here, "a state regulation is found to treat voters differently in a way that burdens the fundamental right to vote, the *Anderson–Burdick* standard applies." *See Hunter*, 635 F.3d at 238; *see also Clements v. Fashing*, 457 U.S. 957, 965 (1982). "We have long been mindful that where fundamental rights and liberties are asserted under the Equal Protection Clause, classifications which might invade or restrain them must be closely scrutinized and carefully confined." *Harper*, 383 U.S.

at 670. Only where the State's interests outweigh the burden on the plaintiff's right to vote do voting restrictions not offend the Equal Protection Clause. *Obama for Am. v. Husted*, 697 F.3d 423, 433 (6th Cir. 2012).

The State's proffered interest in preventing voter fraud must thus be "sufficiently weighty" to justify the elimination of ballot return centers. *Burdick*, 504 U.S. at 434*; Norman*, 502 U.S. at 288–89. If the State had enacted a generally applicable, nondiscriminatory voting regulation that limited voting locations for all Texas voters, its "important regulatory interests" would likely be sufficient to justify the restriction. *See Burdick*, 504 U.S. at 434. The Equal Protection Clause permits states to enact neutrally applicable laws, even if the impact of those laws falls disproportionately on a subset of the population. *See, e.g., Crawford*, 553 U.S. at 207 (Scalia, J., concurring) (citing *Washington v. Davis*, 426 U.S. 229, 248 (1976)). However, the October 1 Order is self-evidently not neutrally applicable; it restricts the rights of some voters, those who qualify to vote absentee in larger, more populous counties and not others. Nor is the State's justification sufficiently "important" to excuse the discriminatory burden it has placed on some Texans, including the most vulnerable.

With no evidence that ballot return centers have jeopardized election integrity in the past, no evidence that they may threaten election integrity in the November Election, the State's admission that multiple ballot return centers can be open on Election Day, and faced with assertions by the County Clerks that their ballot return centers operate in the same manner as central ballot return centers, the State has not shown that its regulatory interest in smooth election administration is "important," much less "sufficiently weighty" to justify the burden it has placed on absentee voters in Texas. As such, Plaintiffs have met their burden of showing a substantial likelihood that they will succeed in showing that the October 1 Order violates the Equal Protection Clause of the Fourteenth Amendment.

2.      **Irreparable Harm**

To satisfy this prong of the preliminary injunction test, Plaintiffs must show that in the absence of an injunction they are "likely to suffer irreparable harm," that is, harm for which there is no adequate remedy at law. *Daniels Health Scis., L.L.C.*, 710 F.3d at 585. The party seeking a preliminary injunction must prove that irreparable harm is likely, not merely possible. *Winter*, 555 U.S. at 20. Here, Plaintiffs allege they will experience irreparable harm in the absence of an injunction because the fundamental right to vote is threatened by the October 1 Order.

Plaintiffs have already established a likelihood of success on their constitutional challenges to the October 1 Order. The right to vote and have one's vote counted is undeniably a fundamental constitutional right, *Reynolds*, 377 U.S. at 554, whose violation cannot be adequately remedied at law or after the violation has occurred. *See, e.g.*, *Obama for Am.*, 697 F.3d at 436; *Williams v. Salerno*, 792 F.2d 323, 326 (2d Cir. 1986); *League of Women Voters of N. Carolina v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014); *De Leon v. Perry*, 975 F. Supp. 2d 632, 663 (W.D. Tex. 2014), *aff'd sub nom. De Leon v. Abbott*, 791 F.3d 619 (5th Cir. 2015). Even the violation of fundamental constitutional rights for minimal periods of time "unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

The State contends that Plaintiffs' only injury is "one due to personal preference and geographical distance," and this does not rise to the level of irreparable harm. (Resp. TRO, Dkt, 43, at 30). Not so. State Defendants ignore that Plaintiffs have not alleged that the October 1 Order makes voting inconvenient, but rather that it disproportionately impacts the elderly and disabled, who are less likely to be able to travel long distances, stand in line, or risk exposure to the coronavirus. (*See, e.g.* 1-20-cv-1015, Bryant Decl., Dkt. 11-2, at 4 ("distance to only designated early voting clerk's office in a county might be significant for many members who may not be able to find transportation."); Mason Decl., Dkt. 15-11, at 2; Golub Decl., Dkt. 15-12, at 3; Chimene Decl., Dkt.

15-17, at 3).  Even accepting the State's assertion that absentee voters can still mail in their ballots or return them at the designated ballot return office in their County, (Resp. TRO, Dkt. 43, at 28–29), the existence of alternative means of exercising one's fundamental rights "does not eliminate or render harmless the potential continuing constitutional violation of a fundamental right." *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981). That is especially true when each alternative under the current scheme is also likely to unconstitutionally burdens Texans' right to vote. We have already determined that the fundamental right to vote is likely "either threatened or in fact being impaired," on the eve of an election, and this conclusion mandates a finding of irreparable injury. *Id.* (citing *Elrod*, 427 U.S. at 373).

### 3.      Balance of Equities

Next the Court must determine whether Plaintiffs' threatened injuries outweigh any damage that the injunction may cause to the State. *See Winter*, 555 U.S. at 20; *Valley*, 118 F.3d at 1050. Plaintiffs argue that the equities greatly favor an injunction, as there is no harm from issuing a preliminary injunction that prevents the enforcement of a likely unconstitutional state law. *See Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002).

The State counters that the balance of equities weighs against an injunction because it considers the alleged violations to Plaintiffs' constitutional rights to be "one[s] due to personal preference and geographical distance." (Resp. TRO, Dkt. 43, at 30). The Court disagrees. The harm to the State in returning to its previously planned voting procedures is minimal compared to the potential for loss of constitutional rights to Plaintiffs. An individual's constitutional rights are not submitted to state vote and may not depend on the outcome of state legislation or a state constitution, much less an executive proclamation issued on the eve of a national election. *See Barnette*, 319 U.S. at 638. Accordingly, the Court finds that the balance of equities favors an injunction.

44

4.     **Public Interest**

Injunctions preventing the violation of constitutional rights are "always in the public interest." *See Ingebretsen on behalf of Ingebretsen v. Jackson Public Sch. Dist.*, 88 F.3d 274, 280 (5th Cir. 1996) (holding that where a enactment is unconstitutional, "the public interest [is] not disserved by an injunction preventing its implementation"); *see also, e.g., G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071 (6th Cir. 1994) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights."); *Charles H. Wesley Educ. Fdn., Inc. v. Cox*, 408 F.3d 1349, 1355 (11th Cir. 2005) ("[The . . . cautious protection of the Plaintiffs' franchise-related rights is without question in the public interest.").

Courts generally consider the *Purcell* principle in the context of determining whether an injunction that changes a state election law serves the public interest. *See, e.g., Benisek v. Lamone*, 138 S. Ct. 1942, 1945 (2018); *League of Women Voters of United States v. Newby*, 838 F.3d 1, 13 (D.C. Cir. 2016); *Ne. Ohio Coal. for Homeless & Serv. Employees Int'l Union, Local 1199 v. Blackwell*, 467 F.3d 999, 1012 (6th Cir. 2006). Here, for the reasons discussed above, the *Purcell* principle does not apply. While the Court has considered the public interest in preventing confusion, it maintains that allowing the challenged provisions of the October 1 Order to remain in place causes greater confusion and impedes on the public's "strong interest in exercising the fundamental political right to vote." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006). That interest is best served by upholding enfranchisement and ensuring that qualified absentee voters, who comprise some of the most vulnerable citizens in Texas, can exercise their right to vote and have that vote counted.

Here, the public interest is not served by Texas's continued enforcement of a proclamation Plaintiffs have shown likely violates their fundamental right to vote. This factor therefore weighs in favor of a preliminary injunction.

IV.     CONCLUSION

For the reasons given above, **IT IS ORDERED** that Governor Abbott's Motion to Dismiss, (Dkt. 43), is **GRANTED IN PART and DENIED IN PART**. Plaintiffs' claims against Governor Abbott are **DISMISSED**.

**IT IS FURTHER ORDERED** that Governor Abbott's Motion to Dismiss, (1-20-cv-1015, Dkt. 27), is **GRANTED**.

**IT IS FURTHER ORDERED** that Secretary Hughs's Motion to Dismiss, (1-20-cv-1015, Dkt. 28), is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiffs' motions for a preliminary injunction, (Dkt. 15; Case No. 1:20-cv-1015, Dkt. 10-1), are **GRANTED**. Secretary Hughs, in her official capacity as Texas Secretary of State, Dana DeBeauvoir, in her official capacity as Travis County Clerk, Chris Hollins, in his official capacity as Harris County Clerk, John Oldham, in his official capacity as Fort Bend County Elections Administrator, and their officers, agents, servants, employees, attorneys, and those persons in active concert or participation with them who receive actual notice of this Order, are preliminarily **ENJOINED** from implementing or enforcing the following paragraph on page 3 of the October 1 Order:

> "(1) the voter delivers the marked mail ballot at a single early voting clerk's office location that is publicly designated by the early voting clerk for the return of marked mail ballots under Section 86.006(a-1) and this suspension;"

(1-20-cv-1015, Oct. 1 Proc., Dkt. 11-23).

**SIGNED** on October 9, 2020.

_____
ROBERT PITMAN
UNITED STATES DISTRICT JUDGE

46